**UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| VISUAL SEMICODUCTOR, INC. | Chapter 11 |
| | Bky No. 23-10763 (DJB) |
| Plaintiff | |
| | Adv. No. 25-00197 (DJB) |
| v. | |
| | **Jury Trial Demanded** |
| REMBRANDT 3D HOLDING, LTD.; | |
| STEPHEN K. BLUMENTHAL; STREAM | **Adversary Proceeding** |
| TV NETWORKS, INC.; WILLIAM A. | |
| HOMONY, IN HIS OFFICIAL CAPACITY | Claims for Relief: |
| AS TRUSTEE AND INDIVIDUALLY (AS | 1) Declaratory Judgment |
| *ULTRA VIRES*); SEECUBIC, INC.; | 2) Injunction |
| SHADRON L. STASTNEY; HAWK | 3) Breach of Contract (including |
| INVESTMENT HOLDINGS LIMITED; | Breach of Covenant of Good |
| ARTHUR LEONARD ROBERT | Faith and Fair Dealing) |
| MORTON; AND SEECUBIC B.V. | 4) Unjust Enrichment |
| | 5) Promissory Estoppel |
| Defendants | 6) Conversion |
| | 7) Violation of the Defend Trade |
| | Secrets Act ("DTSA") |
| | 8) Conspiracy/Aiding and Abetting |

## FIRST AMENDED ADVERSARY COMPLAINT

Plaintiff Visual Semiconductor, Inc., by and through its undersigned counsel, hereby files

this First Amended Adversary Complaint, and VSI avers:

**I.     THE PARTIES**

1.     Plaintiff, Visual Semiconductor, Inc.  ("VSI"), is a registered corporation

organized under the laws of Wyoming with an office address in Wyoming.  VSI is headquartered

in Pennsylvania.

2.     Defendant, Rembrandt 3D Holding, Ltd. ("Rembrandt") is a corporation

organized and existing under the laws of the Island of Nevis, West Indies with a registered

address in the West Indies.

3.      Defendant Stephen K. Blumenthal ("Blumenthal") is an individual residing in New York.

4.      Defendant Stream TV Networks, Inc. ("Stream"), a Delaware corporation, is instant debtor in these bankruptcy proceedings.

5.      Defendant William A. Homony ("Homony") is instant Chapter 11 trustee, sued both in his official capacity, and individually, as acting *ultra vires*.

6.      Defendant SeeCubic, Inc. ("SeeCubic") is a Delaware corporation with an office and headquarters in New York, NY.

7.      Defendant Shadron L. Stastney ("Stastney") is an individual who resides in New Jersey.

8.      Defendant Hawk Investment Holdings Limited ("Hawk") is an entity formed under the laws of Guernsey of the United Kingdom Channel Islands.

9.      Defendant Arthur Leonard Robert "Bob" Morton ("Morton") is a resident of Jersey of the United Kingdom Channel Islands.

10.     Defendant SeeCubic B.V. ("SCBV") is a limited liability company formed under the laws of the Netherlands.

## II.     JURISDICTION AND VENUE

11.     This court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different U.S. States and foreign countries, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

12.     This Honorable bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of reference of the United States District Court for the Eastern District of Pennsylvania.  Alternatively, this Court has original jurisdiction of the asserted federal law claims under the Defend Trade Secrets Act, 18 U.S.C. §

1836(c), federal question jurisdiction pursuant to 28 U.S.C. § 1331. This Court has supplemental

jurisdiction over the state law claims pursuant to 28 U.S.C. § 1357 and § 1367, which claims are

part of the same case or controversy, 18 U.S.C. § 1836.

13.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A), (H), (K), and (O).

14.     Venue is proper pursuant to 28 U.S.C. § 1409 because the adversary proceeding

arises in, and is related to, the above caption jointly administered bankruptcy estate pending in

the United States Bankruptcy Court of the Eastern District of Pennsylvania.

## III.     BACKGROUND OF THE PARTIES

15.     Plaintiff VSI was founded to develop and commercialize glasses-free holographic

display technology for use in commercial and consumer markets globally. VSI is a shareholder

of Stream and proposed to serve as sponsor for two plans of reorganization for Stream submitted

in these bankruptcy proceedings.

16.     Defendant Rembrandt engages in the development and commercialization of

advanced display technologies and is the owner of all of the assets of 3D Fusion Corp., a

Delaware corporation, and its wholly owned Dutch subsidiaries, 3D Fusion Holding B.V. and

3D Fusion EU B.V. in Eindhoven, the Netherlands. Rembrandt licensed its intellectual property

(the "Rembrandt IP"), including 3 patents and 175 trade secrets, to Stream in 2021.

17.     Defendant Stephen K. Blumenthal is the CEO and sole shareholder of Rembrandt.

18.     Defendant Stream TV Networks, Inc. is a Delaware corporation and instant

debtor. Its assets, including its trademarked Ultra-D™ technology, were sold in December 2024

in a contested § 363 Sale.

19.     Defendant Homony is the Chapter 11 trustee for the bankruptcy estates of Stream

and non-party, Technovative Media, Inc. ("Technovative"). With the aid of his advisors,

Homony orchestrated the § 363 sale of the assets of Stream and Technovative. Homony is also a defendant in litigation in which Rembrandt alleged patent infringement and misappropriation of trade secrets.

20.     Defendant SeeCubic was founded by Defendants Stastney and Morton in June 2020 for the purpose of receiving the assets and intellectual property of Stream pursuant to a settlement agreement that was later invalidated by the Delaware Supreme Court in June 2022. Notwithstanding that reversal, SeeCubic acquired title to the Stream assets through the Homony-brokered § 363 sale.

21.     Defendant Stastney was a senior investor and lender of Stream and was also its chief financial officer and vice chairman of its board of directors. Upon information and belief, Stastney is a chief executive of SeeCubic. Stastney settled SEC charges regarding breaches of fiduciary duty in unrelated investments in September 2013, barring Stastney from investment and advisory work for 18 months.[1]

22.     Defendant Hawk is the alter ego of Defendant Morton. Upon information and belief, Morton owns and/or controls Hawk through entities owned and controlled by him, including Albany Directors Ltd.  Hawk was Stream's largest secured creditor before transferring its debt to SeeCubic. The UK Financial Conduct Authority banned all UK banks and brokers from participating in any take-over activity in which Defendant Morton is involved, a dramatic sanction known as "Cold Shouldering."[2]

---

[1] Stastney settled a set of SEC charges regarding breaches of fiduciary duty in unrelated investments in September 2013. The settlement *inter alia* barred Stastney from investment advisory work for 18 months. The SEC settlement is public record. *In the Matter of Shadron L. Stastney*, United States Security and Exchange Comm. Admin. File No. 3-15500, Release Nos. 3671, 30689 (Sept. 18, 2013), published at https://www.sec.gov/litigation/admin/2013/ia-3671.pdf.

[2] The Cold Shoulder is the colloquial "death penalty" sanction for UK investment managers, because it establishes both criminal and civil abetting liability for any other regulated entity who deals with the recipient of the sanction. The committee that punished Morton found that he systematically lied, had invented an agreement to try to hide his malfeasance, and had engaged in egregious misconduct. Barred from acquisition activity in the United Kingdom, Morton chose to take his show on the road by joining Stastney in similar misconduct in the US.

## IV.    OPERATIVE FACTS

### A.  Homony's Infringement of Rembrandt's Intellectual Property.

23.    As detailed below, Stream's Ultra-D™ technology assets incorporate certain Rembrandt IP. That Rembrandt IP was not removed or returned by Homony before he sold Stream's assets to SeeCubic in accordance with a settlement agreement between Stream as the debtor, Hawk as the collateral agent for Stream's purported secured creditors, and SeeCubic as the stalking horse bidder approved by Homony (the "SeeCubic 9019 Settlement").

24.    Rembrandt made its intellectual property claims clear to Homony and this Court on multiple occasions: (a) in Rembrandt's opposition to the SeeCubic 9019 Settlement,[3] (b) in Rembrandt's opposition to the § 363 Sale bidding procedures,[4] (c) in Rembrandt's Adversary Complaint filed in this Court against Homony,[5] and (d) in Rembrandt's opposition to the § 363 Sale itself.[6] In the first two instances, Rembrandt was advised by the Court that it would be entitled to make its argument at a later date. The Adversary Complaint was given no consideration by the Court at all. Ultimately, the Court approved the § 363 Sale with the caveat that Rembrandt would retain the right to pursue litigation against SeeCubic as the purchaser of the Stream assets. There was no acknowledgement by the Court that Homony had no legal right to sell assets that did not belong to the estate, particularly intellectual property assets of a third party.

### B.  The LFCA Contract and Subsequent Amendments.

25.    With Homony committed to conducting a § 363 Sale of Stream's assets despite infringement warnings from Rembrandt, it became clear to VSI and Rembrandt that they had a

---

[3] ECF No. 643
[4] ECF No. 789
[5] Adversary Case No. 24-00142 (DJB)
[6] ECF Nos. 816 and 871

common interest in preventing the unlawful transfer of Stream's assets to an unlicensed party like SeeCubic, and in protecting Stream's other parties in interest from the reckless actions of Homony.

26.     Rembrandt lacked the financial resources necessary to file (a) objections to the § 363 Sale, (b) appeals to the higher court related to the SeeCubic 9019 Settlement, the § 363 bidding procedures, and the § 363 Sale, and (c) federal litigation against Homony and his advisors seeking damages for patent infringement and trade secret misappropriation.

27.     VSI agreed to provide litigation funding to Rembrandt to pursue legal options in various venues. On November 5, 2024, Rembrandt and VSI entered into a Litigation Funding and Confirmation Agreement (the "LFCA"), whereby VSI would provide litigation funding to Rembrandt and receive certain considerations in return, including the right to guide litigation strategy. Pursuant to the agreement, litigation funding was paid by VSI to (a) Blumenthal directly for Rembrandt's benefit and (b) to Brown & Michaels PC, counsel to Rembrandt. The LFCA was signed by Blumenthal as CEO of Rembrandt. A true and correct copy of the LFCA is attached hereto as **Exhibit A**.

28.     When it became clear that the imminent § 363 Sale would result in additional legal expenses for Rembrandt, Rembrandt and VSI amended the LFCA ("LFCA Amendment #1") on November 20, 2024 to increase VSI's financial support. LFCA Amendment #1 increased the amount of weekly litigation funding by VSI and also stipulated that VSI counsel would draft initial documents for Rembrandt review and subsequent filing, thereby reducing direct litigation costs to Rembrandt. Pursuant to LFCA Amendment #1, litigation funding was paid by VSI to (a) Blumenthal directly for Rembrandt's benefit and (b) to Brown & Michaels PC, counsel to Rembrandt. LFCA Amendment #1 was signed by Blumenthal as CEO of Rembrandt. A true and correct copy of LFCA Amendment #1 is attached hereto as **Exhibit B**.

29.    As an alternative to Homony's proposed asset sale, VSI filed a disclosure statement and accompanying plan of reorganization for which it would serve as sponsor and provide approximately $185 million in reorganization funding. The proposed plan would provide recoveries for not only Hawk and SeeCubic, but for all of Stream's unsecured creditors as well. The plan was filed on December 3, 2024 but never received consideration from the Court, whose attention was focused on the § 363 Sale, which was approved on December 9, 2024.

30.    On December 30, 2024, as Rembrandt prepared for multiple appeals and other litigation related to the intellectual property infringement of Homony, SeeCubic, and Hawk, VSI and Rembrandt amended the LFCA a second time ("LFCA Amendment #2"). LFCA Amendment #2 not only adjusted the amount of VSI financial support again, but it also changed the payment directions so that all litigation funding was paid by VSI directly to Blumenthal for allocation at Rembrandt's sole discretion. LFCA Amendment #2 was signed by Blumenthal as CEO of Rembrandt. A true and correct copy of LFCA Amendment #2 is attached hereto as **Exhibit C**.

31.    In essence, the LFCA, along with its two amendments, provided that Rembrandt would work exclusively with VSI in connection with the pending litigation against SeeCubic, Stastney, and Homony, with the shared goal of recovering technology wrongfully transferred from Stream.

32.    VSI made litigation funding payments of Two Hundred Seventy-Thousand Five Hundred U.S. Dollars (USD $270,500.00) to Rembrandt and its counsel pursuant to the LFCA, LFCA Amendment #1, and LFCA Amendment #2. Additionally, VSI paid its own counsel, Akerman LLP, hundreds of thousands of dollars to draft and review documents for Rembrandt's benefit, bringing the likely total expended by VSI for Rembrandt litigation to nearly $1 million. VSI made these payments with the reasonable expectation that Rembrandt would adhere to

mutually agreed litigation strategy and seek VSI pre-approval before negotiating any settlement.

True and correct copies of wire transfer payments made by VSI pursuant to the LFCA and its

amendments are attached hereto as **Exhibit D**.

33.    In pertinent part, LFCA Amendment #2 states:

> Notwithstanding anything to the contrary in the LFCA, the Amendment
> or this Amendment #2, Rembrandt shall not propose or agree to any
> settlement in the Legal Actions without VSI's prior written consent and
> approval.[7]

34.    Rembrandt did not have the authority to conduct settlement negotiations or enter

into any settlement agreement without the express pre-approval of VSI, which was neither

consulted nor solicited by Rembrandt.

35.    Had Rembrandt done so, VSI would not have approved of the settlement terms for

various reasons, not the least of which is Homony's dereliction of his responsibility to provide

Rembrandt with access to the Ultra-D technology as partial compensation for rejecting the May

23, 2021 Rembrandt Settlement as defined below. Homony put the onus on Rembrandt to secure

such access from SeeCubic, a party which (a) unlawfully seized Stream's assets in December

2020, (b) refused to return them following the Delaware Supreme Court decision in June 2022,

(c) was held in contempt by the Delaware Court of Chancery in October 2022, (d) violated a

TRO of this Court on multiple occasions in 2024, (e) was weeks late in making the nominal

payment for the Stream assets purchased in the § 363 Sale, and (f) has now failed to honor its

indemnity obligations to Homony and Stream.

36.    With a history like that – and with executives and key shareholders who have

been fined by the Securities and Exchange Commission and exiled by the UK Financial Conduct

Authority – SeeCubic cannot be expected to honor any commitment made by Homony on its

---

[7] LFCA Amendment #2 at ¶ E(5)

behalf. Rembrandt's right to access the Ultra-D technology as partial compensation for rejection

of the Rembrandt Settlement is important to VSI because such partial compensation belongs to

VSI pursuant to LFCA Amendment #2, which states:

> In the event that Rembrandt succeeds in obtaining ownership of or access
> to the Stream Ultra-D technology, Rembrandt shall immediately transfer
> the entirety of such ownership or access to VSI as partial consideration for
> the litigation funding provided hereunder.[8]

37.     VSI did not provide its pre-approval for Rembrandt to negotiate settlement terms,

nor has it approved of the Rembrandt 9019 Settlement terms agreed between Rembrandt and

Homony. VSI has filed or will file its objection to Homony's motion seeking Court approval of

the Rembrandt 9019 Settlement.

38.     The background information which follows describes (a) the relationship of the

Rembrandt intellectual property to the Ultra-D technology, (b) an overview of the litigation and

settlements between Rembrandt and Stream, (c) attempts and actions by Defendants Stastney,

Morton, SeeCubic, and Hawk to seize Stream's assets, including control of Stream's

international subsidiaries during the pendency of these bankruptcy proceedings, (d) Stream's

bankruptcy history, including prior dismissals and TRO against Defendants Stastney, Morton,

SeeCubic, and Hawk, and others, (e) and various actions by Homony to collude with the other

Defendants and defraud the Court.

**C. The Stream Technology and its Dependence on Third-Party Intellectual Property of
    Philips and Rembrandt**

39.     Stream's Ultra-D solution was built on a foundation of technology that Stream

licensed from Koninklijke Philips N.V. ("Philips") on a non-exclusive, not-transferable, non-

sublicensable basis in 2011. Stream negotiated and paid for the Philips license, which is held by

---

Ultra-D Ventures, C.V., a Curacao company that was formerly a subsidiary of Stream but is now

owned by SeeCubic following the § 363 Sale of Stream's assets.

40.    Certain engineers employed by Stream through its Netherlands subsidiary, SCBV

had previously worked for Blumenthal, founder and CEO of Rembrandt. During their work-for-

hire period, these Stream engineers developed improvements to the Philips technology using a

Philips license obtained by Blumenthal. After joining Stream at its subsidiary SCBV in 2011,

these engineers incorporated trade secrets and other confidential information developed with

Blumenthal into the Ultra-D solution for the benefit of Stream. Stream's executives were

unaware that their R&D engineers had accessed or wrongfully appropriated third-party

intellectual property until Rembrandt filed a complaint against Stream in 2017 in the Supreme

Court of the State of New York (the "Rembrandt Lawsuit").

**D.  The Rembrandt Lawsuit and the Mediated Stastney-Rembrandt Term Sheet.**

41.    While attending the Consumer Electronics Show in Las Vegas, NV in January

2017 to promote Ultra-D, Stream's management and key engineers were served with the

Rembrandt Lawsuit. Stream's engineers denied any wrongdoing to Stream management; some of

them admitted they had previously worked with Blumenthal to improve the Philips technology

but explicitly denied that they had wrongfully used any proprietary information or were bound

by non-disclosure or confidentiality documents. Other Stream engineers denied even knowing

Blumenthal, a claim that would later be proved false.

42.    Based on the representations of its engineers, Stream defended itself against the

Rembrandt Lawsuit, which was later removed from the Supreme Court of the State of New York

to the U.S. District Court for the Southern District of New York for procedural reasons.  The

litigation continued for approximately two years.

43.     Rembrandt and Stream were ordered into mediation under the supervision of

Magistrate Katharine H. Parker. After unfruitful attempts at settlement, Magistrate Parker

ordered each party to send representatives with authority to bind their respective companies to a

settlement. Blumenthal participated on behalf of Rembrandt. Stastney volunteered to represent

Stream as its Vice Chairman and CFO.

44.     Presented with irrefutable evidence that Stream's engineers had, in fact, executed

non-disclosure agreements and had shared detailed and proprietary technical information with

Blumenthal during their work-for-hire period, Stastney capitulated to Rembrandt's demands for a

generous settlement. On April 9, 2019, the settlement was memorialized in a term sheet (the

"Stastney-Rembrandt Term Sheet") signed by Stastney, Blumenthal, and Magistrate Parker

herself. A true and correct copy of the Stastney-Rembrandt Term Sheet is attached hereto as

**Exhibit E**.

45.     The Stastney-Rembrandt Term Sheet contained the following key provisions:

a.  Stream would pay Rembrandt more than $5 million, paid out in monthly

installments over approximately ten (10) years;

b.  Stream would provide Rembrandt with more than three (3) million televisions

(or similar products) at cost so that Rembrandt could retain the retail margin,

estimated at $400 per unit for a total value of USD $1.2 billion;

c.  Rembrandt would grant Stream a non-exclusive license to the Rembrandt IP;

and

d.  Stream would grant Rembrandt a non-exclusive license to the Ultra-D

technology, to be used in the event that Stream was ultimately unable to

provide the three (3) million televisions as required.

**F.  The Rembrandt Settlement Between Stream and Rembrandt.**

46.     At the time the Stastney-Rembrandt Term Sheet was executed – and for nearly two years afterward – Stream management was unaware of the incriminating evidence Rembrandt had provided to Stastney. It was not until 2021 that they would learn (a) many of Stream's engineers, including some who claimed they did not even know Blumenthal, had signed non-disclosure agreements, (b) Blumenthal had meeting minutes for at least 45 separate engineering meetings with Stream's personnel, (c) Blumenthal possessed significant portions of computer code that predated the formation of SCBV and was used by Stream's engineers in the Ultra-D solution, and (d) Blumenthal's claims extended beyond the three Rembrandt patents to include 175 trade secrets (the "Rembrandt Trade Secrets").

47.     Stream management disputed the validity of the Stastney-Rembrandt Term Sheet for two years, believing Stastney had agreed to an overly generous settlement to increase his chances of foreclosing on Stream as a secured creditor. Rembrandt sought to enforce the Stastney-Rembrandt Term Sheet or resume litigation, but its case against Stream was stayed by Stream's February 2021 bankruptcy filing. Rembrandt approached Stream to renew settlement discussions in May 2021, making it clear that Rembrandt intended to file a USD $1.2 billion claim in the Stream bankruptcy if a settlement could not be finalized.

48.     It was clear to Stream management that a settlement to avoid a USD $1.2 billion claim was in the best interest of Stream and its stakeholders. Stream and Rembrandt negotiated the terms of a longform agreement that mirrored the terms of the Stastney-Rembrandt Term Sheet. Final points were discussed and incorporated into a document that the parties intended to submit to the Bankruptcy Court for approval.

49.     Before Stream and Rembrandt were able to finalize the longform agreement, the Bankruptcy Court dismissed Stream's Chapter 11 case on May 17, 2021. The Bankruptcy Court

dismissal did not diminish Stream's desire to settle the 4-year-old litigation, however, and the parties completed their negotiations and executed a settlement agreement on May 23, 2021 (the "Rembrandt Settlement"). A true and correct copy of the Rembrandt Settlement is attached hereto as **Exhibit F**.

**G.  The Homony Adversary Complaint Against Rembrandt and VSI.**

50.     On April 30, 2025, Homony filed an adversary complaint against Plaintiffs Rajan and VSI, Rembrandt and Rembrandt's counsel, and Raja Rajan, challenging Rembrandt's bankruptcy claims (the "Homony Complaint") in these bankruptcy cases.  The Homony Complaint described the Rembrandt Settlement as a "sham" requiring Stream "to manufacture and provide to Rembrandt knowingly unattainable quantities of products deploying so-called 'Ultra-D' technology in 4K and 8K along with illusory rights of first refusal to purchase more than 3 million units of such products."  A true and correct copy of the Homony Complaint is attached hereto as **Exhibit G**.

51.     The quantity of products was not "knowingly unattainable" as alleged by Homony, who has never operated a company, has no manufacturing experience, and has absolutely no knowledge of Stream's optical bonding equipment (the "Bonding Equipment") or its capabilities. Homony made no attempt to secure the return of Stream's Bonding Equipment, which had already produced thousands of units in mass production and is capable of producing more than 200,000 units per year. The quantities were also not "knowingly unattainable" because the number of monthly units to be delivered by Stream was less than 50% of the capacity of a single bonding machine. Homony remained willfully ignorant of Stream's production capabilities, making no inquiries of Stream's management, its operational personnel, or its manufacturing team in Asia regarding Stream's past or present abilities to satisfy the Rembrandt requirement.

52.     Homony made his baseless allegation despite being informed by Mathu Rajan more than a year earlier that Stream had maintained its business relationship with the manufacturer of the Bonding Equipment and had made arrangements to establish a bonding facility with a strategic partner able to accommodate additional bonding machines for expanded production.  Homony did nothing to obtain the return of the Bonding Equipment or deploy it with this strategic partner for the benefit of the Debtors' estates, and his misguided and unfounded allegations now are disingenuous at best.

53.     The Homony Complaint refers to Rembrandt's right of first refusal to purchase inventory at cost as "illusory" without any explanation as to why such rights are not firm and proper. Pursuant to the 6(B)(2) of the Rembrandt Settlement, Stream is merely obligated to provide Rembrandt with the right to purchase units when and if production commences. Furthermore, Stream is not required to pay for such products; it need only make them available to Rembrandt on commercial terms similar to any other customer, with Rembrandt required to "meet the financial and volume requirements of Stream" in order to exercise its purchase rights.

54.     The Homony Complaint also describes Stream's obligation "to make knowingly unattainable monetary payments," but Homony alleges this without even a basic understanding of the unit economics in Stream's production planning and financial forecasting. For someone with no experience such as Homony, the obligation might seem burdensome, but both Rembrandt and Stream entered into the Rembrandt Settlement with the expectation that Stream would regain title to and possession of its assets for commencement of production. Stream maintained relationships with multiple consumer brands anxiously awaiting Stream's ability to manufacture glasses-free 3D products once again. Monthly payments to Rembrandt increasing from $28,000 to $40,000 over a nearly 10-year period is not remotely "unattainable" for any business with as many commercial opportunities as Stream had at the time.

55.     Lastly, the Rembrandt Settlement afforded Stream two critical benefits: (a) Stream no longer needed to incur the time and expense of ongoing litigation with Rembrandt because the existing disputes were fully resolved, and (b) Stream obtained a license to Rembrandt's intellectual property, ensuring that it could proceed with product development and sales without concern about future infringement claims.

56.     The Homony Complaint also cites the fact that Rembrandt did not declare a default against Stream, cancel the license, or seek to claw back its technology as supposed proof that the Rembrandt Settlement is a sham. Rembrandt, having worked in the glasses-free 3D technology industry for more than fifteen (15) years, understands the sizeable opportunities available to Stream, and it has had a front-row seat to the unlawful seizure of Stream's assets and Stream's subsequent difficulties in re-establishing operations. A patient licensor willing to give its licensee time and room to recover from injustice, while retaining a business upside it valued at more than $1 billion, is hardly proof of anything other than Rembrandt's desire to monetize its technology through Stream's eventual success.

**H.  The Continuous Attempts by Stream's Alleged Secured Creditors to Seize Stream's Assets.**

57.     On March 26, 2020, Stream's senior secured lender, SLS Holdings VI, LLC ("SLS"), with Stastney as its managing member, filed a complaint in Delaware Superior Court seeking to foreclose on all the assets of Stream pursuant to security agreements pledging Stream's assets as collateral for loans provided by SLS. The trial judge estimated a hearing date of June 2021, fourteen (14) months later. That case has languished for more than five (5) years without pursuit by Stastney or SLS.

58.     Unable to obtain Stream's assets through a quick foreclosure, Stastney colluded with three of Stream's directors – Kevin Gollop ("Gollop"), Asaf Gola ("Gola"), and Krzyzstof Kabacinski ("Kabacinski") – in early May 2020 to establish a debt resolution committee and

enter into a Rembrandt Settlement (the "Omnibus Agreement") whereby all of Stream's assets would be transferred to Stastney's "NewCo" (SeeCubic) while leaving Stream's debt behind. The Omnibus Agreement also impermissibly gave preferential treatment to certain Stream shareholders over the founding shareholders. Stream's management denied the validity of the Omnibus Agreement, as it violated the company's charter prohibiting transfer of the assets without approval of Stream's Class B Voting shareholders. Ultimately, on June 15, 2022, the Delaware Supreme Court agreed with Mathu Rajan and Stream, determining in a unanimous *en banc* opinion that Stastney's scheme to seize Stream's assets via the Omnibus Agreement was void *ab initio* and mandating that Vice Chancellor Laster's Chancery Court ruling be vacated and reversed.

59.     In the current Bankruptcy Case, Stastney made his third attempt to obtain Stream's assets, this time convincing Homony in May 2024 to allow a $180 million claim for SeeCubic's collection agent, Hawk, despite hundreds of documents evidencing Stream's satisfactory conversion of the Hawk debt (or at least the vast majority of such debt) to equity pursuant to debt-to-equity conversion agreements signed by Hawk in 2018. The global settlement agreed between Homony, SeeCubic, and Hawk outlined the terms for a sale of Stream's assets pursuant to § 363 of the Bankruptcy Code, with Stastney's SeeCubic as the designated stalking horse bidder.

**I.  SeeCubic's Seizure of Stream's Assets and Failure to Return Them.**

60.     The seizure of Stream's assets actually began in March 2020. Stastney began seizing Stream's assets immediately upon filing his foreclosure action, notifying the third-party custodian of Stream's Silicon Valley computer servers (on which its valuable production source code was stored), that he "had foreclosed" as was now the new owner of those assets. He presented a filed copy of his non-adjudicated Superior Court complaint as supposed proof of his

ownership and convinced the unsuspecting vendor to block Stream's access to its own computers and transfer control of them to Stastney's representatives.

61.     Later, while Stream management contested the validity of the Omnibus Agreement, Stastney and his conspirators continued their mission to seize Stream's assets. On August 24, 2020, despite being removed as Stream directors three months earlier, Gollop and Gola executed a delegation of authority on Stream letterhead purporting to empower a third party to act on behalf of Stream in its China operations for the purpose of transferring Stream's Bonding Equipment to SeeCubic. Days later, Kabacinski sent threatening communications to the CEO of Stream's R&D subsidiary, SCBV, related to inventory shipments, alleging fraud and other crimes by those who acted contrary to the (later invalidated) Omnibus Agreement. Kabacinski was clearly trying to assume control of SCBV through thuggish intimidation.

62.     On September 8, 2020, Stream sought injunctive relief from the Delaware Court of Chancery to prevent Stastney and SeeCubic from continuing their efforts to seize Stream's assets.  After three months of discovery and hearings, Vice Chancellor Laster issued a Preliminary Injunction Order which prohibited Stream and Mathu Rajan from interfering with implementation of the Omnibus Agreement. Immediately following, Stream surrendered its remaining assets to SeeCubic.

63.     On November 10, 2021, eleven months later, the Delaware Chancery Court issued a partial final judgment against Stream, confirming its preliminary validation of the Omnibus Agreement. Stream appealed the decision to the Delaware Supreme Court, which sat *en banc* to hear oral arguments in April 2022 and issued a unanimous 5-0 opinion on June 15, 2022 that vacated and reversed the lower court ruling and remanded the case to Vice Chancellor Laster to unwind the effects of his poor and improper decision.

64.    Despite the mandate from the Delaware Supreme Court, SeeCubic argued that it should not have to return assets that had been "improved" while SeeCubic exercised control over them for prior eighteen months. When Vice Chancellor Laster ordered the assets returned anyway (with the caveat that SeeCubic could pursue unjust enrichment claims at a later date), Hawk engaged SSG Advisors LLC ("SSG") to sell the assets in a UCC Article 9 sale rather than return them to Stream. SeeCubic, Hawk, and SSG set a sale date and prepared to market the assets in pursuit of the Article 9 sale, which was stopped when Stream was granted injunctive relief.

65.    Although the Article 9 sale was averted, SeeCubic refused to surrender critical Stream assets, including technology demonstrators, the Bonding Equipment, and control of Stream's subsidiaries. After several months of legal gamesmanship, SeeCubic was specifically ordered to surrender control of Stream's subsidiaries by transferring ownership of the Technovative, Inc. stock shares to Stream. Rather than comply, Stastney, SeeCubic and Hawk executed a scheme which transferred the shares to Stream for mere minutes before Hawk exercised purported proxy rights to seize control (not ownership) of those shares and appoint Stastney the new director of Technovative, Inc., thereby maintaining the illegal status quo. Vice Chancellor Laster was not fooled by the maneuver and found Stastney, SeeCubic, and Hawk in contempt of court. Despite holding them in contempt, Vice Chancellor Laster imposed no sanctions and gave Stastney, SeeCubic and Hawk the green light to seize the shareholdings only two weeks later. Vice Chancellor Laster never made any meaningful attempt to undo the damage his improper ruling had caused – as mandated by the Delaware Supreme Court.

66.    As Stream continued to seek the return of its assets, Hawk initiated new litigation to confirm its right to control Technovative, Inc. (and all of Stream's other subsidiaries which held the valuable Ultra-D IP).  Rather than make Stream whole, Vice Chancellor Laster issued a

Status Quo Order that froze all assets in place, which meant SeeCubic was allowed to continue

its unlawful possession of Stream's assets. A receiver pendente lite was appointed to manage

Technovative, Inc. and Stream's other subsidiaries. Under the receiver's management of

Technovative, Inc., SCBV supported SeeCubic projects using Stream's Ultra-D technology and

the foundational technologies of both Philips and Rembrandt even though both third-party

licenses were to be used solely for the benefit of Stream and were non-transferable, non-

assignable, and explicitly prohibited sub-licensing.

67.     Stream's inability to secure the return of its assets continued into the current

bankruptcy cases. With the reasonable expectation that Chapter 11 afforded rights and

protections it had not been able to obtain outside of bankruptcy, Stream filed a motion on April

5, 2023 seeking turnover of its assets from SeeCubic (the "Turnover Motion").  Because

SeeCubic and Hawk consumed the Court schedule with endless motions practice in an effort to

derail Stream's bankruptcy, the Turnover Motion was held in abeyance for many months.

68.     On August 12, 2023, Stream filed an adversary complaint against Stastney,

SeeCubic, Hawk and other defendants.  The complaint, which was yet another formal attempt to

seek turnover of estate assets, also sought injunctive relief, determination of lender liability,

equitable subordination or disallowance of the Hawk, SeeCubic, and SLS claims, and damages

for breach of fiduciary duty, tortious interference, fraudulent conveyance, and misappropriation

of trade secrets.

69.     Mathu Rajan, who had been hospitalized for several months, testified in August

2023, confirming to Judge Coleman that Stream had filed the Turnover Motion shortly after the

petition date, and that the new adversary case was continuing that turnover pursuit, among other

objectives. In December 2023, eight months after Stream first sought turnover of estate property

in these bankruptcy cases, Judge Coleman admitted that the Turnover Motion had been

overlooked; she blamed her staff for the oversight but did nothing to rule on or rectify the situation. Instead, she appointed Homony shortly thereafter.

**J.  Stream's First Chapter 11 Bankruptcy was not a Bad Faith Filing.**

70.     There is no question that Stream was in financial distress when it filed for Chapter 11 protection on February 24, 2021. The Omnibus Agreement signed by Gollop and Gola (on behalf of Stream), Stastney (on behalf of SLS), Hawk, and others purported to transfer all of Stream's assets to SeeCubic while leaving more than $16 million in trade debt at Stream. The preliminary injunction order issued by the Chancery Court on December 8, 2020 prohibited Stream from interfering with the Omnibus Agreement, and by the beginning of 2021, Stream had a mountain of debt and few assets and operations with which to service the debt.

71.     In the 2021 bankruptcy, Stream attempted to have the Omnibus Agreement rejected as an executory contract, arguing that (a) Stream had not yet transferred all the assets as required under the contract and (b) SeeCubic had neither issued stock to Stream as payment for the assets nor withdrawn litigation that the Omnibus Agreement was intended to resolve. The Omnibus Agreement was executory by definition, but the Court refused to allow Stream to challenge what was only a preliminary ruling made by a state court. In fact, during the initial 341 conference, Judge Owens made it clear she did not expect and would not tolerate any Stream personnel challenging the validity of the Omnibus Agreement in her court.

72.     While it is true that Stream's 2021 Chapter 11 case was ultimately dismissed as a bad faith filing, Judge Owens ordered so because Stream attempted to use its legal rights as a debtor in bankruptcy to challenge the legality of an incredibly damaging and unlawful settlement – a challenge ultimately justified by the Delaware Supreme Court in June 2022 when the Omnibus Agreement was unanimously determined to be void *ab initio*. Had the Bankruptcy Court in that Chapter 11 case openly examined the agreement rather than blindly adopting a

20

preliminary ruling from a state court, it might have reached the same conclusion as the Delaware

Supreme Court, allowing Stream to reject the Omnibus Agreement and move forward with a

reorganization plan it never had a chance to file.

**K. Stream's Chapter 7 Bankruptcy Filing.**

73.     Rembrandt believed that its best chance to see a recovery from Stream pursuant to

the Rembrandt Settlement was to force Stream into an involuntary bankruptcy. Accordingly, it

joined with two fellow creditors and initiated the Chapter 7 case.  Stream argued that it should be

allowed to reorganize rather than be subjected to dissolution, but the short-lived case was

dismissed on June 10, 2021, a mere two weeks after the initial filing.

74.     Bankruptcy Judge Owens stated in the June 10, 2021 hearing, "I thought I made

myself clear when I dismissed the Chapter 11 case that I did not expect to see another case until

the Chancery Court action was completed and the transfers to SeeCubic were accomplished."

Again, her position was clear; she did not want to challenge Vice Chancellor Laster, she

expected Stream to surrender all its assets pursuant to what would later be confirmed as an

invalid agreement, and she was unwilling to entertain argument from Stream or any of its

stakeholders. Stream was barred from filing any bankruptcy action for a period of at least one

year, and not before the Chancery Court action was concluded.

75.     The fact that the Delaware Supreme Court, sitting *en banc*, issued a unanimous

5-0 ruling that the Omnibus Agreement was invalid because it violated Stream's charter proves

that not only were Bankruptcy Judge Owens' dismissals improper, but her rulings were also

misguided and without merit. Judge Owens could easily have allowed Stream to reject the

Omnibus Agreement as an executory contract; it was within her authority under basic bankruptcy

law. She could have saved Stream millions of dollars if she had allowed Stream to reorganize in

2021 rather than forcing to it complete the Chancery Court case, appeal and prevail in the

Delaware Supreme Court, then spend an additional nine months of litigation trying unsuccessfully to get the Chancery Court to properly unwind the damage it had done with its improvident ruling as mandated by the high court.

76.     If Homony, as the court-appointed manager of Stream, had done any due diligence to understand the history of Stream's litigation during the eighteen months he has held his position, he would know that casting aspersions at Mathu Rajan as a habitual bad faith filer is unjustified and rings hollow.

**L.  Invalidation of the Omnibus Agreement by the Delaware Supreme Court.**

77.     Vice Chancellor Laster issued a partial final judgment favoring SeeCubic on November 10, 2021 followed by a December 8, 2021 Memorandum Opinion supporting his decision.  In that Opinion, he reaffirmed his reliance on *Butler v. New Keystone Copper Co.*[9] and stated that "Delaware law recognized these common law principles, including the existence of exceptions to the common law requirement of unanimous stockholder approval." Besides relying on a 100-year-old precedent that pre-dated the Delaware General Corporate Law governing all modern litigation, he also made an expansive interpretation of the precedent to suit his needs. Whereas, the 1915 Butler case ruled that unanimous stockholder approval was not required to transfer the assets from an unprofitable company, Vice Chancellor Laster ruled that no stockholder approval was required to transfer assets from an insolvent company, even if the company's charter required it. He further cited two archaic treatises: *A Treatise on the Law of Corporations* by William W. Cook (1908) and *Commentaries on the Law of Private Corporations* by Seymour D. Thompson & Joseph W. Thompson (1909). Vice Chancellor Laster's interpretation was not only wrong, it was deliberate; Stream's charter was thrown out the window by a judge creating legislation from the bench.

---

[9] 93 A. 380, 10 Del. Ch. 371, 1915 Del. Ch.

78.    Stream successfully appealed the decision to the Delaware Supreme Court, which

VACATED, REVERSED, and REMANDED the case to the Chancery Court to unwind the

damages that Stream had incurred. Despite a mandate from the high court that VACATED his

ruling, Vice Chancellor Laster continued to rely on certain of its aspects, allowing Stastney,

SeeCubic, and Hawk to make improper collateral estoppel claims, which they also continued to

make in these bankruptcy cases. The Third Circuit, in its November 3, 2022 Opinion on an

appeal by Mathu Rajan, stated:

> The test for applying the collateral estoppel doctrine requires that (1) a
> question of fact essential to the judgment (2) be litigated (3) determined
> (4) by a valid and final judgment [*M.G. Bancorporation, Inc. v. Le Beau*,
> 737 A.2d 513, 520 (Del. 1999].
>
> The Delaware Supreme Court vacated the permanent injunction against
> Rajan and Stream, reversed the judgment declaring the Omnibus
> Agreement valid, and remanded to the Chancery Court for further
> proceedings … [A] bedrock principle of preclusion law has been that a
> reversed judgment cannot support preclusion; …an initial reliance on
> preclusion must be reversed once the underlying judgment is reversed.

79.    The Third Circuit Opinion also cited a Sixth Circuit ruling: "Where the prior

judgment, or any part thereof, relied upon by a subsequent court has been reversed, the defense

of collateral estoppel evaporates."

80.    For nine months, Stream made every effort to regain possession and title of its

assets but got little assistance from the Chancery Court. SeeCubic was allowed to retain control

of demonstrator samples, business records, the Bonding Equipment, and Stream's international

technology center and engineers. SeeCubic made every conceivable argument why it should not

have to return Stream's assets, even finding itself in contempt of court at one point for its

collusive behavior.

**M. Stream's Second Chapter 11 Bankruptcy Filing and its Plan of Reorganization.**

81.      Finally, on March 15, 2023, Stream filed for Chapter 11 bankruptcy protection
with the hopes and expectation that the Bankruptcy Court would grant and enforce turnover of
the Debtors' property. With the prospect of real reorganization and the return of its assets,
Stream was able to secure $138.6 million in new customer purchase orders on which to rebuild
its dormant business.

82.      Unfortunately, SeeCubic and its allies monopolized the Court's attention and
Stream's resources with a motion to dismiss and other motions fighting Stream at every step.
Stream's Turnover Motion was ignored by this Court for nine months, getting only a brief
apology from Judge Coleman in December when she acknowledged that somehow her staff had
let the motion slip through the cracks. There was no legal rationale for Judge Coleman not to
order the turnover of estate assets by SeeCubic, yet even after leaving the Turnover Motion in
abeyance for eight months, she took no action to correct her mistake.

83.      Despite not receiving its assets through the Turnover Motion, Stream nevertheless
worked to develop and propose a Plan of Reorganization (the "Stream POR"). To ensure the
Stream POR had the best chance for both Court confirmation and practical success, Stream
obtained the support of Rembrandt as a proponent and secured a $35 million commitment from
VSI as plan sponsor. A Disclosure Statement and the Stream POR were filed with the Court on
July 13, 2023.[10]

**N.  The Rembrandt Amendment between Stream and Rembrandt.**

84.      While drafting the Stream POR, Stream and Rembrandt began negotiations to
amend certain terms of the Rembrandt Settlement. Over the course of the following month, the
parties reached agreement on an amendment (the "Rembrandt Amendment"), which was

---

[10] Docket No. 293

executed by Stream and Rembrandt on August 12, 2023. Notably, all past due cash payments were reset to a schedule tied to confirmation of the Stream POR, to which Rembrandt served as a plan proponent. Nothing in the Rembrandt Amendment created new or additional obligations for Stream, and all terms tracked with the proposed Stream POR. A true and correct copy of the Rembrandt Amendment is attached hereto as **Exhibit H**.

85.    The Homony Complaint implies that the Rembrandt Amendment created new or improper obligations, which is simply incorrect; (a) $250,000 in legal fees to be reimbursed by Stream was merely a quantification of previously agreed but as-then unknown fees due under the original Rembrandt Settlement, (b) quantification of the $2,360,000 past due amount was merely confirmation of previously agreed monthly fees accrued to that point, (c) the revised production and delivery schedule of at-cost products was in no way "illusory," because the Rembrandt Amendment was tied to Stream's POR, confirmation of which would have enabled Stream to exit bankruptcy, reclaim its assets, and recommence production, and (d) a "change of control right," but not the obligation, to transfer the Rembrandt license to VSI was added because VSI was providing $35 million to fund the Stream POR and would own 100% of the reorganized Stream following plan confirmation. Stream was not deprived of any rights, and all obligations of the Rembrandt Amendment were tied to confirmation of the Stream POR.

86.    The Homony Complaint grossly mischaracterizes the change of control referenced above when it states that the provision would "deprive Stream of rights in the event Rajan was removed as the principal in control of Stream." This misrepresentation is not only false, but it also appears to be an intentional attempt to mislead the Court. The provision had nothing to do with Mathu Rajan as alleged by Homony; it was added specifically to accommodate VSI as the new owner of Stream following confirmation of the Stream POR. VSI would have the option to assume the license if it agreed to accelerated payment terms. The text

of that provision is clear in Section D of the Rembrandt Amendment: "In the event of a change of control of Stream, Rembrandt agrees to a one-time transfer of the Rembrandt license from Stream to [VSI] subject to (a) VSI making full payment of all amounts due to Rembrandt per the acceleration clause … and (b) VSI assuming all remaining obligations of the Settlement."

87.    Furthermore, Stream would not be "deprived" of any rights because Section C(1) of the Rembrandt Amendment states that the licensee's "subsidiary and affiliate companies shall have the right to use the Rembrandt Intellectual Property" for the benefit of the licensee. As Stream would be a wholly-owned subsidiary of VSI following confirmation of the VSI POR, Stream would retain its right to use the Rembrandt IP even if the license were transferred to VSI.

**O. Stream Loses Control of its International Subsidiaries and Files an Adversary Complaint Against Stastney, SLS, SeeCubic, Hawk, SCBV, and others.**

88.    While Stream was forming the Stream POR, and despite a clear warning from Bankruptcy Judge Coleman not to take any international action that would impact the Debtors, Stastney, SeeCubic, SLS, and Hawk initiated legal action in June 2023 in Amsterdam Court in the Netherlands to remove Mathu Rajan as director of multiple Stream subsidiaries that held Stream's R&D engineers, its computer source code, its patent portfolio, and the license from Philips that enabled Stream to develop and market its Ultra-D technology. Jasper Berkenbosch was appointed interim director by the Amsterdam Court, but he immediately found himself in an impossible situation; Stream's subsidiary SCBV was demanding permission to deliver prototype samples to Hyundai Mobis, a customer relationship developed by SeeCubic, which did not have licenses from either Philips or Rembrandt. When Rembrandt made it clear that such delivery would violate its license to Stream and result in liability for Berkenbosch as SCBV director, Berkenbosch resigned. Stastney renewed litigation in the Amsterdam Court in August 2023 and succeeded in getting himself installed as the sole director of all of Stream's Dutch subsidiaries,

including SCBV, giving him direct control and access to all of Stream's overseas assets and

technology foundation.

89.    Stream filed an Adversary Complaint in this Bankruptcy Court on August 12,

2023 against Stastney, SLS, SeeCubic, Hawk, SCBV and others (the "Stream Adversary Case")

for fraudulent conveyance, tortious interference, and breach of contract. The complaint sought

turnover and accounting, injunctive relief, disallowance or equitable subordination of claims, and

recharacterization of loan as equity interest, among other relief.

**P.  Stream and Rembrandt Enter into the Licensing Covenant with VSI.**

90.    Stream, Rembrandt, and VSI were not "collusive" as alleged in the Homony

Complaint, but they did have a common goal from June 2023 through January 2024 and beyond:

protecting the Stream estate and its respective licensors by preventing third parties from

infringing technologies for which they had no license and no legal right to access.

91.    With the Stream POR on file and ready for consideration by the Court, and with

the Stream Adversary Case initiated to prevent the defendants therein from tortiously interfering

with Stream and infringing the technologies of Rembrandt and Philips, VSI sought to further

cement a relationship with Rembrandt by negotiating supplemental terms to the Rembrandt

Amendment. Those negotiations led to an agreement reached on August 14, 2023 (the

"Licensing Covenant"). A true and correct copy of the Licensing Covenant is attached hereto as

**Exhibit I**.

92.    The Licensing Covenant did not prioritize the interests of Plaintiffs Rajan and VSI

over the interests of Stream as alleged in the Homony Complaint. The Licensing Covenant

barred Rembrandt from providing a direct license to Stream's subsidiaries, which were under

improper control of Stastney and SeeCubic. If those subsidiaries were under the proper control of

Stream, and acting for the benefit of Stream, then they would be covered under Stream's license

and therefore have no need for their own direct license, a fact that Bankruptcy Judge Coleman
failed to consider when issuing her Opinion appointing Homony.

93.    In fact, the Licensing Covenant actually provides an express benefit to Stream by
preventing Stream's own subsidiaries from competing with Stream by obtaining direct licenses
that would allow them to produce products that are not for the benefit of Stream, which is a
requirement of Stream's subsidiaries operating under the Rembrandt Settlement and Rembrandt
Amendment. The Licensing Covenant ensures that Stream's subsidiaries operate solely for the
benefit of Stream, not for the benefit of parties that have repeatedly tried to withhold Stream's
assets by any means necessary and which have openly confirmed a business model of
sublicensing technologies in direct contravention of the license terms.

94.    There was no "stunning admission of fraudulent intent" nor any "fraudulent
intent" at all by VSI, Rembrandt and Mathu Rajan as alleged in the Homony Complaint, which
attempts to color the transaction with pejorative language. The purpose of the Licensing
Covenant is obvious in the plain language of the agreement, and the evidence cited by Homony
merely confirms that the intent of the parties was to prevent third parties from taking
extrajudicial action to harm the Debtors, a pattern of behavior well-documented over a period of
years.

**Q.  The Temporary Restraining Order.**

95.    Stream and Rembrandt were not "collusive" as alleged in the Homony Complaint,
but they were determined to prevent unlicensed parties from infringing technologies for which
they had no license and no legal right to access. Both parties provided evidence and witness
testimony to substantiate the claims in the Stream Adversary Case.

96.    From August through December 2023, this Court held numerous hearings in the
and considered evidence demonstrating that (a) SeeCubic publicly claimed Stream's R&D

engineers as its own, (b) SeeCubic publicly claimed Stream's accolades and fundraising

achievements as its own, (c) SeeCubic controlled websites proclaiming that SeeCubic was the

owner of Stream's Ultra-D technology and other Stream assets, (d) SeeCubic had 28 running

projects with 25 different customers using Stream's technology, (e) SeeCubic's stated business

model was based on sublicensing the Ultra-D technology in violation of both the Rembrandt and

Philips licenses, and (f) Stastney had filed a fraudulent application with the U.S. Patent and

Trademark Office to register the "SeeCubic" mark, creating clear confusion with the "SeeCube"

mark held by Stream.

97.     Rembrandt substantiated Stream's claims with expert testimony from its own

intellectual property witness, and upon evaluation of the evidence, this Court issued a Temporary

Restraining Order (the "TRO") on January 4, 2024 against Stastney, SLS, Hawk, SeeCubic,

SCBV, and others (the "Enjoined Parties").[11] The TRO was extended no less than eight times,

through February 14, 2025.

98.     The Enjoined Parties were prohibited from, among other things, (a) taking "any

action to sublicense, transfer, assign, or otherwise dispose of or affect any license or technology

held or purported to be held by the Debtors' estates, including but not limited to the Ultra-D

technology, and the Philips or Rembrandt licenses," and (b) "any external or publicly

disseminated form of communication … [to] (ii) describe, reference, display, or portray the

technology, or any improvements thereon, or make any representations with respect to ownership

of such technology, purported to be owned and/or developed by Stream and/or its subsidiaries."

**R. Homony Ignores TRO Violations and Charts a Course to Sell the Debtors' Assets
Despite IP claims from Rembrandt.**

---

[11] Case 23-00057 (DJB), ECF No. 119

99.    On March 7. 2024, Homony met with Mathu Rajan, Rajan's executive assistant, and Stream's former bankruptcy counsel to discuss the Ultra-D technology, Stream's legal and financial history, customer prospects, and other operational topics. Upon learning about the Omnibus Agreement, its invalidation by the Delaware Supreme Court, and the actions of Stastney, SeeCubic, and Hawk, Homony acknowledged that Stream had been the victim of a civil conspiracy. Homony requested additional information regarding the cost of pursuing litigation to seek damages and the return of estate property from Stastney, SeeCubic, and Hawk. His outrage was short-lived, however, when he realized he would need to operate the business of the Debtors, a task for which he was incapable. Instead, he pursued the fastest escape route possible and made a deal with the very perpetrators who had damaged the Debtors in the first place.

100.    Upon information and belief, in April 2024, Homony entered into negotiations with Stastney, SeeCubic, and Hawk. The result was the SeeCubic 9019 Settlement executed on May 6, 2024 which granted Hawk an allowed claim of $180 million and the right to credit bid $150 million toward the purchase of the Debtors' assets, with a measly $7.5 million cash carve-out to satisfy administrative and unsecured claims. The sweetheart deal was filed with a motion by Homony seeking approval from the Court.

101.    Coincidentally, on the same day, Rembrandt notified counsel for Homony, SeeCubic, Hawk, and VSI that it had become aware of a planned May 7, 2024 fundraising meeting to be held by Stastney, SeeCubic, and Hawk in violation of the TRO. Counsel for Homony completely ignored the Rembrandt email, as did counsel for SeeCubic. Hawk's counsel eventually responded, but only two days after the alleged meeting had occurred. Hawk's counsel stated:

> It is up to the Debtors to determine whether they believe a violation
> occurred or needs to be addressed. The Debtors have not taken any action
> or voiced any concerns."

102.    VSI counsel immediately responded in support of Rembrandt's request for TRO

enforcement:

> [T]he trustee steps in the shoes of the Debtor and therefore should be
> pursuing [enforcement of the TRO]. It is clear that parties other than the
> Debtors are unlawfully using the IP which is licensed to the debtor (and
> which cannot be used and has not been sublicensed) along with Debtor's
> assets.  So, maybe it is the trustee who should reply, too, and say what he
> intends to do going forward…

103.    Despite this follow-up from VSI, Homony never responded or even

acknowledged the communication. When VSI counsel suggested that discovery was warranted,

counsel for Hawk argued on May 10, 2024 that Homony should be absolved of discovery,

reiterating that Homony retained the sole right to determine whether or not to enforce the TRO:

> While your client's may believe the current TRO Order was violated, the
> Trustee does not appear to agree with you.  Since there are no pending
> proceedings related to the TRO motion controlled by the Debtor and your
> clients lack standing to pursue the issue, there is no need for discovery…

104.    On multiple occasions, VSI informed Homony that it believed violations were

being committed by Stastney, SeeCubic, Hawk, and SCBV. Homony was notified about

fundraising meetings conducted in April 2024 and May 2024, including a global Zoom

teleconference on May 28, 2024 that was recorded by both SeeCubic and an investor who

reported the meeting to VSI. VSI specifically encouraged Homony to contact Stastney and

request a copy of the Zoom recording as an easy step to confirm whether or not a violation had

occurred. Upon information and belief, Homony made no effort to investigate any of the alleged

violations.

105.    On September 10, 2024, Homony sent an email to Stream contract employee Bud

Robertson in which he acknowledged that SCBV had produced and delivered Ultra-D products

in violation of the TRO, but he excused the violation, stating: "…**the TRO is no longer in effect. I settled that issue**." Not only did Homony have no authority to "settle" the TRO, but the Court subsequently extended the TRO four more times after Homony's email, confirming that the issue was far from settled. Homony's awareness of violations committed by the debtor's subsidiary – at the direction of Stastney, CEO of the stalking horse bidder – is clear evidence of their collusive behavior. A true and correct copy of the September 10, 2024 Homony email is attached hereto as **Exhibit J**.

106.    Homony was aware that SCBV, under the direction of Stastney, was conducting demonstrations of Stream's technology, as evidenced by a statement of his own counsel in this Court on June 5, 2024: "And the fact of the matter, Judge, is that [SCBV] is an affiliate of [Stream]. And the Philips license allows the affiliates of [Stream] to use those licenses for demonstrations."  Homony's counsel was wrong in two respects: (a) SCBV did not have authority to use Stream's Philips license for the benefit of a third party like SeeCubic, and (b) the TRO against the enjoined parties – including SCBV – explicitly prohibited such demonstrations. Judge Chan failed to acknowledge the overt violation or make any effort to enforce the TRO.

107.    With no TRO enforcement by Homony, Stastney and SeeCubic continued to violate the TRO at will. Upon information and belief, on or about September 23, 2024, Stastney circulated an email to "Fellow SeeCubic, Inc. Stakeholders" to update them and solicit funds required to satisfy SeeCubic's § 363 Sale obligation to provide the $7.5 million cash carve-out. Stastney's email, which included an attached information memorandum, confirmed SeeCubic's ongoing violations:

> [W]e've undertaken a business mapping project over the past several months, which has engaged virtually everyone across the business. By mapping, I mean tying all aspects of the business together, from the business development pipeline, through product development based on that pipeline, to technology development to both supply building blocks for those products and innovate for the future…

This has also allowed us to describe ourselves and our financial prospects with much greater clarity and particularity, and the attached Information Memorandum is the result.

While the attached IM does a better job than I would here highlighting key accomplishments, I would call out a few: we have successfully delivered the Hyundai Mobis "concept car" screens … and we have a pipeline of 28 projects across 25 customers, all of whom are moving through some stage of the PoC [Proof of Concept] intake process.

108.    As a fiduciary of the Debtors, Homony should not have allowed the Enjoined Parties without a license to use the technology or offer to sublicense the technology in violation of the Debtors' third-party technology licenses. Homony aided and abetted their breach of the Debtors' third-party licenses and tortious interference with the Debtors' business and potential reorganization.

**R.  Homony Refuses to Consider $170 Million in Reorganization Funding from VSI.**

109.    After the SeeCubic 9019 Settlement was approved by the Court in June 2024, Homony told VSI that any VSI-sponsored plan of reorganization would need to include funding that fully accommodated Hawk's newly-allowed claim. Homony informed VSI that he would not entertain any plan until VSI provided proof of funds evidencing its ability to support such a plan.

110.    VSI informed Homony that it intended to propose a plan that would pay all creditors 100% of their allowed claims plus interest. On July 25, 2024, VSI provided a $170 million proof of funds from one of its key investors (the "VSI Investor") who had twenty-five years' experience in corporate banking and had successfully structured over $5 billion in corporate financing in North American and international markets. Even though the proof of funds was exactly what he had requested of VSI, Homony failed to respond for six weeks. When counsel to Homony finally engaged with VSI counsel in a call on September 5, 2024, they demanded that VSI make a $50 million good faith deposit – before any due diligence information had been provided.

111.    On September 17, 2025, counsel for Homony agreed to engage VSI for a two-week period to explore a potential reorganization plan, but only if VSI withdrew its objection to Homony's motion to retain SSG as investment banker to sell the Debtors' assets.  VSI had objected to SSG on August 21, 2024 because it believed SSG was conflicted due to its previous retention in 2022 by Hawk, the prime beneficiary of the SeeCubic 9019 Settlement. VSI's objection motion was now an impediment to Homony's path for a planned § 363 Sale. Taking Homony at his word that good faith negotiation would follow, VSI withdrew its objection on September 18, 2024.

112.    VSI arranged a face-to-face meeting between Homony and the VSI Investor who had provided the $170 million proof of funds. Homony attended the meeting, though his initial comment to the VSI Investor was, "I don't know why I'm meeting with you."

113.    Throughout the meeting with the VSI Investor, Homony was not receptive to any proposed offers to reorganize Stream. In addition to plan funding that would satisfy all creditors in full, the VSI Investor proposed offering a DIP loan of $25-$30 million to support Stream's commencement of production to fulfill its $138 million in customer orders. Even though the VSI Investor confirmed his financial ability and interest in exploring a path forward, Homony stated that the VSI Investor would not receive any due diligence materials.

114.    At the meeting, the VSI Investor informed Homony that the planned § 363 Sale was unlikely to get Court approval due to Rembrandt's technology claims and Homony's failure to properly investigate the Debtors' technology and remove the Rembrandt IP wherever found. Despite his clear lack of prior Chapter 11 experience and unfamiliarity with the technology sector, Homony dismissed the concern of an experienced technology investor, focusing instead on his singular goal of a quick and dirty liquidation of the Debtors' assets.

115.    VSI subsequently provided an overview of a restructuring arrangement that satisfied key terms proposed by Homony, who requested that the informal VSI outline be revised to a formal restructuring agreement for consideration. On September 23, 2024, VSI provided Homony with a formal Restructuring Support Agreement as requested, but there was no response for days. The two-week negotiation clock was quickly running out, and despite VSI's good faith efforts, Homony's disinterest was clear. On September 30, 2024 – before the agreed two-week negotiation period had ended, without any serious engagement with VSI or the VSI Investor, and without even the courtesy of counsel-to-counsel notice – Homony filed an emergency motion to approve his § 363 Sale bidding procedures.

116.    It was clear to VSI that Homony never had any intention of good faith negotiation for a plan to reorganize the Debtors, and that his offer to negotiate had been a mere ploy to convince VSI to withdraw its objection to SSG. Rather than explore an option that might truly have been in the best interest of the Debtors and all parties in interest, Homony breached his fiduciary duty and completely dismissed the VSI Investor's serious offers to fund a plan of reorganization and provide a DIP loan to commence production.

117.    Homony did eventually provide VSI with due diligence materials, but VSI believes this occurred only because SSG prevailed over Homony that providing such materials would create the semblance of a fair sale.

118.    Unable to secure the support of Homony as a plan proponent, VSI ultimately filed its own independent proposed Plan of Reorganization (the "VSI Plan") and accompanying Disclosure Statement on December 3, 2024.  The VSI Plan, which contemplated payment in full to the secured creditors and $18 million for unsecured creditors (an estimated 80% payment), was never considered by the Court, which issued the § 363 Sale approval order one week later.

**T.  The Rembrandt Claim.**

119.    Stream did not list Rembrandt on its list of creditors because the bulk of the cash

payments, the no-charge TV's and prototypes, and the three million mass-produced units were

not yet due. Stream's management believed that a successful plan of reorganization would allow

it to address Rembrandt as a strategic vendor and plan proponent, which it did.

120.    To put its stake in the ground, however, Rembrandt filed a proof of claim against

Stream (the "Stream POC") on April 14, 2023, less than a month after Stream commenced its

bankruptcy case. The Stream POC, with an approximate amount of $1.2 billion, declared the

Rembrandt Settlement as the basis for the claim and provided an overview of the composition of

the claim amount, including (a) total cash payments of $5,840,000 million, (b) no-cost TV's and

prototypes valued at $567,000, and (c) more than three million at-cost units with an estimated

margin of $400 per unit for a total value of $1,206,000,000.

121.    Notably, Stream did not dispute Rembrandt's filing of the Stream POC at the time

of the filing or in the two years that followed because the value of the claim tracks exactly with

the value of the Rembrandt Settlement and the Stastney-Rembrandt Term Sheet reached through

mediation back in 2019, and because successful reorganization of Stream through the Stream

POR would have resolved the claim to the satisfaction of both parties.

122.    However, by October 2024, it became clear that Homony had no intention of

pursuing a reorganization of Stream as proposed by the Stream POR and instead intended to

consummate a sale of the Debtors' assets. In that event, Rembrandt would be left with only the

Stream POC and no hope of any meaningful recovery. As it was unclear whether the proposed §

363 Sale of the Debtors' assets would include ownership of Technovative, Inc. Rembrandt filed a

claim against Technovative, Inc. (the "Technovative POC") on October 22, 2024, in an amount

identical to the Stream POC but citing a different basis for which the new claim was based.

123.     The Homony Complaint incorrectly asserts that the basis for the Technovative

POC is the Rembrandt Settlement, and thus, the claim should be rejected because Technovative

is not a party to that agreement. Homony omits, in his attempt to mislead the Court, that the

Technovative POC is not based on the Rembrandt Settlement but is actually and explicitly based

on the minimum value of damages Rembrandt expects to be awarded in its litigation against

Technovative, Inc., SeeCubic, and Hawk in the U.S. District Court for the District of Delaware

filed on February 21, 2023 for misappropriation of trade secrets.  The case is currently stayed

against Technovative due to the current bankruptcy. The Technovative POR is not simply

duplicative of the Stream POR as may appear at first glance or as alleged by the Homony

Complaint.

**U.  Homony Fails to Investigate the Debtors' Technology Assets to Ensure that
     Rembrandt's IP is not Transferred to Unlicensed Parties.**

124.     The SeeCubic 9019 Settlement was more than a settlement of outstanding debt

and litigation between the Debtors and their creditors; the agreement telegraphed an intent to sell

Stream's assets in a § 363 Sale and laid the framework whereby SeeCubic – a party without a

license to use the Rembrandt technology embedded in Stream's Ultra-D technology – was

designated as the stalking horse bidder and given the right to use $150 million of newly allowed

debt to credit bid for the assets.

125.     Rembrandt objected to the SeeCubic 9019 Settlement immediately. In the June 5,

2024 hearing, Homony testified that he had not sought expert advice regarding the Debtors'

ongoing use of Rembrandt's IP   as allowed under the Rembrandt Settlement. When Rembrandt

inquired about Homony's plans to promote the § 363 Sale, Homony stated that he had not

assessed whether the Debtors' technology utilized Rembrandt's IP. As justification to proceed

with the SeeCubic 9019 Settlement and the intended § 363 Sale, Homony stated, "Rembrandt

will have whatever rights Rembrandt has after [Stream's assets are] sold as well." Homony's

view that he was permitted to transfer assets containing third-party trade secrets because the

intellectual property owner would retain the right to pursue legal remedy at a later date (in an

alternative venue) is contrary to and violative of well-established DTSA precedent.

126.    Homony did not file a motion to employ IP counsel until November 21, 2024 –

the day after the Bidding Procedures were approved by the Court and only two weeks before the

bid deadline and planned auction date – a clear attempt to create the appearance of diligence but

lacking any practical effect since neither the Rembrandt IP nor the Debtors' Ultra-D source

codes were evaluated for direct or derivative connections. No expert report was ever prepared to

substantiate Homony's assertions that the Rembrandt IP was not implicated in the sale.

127.    The incorporation of Rembrandt's IP into the assets offered for sale was

confirmed in the December 4, 2024 declaration of Mark Hsu, one of Stream's former engineers

who worked closely with the technology and is familiar with the source code stored on servers

being sold as part of the estate. Mr. Hsu stated:

> My team, the Silicon Valley Team, developed the production code, which
> incorporated Stream trade secrets, as well as [the] protected intellectual
> property of Rembrandt and Phillips, all of which was housed on Stream's
> Silicon Valley based servers.[12]

128.    Rembrandt's counsel attempted to cross-examine Homony about his efforts to

confirm that the Rembrandt IP was not included as part of "source code on a secure server" listed

as an asset for sale in the Asset Purchase Agreement (the "APA"), but the Judge Chan shut down

the line of questioning:

> REMBRANDT COUNSEL: How is it you determined that intellectual
> property belong to Rembrandt, Philips, or any other third party were not
> on the source code on a secure server—
>
> THE COURT: Okay. I'm – this is the legal argument. You're talking
> about, you know, the fact that you think that the sale is impermissible
> because it's infringing upon your rights. I get that. It's a legal argument. I

---

[12] Docket No. 859 at ¶ 3

> don't want to hear any questions about that. The assets are what they are.
> The only person who's bid on them has done their due diligence, and to
> the extent that you believe that the sale is going to violate your rights,
> you can bring whatever litigation you want. We simply are going to have
> to agree to disagree on this matter, sir.[13]

129.    By allowing Homony to sell technology assets that the Debtors did not own, and

by making the assertion that Rembrandt could simply pursue litigation later, Judge Chan aided

and abetted the infringement being committed by Homony and SeeCubic. No trustee and no

judge has the authority to violate the DTSA.

130.    Homony admitted he did not conduct a complete inventory or review of assets

being sold, but merely identified what he (as a non IP-specialist) determined were of the greatest

value and lumped other assets into a category simply referred to as "unknown:"

> …I identified the most valuable assets and have proposed to sell them.
> And so could there be other assets out there that are not specifically
> identified? Of course. And that – that is under the broader description in
> the APA that provides for a sale of known and unknown assets to the
> extent they fall into those categories described in the APA. [14]

131.    One of the specific items listed for sale in the APA is "source code on a secure

server," but Homony made no effort to inspect the server, engage IP experts to evaluate the

computer code stored thereon, or confirm that the intellectual property of Rembrandt and Philips

were not being transferred in the § 363 Sale.

132.    Prior to the Sale Order hearing, Rembrandt filed an adversary complaint pursuant

to Bankruptcy Rule 7001 against Homony, seeking a Declaratory Judgment requiring removal of

any Rembrandt IP prior to the sale of Debtor's assets. However, the Court issued its order

approving the § 363 Sale without ever hearing a single motion in Rembrandt's adversary case.

---

[13] 12/4/24 Hearing Transcript at 58:18-59:5
[14] 12/4/24 Hearing Transcript at 43:18-23

## V. The Homony Complaint is a Thinly Veiled Attempt to Draw Attention Away from the IP Infringement Committed and Enabled by Homony, his Investment Banker, and the § 363 Sale Buyer.

133.     The APA entered into by the stalking horse bidder and approved by the Court specifies assets sold in an "as-is, where-is" basis. While intending to generally indemnify the seller from obligations to quantify and qualify such assets, the "as-is, where-is" term does not protect the seller or the buyer from civil and criminal infringement when trade secrets are transferred.

134.     The § 363 Sale was consummated on January 3, 2025 by SeeCubic, which paid the carve-out fees to the Debtors as required by the Sale Order. Accepting payment for the transfer of Rembrandt's trade secrets is a violation of the DTSA.

135.     Homony provided no evidence, and appears to have taken no action to ensure, that Rembrandt's trade secrets and other intellectual property was not transferred to an unlicensed buyer in violation of Rembrandt's IP rights.

136.     By failing to engage experts to evaluate the extent to which Rembrandt's IP is incorporated into the Debtors' technology, by failing to require an inspection of the "secure servers" being sold in the § 363 Sale, and by relying instead on the representations and due diligence satisfaction of a prospective buyer who was a conflicted party with a history of attempts to seize Stream's assets unlawfully, Homony was grossly negligent and acted with reckless disregard. He not only failed to follow a proper sale process, he created liability under the DTSA for the Debtors' estate.

137.     Homony filed the Homony Complaint in an attempt to draw attention away from the SeeCubic 9019 Settlement that put the Debtors on a path to administrative insolvency and from the illegal technology transfer enabled by the § 363 Sale.

**X.  There is no Bona Fide Dispute Between Rembrandt and Stream.**

138.    Rembrandt and Stream settled their issues long ago. The terms of agreement were

first memorialized in the Stastney-Rembrandt Term sheet of April 2019, fully documented in the

more formal Rembrandt Settlement of May 2021, acknowledged in the Stream POR of July

2023, and amended slightly in August 2023 to conform to the Stream POR.

139.    Homony alleges a bona fide dispute as part of his rationale to challenge

Rembrandt's claims and justify his own IP infringement and breach of fiduciary duty, but it is

really just an artificially manufactured dispute on his part – years after the fact – in a smoke-

screened diversionary effort to prevent Rembrandt from receiving rightful compensation so that

assets of the Debtors' estates can be directed to parties preferred by Homony.

140.    Homony has challenged the Rembrandt claims in the Homony Complaint, and he

has also challenged the administrative claim filed by Louis Brisbois Bisgaard & Smith LLP

("LBBS") even though the LBBS claim has already been approved by the U.S. Trustee with

minor modification. Why is Homony seeking to knock out claims? Because he has steered the

Debtors into administrative insolvency with his poor judgment. The carve-out provided by the

§ 363 Sale is not possibly large enough to satisfy LBBS, Rembrandt, and other administrative

claimants, let alone the unsecured creditors. What was the rationale for negotiating the $7.5

million carve-out when Homony agreed to the SeeCubic 9019 Settlement? A prudent trustee

would have had a budget and a plan for satisfying claims against the estate and would have

factored those estimates into such a settlement. Homony has provided no documentation on how

the carve-out amount was determined. What input came from SeeCubic and Hawk? Was the

carve-out intended to omit payments to LBBS and others? While these questions remain

unanswered, it is clear that Homony has reached a settlement/sale that cannot support the current

administrative claimants in full, and he is now trying to reverse engineer a payout formula that works by challenging administrative claimants that have not colluded with him.

141.    Homony and SeeCubic, as the prevailing purchaser of the estate assets, rely on 11 U.S.C. § 363(f) to convey title to such assets "free and clear." This is not possible, however, because Homony knows that intellectual property of Philips and Rembrandt are on computer servers unlawfully conveyed in the sale. Acknowledging the validity of Rembrandt's claim would undermine the § 363 Sale, with potential civil and criminal consequences under the DTSA. That is why Homony defrauded the Court about what assets were actually being conveyed. That is why he misled the Court by stating that there were virtually no physical assets, omitting any mention of the Silicon Valley servers SeeCubic has exercised dominion and control over since mid-2020. Plaintiffs strongly believe the Stream servers should be inspected for proof of Rembrandt's claim. Homony has not been willing to do so, and the Plaintiffs are left to wonder why a Trustee prefers litigation over a simpler means of determining the truth of the matter.

**Y.  The Barton Doctrine does not Protect Homony.**

142.    The Barton Doctrine (*Barton v. Barbour*, 104 U.S. 126 (1881)) is meant to protect trustees from collateral litigation so they can do their work without harassment.

143.    *Barton* protection disappears, however, when the trustee acts outside his statutory authority. While Homony may have executed the Rembrandt 9019 Settlement without knowing that Rembrandt was contractually prohibited from doing so without VSI's written pre-approval, he became aware of the contractual obligation on August 7, 2025 when VSI filed its objection to the proposed settlement. Yet he has made no effort to engage with VSI, and by continuing to induce Rembrandt into breaching VSI's rights, Homony is not carrying out trustee duties—he is interfering with a private contract.

42

144.     Further, Homony ignored repeated TRO violations by SeeCubic and Stastney, even after receiving notice and evidence. He also filed a Sanctions Motion supported by exhibits created or altered by his own counsel (with scrubbed metadata). Such conduct is *ultra vires* and not shielded by *Barton*.

145.     *Barton* immunity also fails where the trustee unlawfully transfers or infringes third-party intellectual property. Homony knowingly sold assets that included Rembrandt's trade secrets and Philips' licensed IP without authorization. The Defend Trade Secrets Act (DTSA, 18 U.S.C. § 1836) imposes both civil and criminal liability for such conduct. No bankruptcy court can immunize a trustee against DTSA violations. Thus, the IP transfer to SeeCubic under §363 was *ultra vires* and cannot be protected.

146.     Even within the bankruptcy forum, trustees are not shielded from suits alleging fraud or willful misconduct. Courts consistently hold that *Barton* does not extend to fraudulent, self-interested, or collusive acts. Homony conspired with SeeCubic, Stastney, and Hawk to arrange a sweetheart §363 sale, ignoring competing reorganization proposals that would have paid creditors in full. Fraudulent conduct removes the trustee from *Barton's* protection.

147.     The doctrine also fails where the trustee acts to protect himself rather than the estate. Homony was a named defendant in federal IP litigation involving Rembrandt's patents and trade secrets. By pushing through the Rembrandt 9019 Settlement, he sought to end litigation that exposed him personally. *Barton* only protects actions taken for the benefit of the estate; when the trustee's loyalty shifts to self-preservation, the doctrine collapses.

148.     Finally, Homony misled the court by concealing the existence of servers containing source code and IP, mischaracterizing assets as "unknown" while transferring them "as-is, where-is," and submitting doctored exhibits in the sanctions motion. When a trustee commits fraud on the court, *Barton* cannot apply.

**Z. Collusion in this Bankruptcy Case exists between Homony, SeeCubic, Stastney, and Hawk.**

149.    The foundation for the § 363 Sale was established by the SeeCubic 9019

Settlement, which afforded Hawk a $180 million allowed claim and the right to credit bid $150

million of that amount, despite the fact that contract employees of Stream  had provided Homony

with hundreds of pages of documentation confirming that most – if not all – of that secured debt

had been converted to equity pursuant to a 2018 debt-to-equity conversion agreement and

subsequent amendment thereto. The debt actually owed to Hawk (as collateral agent for

SeeCubic, to whom the debt had been transferred) was considerably lower, if not completely

extinguished. By allowing debt to a claimant who should have been a mere equity holder,

Homony breached his fiduciary duty and violated the absolute priority rule.

150.    With Homony seeking a means to fund the operations of Stream's international

subsidiaries, Hawk offered to pay those costs – of non-debtor entities – in exchange for an award

of immense debt that impacted every other party in interest and established a "qualified bid"

threshold of $120 million that made it impossible for any other party to compete with SeeCubic

as Homony's allied stalking horse bidder. SeeCubic needed to provide nothing more than $7.5

million in cash as a carve-out for Stream's administrative expenses and unsecured creditors

(assuming any funds remain after payment of the rising administrative costs).

151.    SeeCubic, as the stalking horse, needed to raise funds to support its side of the

deal brokered with Homony. Despite the TRO, SeeCubic and other Enjoined Parties conducted

investor presentations, pursued business development, and engaged in sales and marketing

activity with potential and actual customers. Both VSI and Rembrandt notified Homony's

counsel on multiple occasions that Stastney and SeeCubic were violating the TRO, but upon

information and belief, Homony took no action to investigate the allegations and protect the

Debtors' estates, siding instead with the allied stalking horse bidder.

152.    Technology demonstrator samples incorporating Rembrandt's IP were manufactured in the Netherlands by SCBV under Stastney's direction and shipped across international borders to SeeCubic in the United States for presentation to Homony, who was aware that both SCBV and SeeCubic were enjoined by the Bankruptcy Court from using the Debtors' technology (and therefor the incorporated Rembrandt IP). SeeCubic has no license from Rembrandt, and unauthorized use of Rembrandt's IP in products shipped across international borders is IP infringement by SeeCubic. Upon information and belief, Homony made no effort to retain or secure the return of demonstrator units he knew were being presented in violation of the TRO, and instead, allowed his allied stalking horse bidder to proceed with ongoing violations to secure the funding necessary to support the proposed § 363 Sale.

153.    As noted above, Homony was made aware – on multiple occasions by both Rembrandt and VSI – that Stastney and SeeCubic were violating the TRO for fundraising and business development efforts, but Homony ignored any actions that would threaten the success of his plotted § 363 Sale.

154.    Discovery is warranted to determine how much direction Stastney, SeeCubic, and Hawk have been providing Homony during his fifteen months as Trustee. There is a reason that so many judicial errors have been made during the years of litigation between the Debtors and its alleged secured creditors: Stastney, SeeCubic, and Hawk have consistently bent or broken the rules, convinced others to do the same, and have created litigation chaos by flooding the courts with endless motions practice and nonsensical arguments. Vice Chancellor Laster was forced to embrace archaic case law to support a conclusion argued by the Debtors' opponents. Judge Owens succumbed to their argument that an attempt to reject an executory contract was a mere litigation tactic when the Delaware Supreme Court would later prove her wrong and the Debtors to be correct. Judge Coleman let the Debtors' Turnover Motion languish for nearly a year

because she got caught up in motions to dismiss and dozens of other distractions launched by

SeeCubic and Hawk in a desperate attempt to retain unlawful possession of the Debtors' assets.

And Judge Chan accepted SeeCubic as a good faith buyer simply because it was willing to

accept the assets on a where-is, where-as basis, which was a no-brainer for a company that

already had possession of everything and was only seeking a Court-approved whitewash of title

to those assets.

## AA.    The Homony Complaint Mischaracterizes the Facts and Uses Personal Attacks to Mislead the Court

155.    Homony attempts to paint a picture of collusion between Mathu Rajan and

Rembrandt through the use of pejorative language and patently false statements, which are

denied herein. The Homony Complaint states "When the Rembrandt Settlement was executed,

the corresponding value to the Debtors was zero—as Debtors were insolvent…" The fact that

Stream was insolvent at the time is irrelevant to the benefits it received: (a) resolution of

litigation that had been pending for more than two years and (b) permission to use the

foundational Rembrandt IP when and if Stream succeeded in recommencing operations.

156.    The Homony Complaint further references Mathu Rajan's "efforts to fleece

unsuspecting investors in a scheme which smacks of securities fraud" without providing a shred

of evidence to support such a libelous accusation. Were it made outside the Court, where this

outrageous statement is merely another bit of mudslinging that Stream and its managers have

come to expect from such acrimonious litigants, such an accusation would be ripe for a

defamation suit. Mathu Rajan, through Stream and subsequent third parties, has spent boundless

energy to secure funding to save Stream and its Ultra-D technology.

157.    The Homony Complaint attempts to devalue the Rembrandt Settlement by

implying that one reason it provided no benefit to Stream is that Stream was "in the midst of a

'friendly foreclosure' under the Omnibus Agreement whereby Stream's property was being

transferred to [SeeCubic] in return for the extinguishment of [the secured creditors'] secured debt." Again, Homony describes the Omnibus Agreement as a "friendly foreclosure" in his attempt to sugar-coat the fact that the seizure of Stream's assets was determined by the Delaware Supreme Court to be unlawful; there was nothing "friendly" about it, and any insinuation to the contrary is a joke. Has Homony or his counsel read the Delaware Supreme Court's unanimous opinion? Homony is clearly attempting to whitewash the history of SeeCubic, his allied stalking horse bidder, and Hawk, the collateral agent whose debt he allowed without contest.

158.    Finally, the Homony Complaint concludes with the statement that "At all times material hereto, the Debtors were insolvent and attempting to engage in a business for which they were grossly undercapitalized." Homony is completely and grossly unqualified to opine on this matter, as he made no effort to understand the business of the Debtors, made no effort to secure the return of the Bonding Equipment that would have enabled production, and made no effort to investigate the veracity of customer purchase orders that would have provided advance cash flow to enable the necessary mass production to satisfy them. The incompetence exhibited by Homony in this case is staggering, and the underlying ignorance breathtaking, though perhaps somewhat understandable due to his lack of prior Chapter 11 experience.

159.    Furthermore, Mathu Rajan had formed strategic partnerships with supply chain vendors eager to facilitate a re-start of production by the Debtors. Stream had every right to expect the return of its assets through its first Chapter 11 proceeding, the subsequent Delaware Supreme Court mandate overturning the Omnibus Agreement, and Stream's second Chapter 11 proceeding. With assets in hand and production planning confirmed, any additional capital required for operations would not have been difficult to obtain, as has been demonstrated by the support VSI has shown for the Debtors in proposing not one, but two, plans of reorganization.

160.     Had Stream not been stripped of its assets unlawfully, and had they not been
withheld indefinitely, Stream would be operational today and there would be no creditors in this
Bankruptcy Case.

**BB.     Homony's Actions Have Damaged the Debtors' Estates.**

161.     Homony claimed that the SeeCubic 9019 Settlement and subsequent § 363 Sale
were in the best interests of the Debtors. He claimed that the settlement would reduce litigation
costs and effort, resulting in a greater recovery for all parties in interest. Having executed the
SeeCubic 9019 Settlement, he dismissed any attempt by VSI to provide funds and settlement
terms through a plan of reorganization that would have truly been in the best interests of the
Debtors, paying all creditors their allowed claims in full (or more). Instead, the amount of
litigation involving the Debtors has exploded, costing Stream what will likely be the lion's share
of the measly carve-out provided by SeeCubic in the § 363 Sale. Any experienced trustee or
judge acting in mediation would have recognized the value of the VSI proposition and explored
options with sincere good faith. Homony's failure to do so was yet another breach of his
fiduciary duties.

**V.     JURY DEMAND**

162.     Plaintiff demands a jury trial on all claims.

**VI.     CLAIMS**

**<u>COUNT I</u>**
**Declaratory Judgment**
**Against All Defendants**

163.     Plaintiff realleges and incorporates by reference all preceding paragraphs as
though fully set forth herein.

164.    Plaintiff seeks a declaration of rights under 28 U.S.C. § 2201. A live controversy exists as to VSI's contractual rights under the LFCA and amendments, as well as ownership and control over IP incorporated into Stream's assets.

165.    Declaratory relief is appropriate where parties' legal relations are uncertain and immediate resolution is necessary to guide conduct.

166.    VSI's alleges that Rembrandt and Homony disregarded VSI's pre-approval rights in settlement negotiations, and that Homony transferred assets subject to third-party IP, establishing an actual controversy requiring declaratory judgment.

## COUNT II
### Injunction
### Against All Defendants

167.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

168.    As described in the plain text of LFCA Amendment #2, Rembrandt cannot even propose, let alone enter into, a settlement agreement without VSI consent.

169.    VSI alleges irreparable harm, including loss of its contractual right to control settlement strategy, unlawful transfer of IP, and the destruction of its ability to commercialize Ultra-D technology through access it will be denied because of the Rembrandt 9019 Settlement.

170.    Legal remedies are inadequate because damages cannot restore control of trade secrets or prevent unauthorized sublicensing. The balance of harms favors VSI, as an injunction would merely preserve the status quo and prevent unlawful transfers, while denial would permanently impair VSI's rights.

## COUNT III
### Breach of Contract
### (including Breach of Covenant of Good Faith and Fair Dealing)
### Against Rembrandt and Blumenthal

171.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

172.    The LFCA and its amendments required Rembrandt to obtain VSI's written consent before entering settlement, but Rembrandt breached its obligation to seek such pre-approval from VSI before proposing or accepting settlement terms.

173.    VSI provided nearly $1 million in funding pursuant to the LFCA and its amendments - $270,500 directly to Rembrandt and its representatives plus hundreds of thousands of dollars more to VSI's counsel, which provided services to Rembrandt as agreed – yet Rembrandt proceeded with settlement negotiations with Homony absent VSI approval.

174.    These allegations satisfy the elements of contract formation, performance, breach, and damages. In addition, the implied covenant of good faith and fair dealing was breached by Rembrandt's bad-faith disregard of VSI's bargained-for veto rights.

175.    Rembrandt has denied VSI what VSI should have obtained under the contract (the benefit of the bargain).

### COUNT IV
### Unjust Enrichment
### Against Rembrandt and Blumenthal

176.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

177.    Even if the LFCA were unenforceable, Rembrandt was unjustly enriched by nearly $1 million in payments VSI provided, while ignoring VSI's rights and pursuing settlement contrary to VSI's interests.

178.    Equity demands restitution where a defendant retains benefits unjustly at plaintiff's expense.

## COUNT V
### Promissory Estoppel
**Against Rembrandt, Blumenthal, Stream, and Homony**

179.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

180.    Rembrandt induced VSI to provide substantial funding by promising to honor VSI's consent rights and transfer Ultra-D access. VSI relied on these promises to its detriment, expending nearly $1 million.

181.    Injustice can only be avoided by enforcement of Rembrandt's promises or equitable relief.

## COUNT VI
### Conversion
**Against All Defendants**

182.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

183.    Defendants wrongfully exercised dominion over VSI's property interests by transferring technology and litigation rights subject to VSI's control under the LFCA.

184.    VSI's bargained-for rights in settlement approval and Ultra-D access were specific, identifiable property interests, and defendants' unauthorized transfer constitutes conversion.

## COUNT VII
### Violation of the Defend Trade Secrets Act
**Against All Defendants other than Rembrandt and Blumenthal**

185.    Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

186.    This complaint alleges misappropriation of trade secrets incorporated into Stream's Ultra-D technology, transferred without authorization in the § 363 Sale.

187. Homony, acting *ultra vires*, permitted the transfer of Rembrandt's trade secrets despite notice of their proprietary nature, thereby violating 18 U.S.C. § 1836.

188. VSI has standing under DTSA due to its contractual rights to the benefits of Rembrandt's trade secrets via the LFCA.

### COUNT VIII
### Conspiracy/Aiding and Abetting
### Against All Defendants

189. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

190. All of the Defendants colluded and created an illegal combination for a common unlawful purpose.

191. Defendants, including Homony and Rembrandt, combined to deprive VSI of its contractual rights and to transfer technology unlawfully.

192. This complaint alleges concerted action, overt acts (e.g., secret settlement negotiations, execution of the § 363 Sale), and resulting damages to VSI. These facts satisfy the elements of civil conspiracy and aiding and abetting breach of duty.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Visual Semiconductor, Inc., respectfully requests judgment against Defendants.

Dated: September 8, 2025                    Respectfully submitted,

                                            Daniel J. Rink
                                            (610) 220-0206
                                            dan.rink@visualsemi.com

                                            *Corporate Counsel for Plaintiff*