# EXHIBIT A

# LITIGATION FUNDING AND CONFIRMATION AGREEMENT

November 5, 2024

This LITIGATION FUNDING AND CONFIRMATION AGREEMENT is made between VISUAL SEMICONDUCTOR, INC., a Wyoming corporation ("**VSI**"), and REMBRANDT 3D HOLDING LTD., a Nevis corporation ("**Rembrandt**"). VSI and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party."

**WHEREAS**, Rembrandt and STREAM TV NETWORKS, INC. ("**Stream**") entered into a Settlement Agreement and Mutual Release on May 23, 2021 (the "**Settlement Agreement**"), resolving litigation between them, and conferring certain intellectual property license rights to Stream in consideration of cash payments and certain product purchase rights granted to Rembrandt;

**WHEREAS**, Rembrandt and Stream modified settlement terms in a Settlement Amendment dated August 12, 2023 (the "**Settlement Amendment**"), following Stream's entry into chapter 11 bankruptcy protection;

**WHEREAS**, Rembrandt and VSI entered into a Licensing Covenant on August 14, 2023 (the "**Licensing Covenant**"), affording VSI benefits related to Rembrandt licensing restrictions to certain third parties;

**WHEREAS**, VSI intends to acquire the assets of Stream in bankruptcy through either a 363 sale (the "**Sale**") or a plan of reorganization (the "**Plan**"), giving VSI control of Stream's technology;

**WHEREAS**, VSI and Rembrandt desire to confirm their intent to fulfill and honor the agreements by and among Rembrandt, VSI, and Stream; and

**WHEREAS**, VSI and Rembrandt believe that the Parties have common interests with respect to the chapter 11 bankruptcy cases (the "**Bankruptcy Cases**") of Stream and Stream's subsidiary, TECHNOVATIVE MEDIA, INC. ("**Technovative**" and collectively with Stream, the "Debtors");

**NOW THEREFORE**, the Parties agree as follows:

## A. THE SETTLEMENT AGREEMENT AND SETTLEMENT AMENDMENT

1. VSI confirms that it shall, as the ultimate beneficial owner of Stream or Stream's assets following Bankruptcy Court approval of the Sale or Plan ("**Court Approval**"), ensure that Stream fulfills all its obligations under the Settlement Agreement and Settlement Amendment. In addition, VSI agrees to guarantee Stream's performance of these obligations jointly with Stream.
2. In any Plan or Sale negotiated with the chapter 11 Trustee of Stream (the "**Trustee**") or presented to the Bankruptcy Court for approval, VSI shall ensure that the Settlement Agreement and subsequent Settlement Amendment – as executory contracts – are "assumed" and not "rejected" by Stream.
3. Rembrandt agrees that it shall not object to any Plan sponsored by VSI as long as such Plan does not reject the Settlement Agreement or Settlement Amendment.

Initials Rembrandt _____ / VSI _____

# LITIGATION FUNDING AND CONFIRMATION AGREEMENT

4. Rembrandt further confirms that it shall withdraw its bankruptcy claim(s) against the Debtors immediately following or concurrent with Bankruptcy Court approval of a VSI-sponsored Plan as long as such Plan assumes and does not reject the Settlement Agreement or Settlement Amendment, both of which fully satisfy any claims Rembrandt has against the Debtors.

5. Rembrandt confirms that it shall honor all terms of the Settlement Agreement and Settlement Amendment.

6. The Parties further agree that the Settlement Agreement and the Settlement Amendment fully and finally resolve all intellectual property claims of any kind between them.

## B. THE LICENSING COVENANT

7. VSI confirms that it shall fulfill all its obligations under the Licensing Covenant and confirms that it shall, as the ultimate beneficial owner of Stream or Stream's assets following Court Approval, ensure that both Stream and VSI fulfill all their obligations under the Licensing Covenant.

2. VSI further confirms that it shall pay Rembrandt One Million Five Hundred Thousand U.S. Dollars (USD $1,500,000) toward the past-due amount owed by VSI pursuant to the Licensing Covenant within seven (7) days of the Plan Effective Date or close of the Sale if VSI is the prevailing bidder in such Sale. VSI shall subsequently make monthly payments to Rembrandt in the amount of One Hundred Seventy-Five Thousand U.S. Dollars (USD $175,000) until all payment terms of the Licensing Covenant have been fully satisfied.

3. Rembrandt confirms that it shall honor all terms of the Licensing Covenant.

## C. PENNSYLVANIA BANKRUPTCIES

1. Shortly after the commencement of the Bankruptcy Case, on April 14, 2023, Rembrandt filed a $1,212,407,000 claim as an unsecured creditor of Stream.

2. Rembrandt was also listed as an unsecured creditor in the bankruptcy of Technovative, with a claim amount of $100,000,000 listed on Technovative's Schedule E/F.

3. On January 4, 2024, the Bankruptcy Court issued a temporary restraining order (the "**TRO**") against certain of Stream's creditors and Stream's R&D subsidiary, SeeCubic B.V. ("**SCBV**"), in part to protect the IP rights of Rembrandt from irreparable harm.

4. The Trustee entered into a settlement with Stream's secured creditors (the "**9019 Settlement**") which was subsequently approved by the Bankruptcy Court (the "**9019 Order**") on June 7, 2024, giving the Trustee authority to pursue a 363 Sale of Stream's assets.

5. Rembrandt has appealed the 9019 Order and VSI has filed a Motion to Reconsider. Rembrandt believes it can pursue an injunction to block the 363 Sale of Stream's assets either in the bankruptcy case or in a different court without leave of the bankruptcy court.

6. On October 10, 2024, the Trustee filed an amended schedule E/F for Technovative and reduced the Rembrandt claim to $0.00, stating that the basis for the Rembrandt claim was "unknown."

7. Rembrandt intends to pursue enforcement of the TRO and sanctions for the violations thereof, appeal of the 9019 Order, and other remedies it may have in the Bankruptcy Cases.

Initials Rembrandt _____ / VSI _____

# LITIGATION FUNDING AND CONFIRMATION AGREEMENT

## D. LITIGATION FUNDING AND JOINT REPRESENTATION

1. Rembrandt shall engage counsel of its choosing, but acceptable to VSI, which acceptance shall not be unreasonably withheld, to, working in consultation with Rembrandt's in-house attorneys, represent Rembrandt in the Bankruptcy Cases and pursue its claims therein (**"Rembrandt's Counsel"**).

2. VSI shall fund the reasonable fees and expenses of Rembrandt's Counsel in the Bankruptcy Cases. VSI's counsel, Akerman LLP (**"Akerman"**), will work closely with Rembrandt's Counsel as Rembrandt seeks to

    a. enforce the TRO (ECF No. 119), entered by the United States Bankruptcy Court for the Eastern District of Pennsylvania in *In re: Stream TV Networks, Inc., et al.*, Adversary Case No. 23-00057 (MDC), against SeeCubic, Inc., Mr. Stastney, and any other applicable Defendants;

    b. restore, validate, or otherwise support the Rembrandt claims in the Bankruptcy Cases;

    c. object, as needed, to the scope of the bankruptcy estate; and

    d. take other actions in the Bankruptcy Cases as may be prudent.

3. Akerman will also serve as a strategic sounding board for Rembrandt in the Bankruptcy Cases. Rembrandt maintains the sole and exclusive right to control its bankruptcy claims and intellectual property rights but shall consult VSI and Akerman prior to making any strategic decisions in the Bankruptcy Cases. Rembrandt reserves its right to

    a. cease sharing Shared Materials, as defined in the CONFIDENTIALITY AND COMMON INTEREST AGREEMENT attached hereto as Exhibit A, if a conflict arises between the parties or joint representation no longer serves the Parties' collective best interests;

    b. review all Rembrandt's Counsel/Akerman legal filings, motions, and documents prepared on Rembrandt's behalf; and

    c. with respect to the matters hereof, have an in-house legal representative on all attorney's calls, to be copied on all emails, and for Stephen Blumenthal (**"Blumenthal"**) to be included on all calls to which Mathu Rajan and/or Bud Robertson participate.

4. For purposes of clarity, Akerman shall determine legal strategy and draft all filings, with Rembrandt entitled to review and provide input. Such filings shall be made in the Bankruptcy Court on behalf of Rembrandt by Rembrandt's Counsel.

5. Legal costs paid by VSI on behalf of Rembrandt shall be refunded from the proceeds of litigation recovery, if any; then the value of the Settlement Agreement and License Covenant shall be paid to Rembrandt, then Rembrandt shall retain any overage.

## E. OTHER TERMS

1. VSI agrees to pay a fee of Three Thousand U.S. Dollars (USD $3,000) per week as total compensation for participation by Blumenthal and Rembrandt's in-house attorneys providing legal support, evidence, and historical information related to the matter hereof. Rembrandt shall not be responsible for tracking hourly billing, reporting, or invoicing VSI for such services. Rembrandt shall have sole discretion in how it distributes such weekly fees among Blumenthal and its in-house attorneys, Christopher Michaels and Neil Wallace. The weekly legal fee payments shall commence the week ending November 8, 2024 and continue until the earlier of (i) the Bankruptcy Court-approved VSI-sponsored Plan

Initials Rembrandt _____ / VSI _____

## LITIGATION FUNDING AND CONFIRMATION AGREEMENT

effective date, (ii) rejection of the VSI-sponsored Plan by either the Bankruptcy Court or the Debtors' creditors, (iii) Bankruptcy Court approval of a Sale of the Debtors' assets; or (iv) VSI abandons or otherwise terminates its pursuit of the Debtors or their assets.

2. In consideration of Blumenthal's consulting services provided hereunder, VSI agrees to pay Blumenthal:

   a. Twenty-Five Thousand U.S. Dollars ($25,000) on November 8, 2024;

   b. Twenty Thousand U.S. Dollars ($20,000) on November 15, 2024; and

   c. Six Thousand Five Hundred U.S. Dollars ($6,500) per week, commencing on November 22, 2024, and continuing until the earlier of (i) the Bankruptcy Court-approved VSI-sponsored Plan effective date, (ii) rejection of the VSI-sponsored Plan by either the Bankruptcy Court or the Debtors' creditors, or (iii) Bankruptcy Court approval of a Sale of the Debtors' assets. Notwithstanding the foregoing, VSI shall make no less than eight (8) such weekly payments to Blumenthal.

3. Fees paid pursuant to sections E(1) and E(2) shall be refunded to VSI from the proceeds of litigation recovery, if any.

4. Payments pursuant to section E(1) above shall be made by ACH or wire transfer to:

   | | |
   |---|---|
   | Account Name: | Brown & Michaels, PC IOLA Trust |
   | Address: | 118 N Tioga St., Ithaca, NY 14850 |
   | Bank: | Tompkins Community Bank |
   | Bank Address: | 118 E Seneca St., Ithaca, NY 14850 |
   | Wire Routing (ABA): | 021302648 |
   | Account Number: | 0111196628 |

5. Payments pursuant to section E(2) above shall be made by ACH or wire transfer to:

   | | |
   |---|---|
   | Account Name: | SVS 3D Consulting Services |
   | Bank: | Tompkins Community Bank |
   | Bank Address: | P.O. Box 460, Ithaca, NY 14851 |
   | Wire Routing (ABA): | 021302648 |
   | Account Number: | 0111142536 |

6. VSI and Rembrandt agree to abide by the terms of the Confidentiality and Common Interest Agreement attached hereto as Exhibit A.

7. This Agreement shall be interpreted under Delaware law and the parties agree to Delaware courts for jurisdiction and venue.

[ The rest of this page left intentionally blank ]

Initials Rembrandt _____ / VSI _____

# LITIGATION FUNDING AND CONFIRMATION AGREEMENT

The foregoing represents the agreement of the Parties as of the date hereof.

Acknowledged and agreed by
Visual Semiconductor, Inc.

Mathu Rajan
CEO
Date:   November 5, 2024

Acknowledged and agreed by
Rembrandt 3D Holdings Ltd.

Stephen Blumenthal
CEO
Date:   Nov, 05, 2024

Initials Rembrandt _____ VSI _____

## CONFIDENTIALITY AND COMMON INTEREST PRIVILEGE AGREEMENT

This Confidentiality and Common Interest Privilege Agreement (the "**Agreement**") is made by and between Visual Semiconductor, Inc. ("**VSI**"), a Wyoming corporation, by and through its counsel Akerman LLP, and Rembrandt 3D Holding Ltd. ("**Rembrandt**"), a Nevis corporation.

This Agreement memorializes in writing certain understandings reached between VSI Rembrandt (collectively, the "**Parties**") with respect to their respective interests in connection with the bankruptcy case, *In re: Stream TV Networks, Inc., et al.*, Case No. 23-10763 (MDC) (the "**Bankruptcy Case**").

The Parties jointly and severally agree that there are common interests on their part with respect to the Bankruptcy Case and any related investigation, contemplated proceeding and proceedings, specifically in relation to: (a) enforcement of the Temporary Restraining Order (TRO) (ECF No. 119), (b) the bankruptcy estates of Stream TV Networks, Inc. and Technovative Media Inc., and (c) litigation funding for the Bankruptcy Case and the use of the capital of the Debtors ("**Common Interest Matters**"). The Parties have concluded that, from time to time, their mutual interests will be best served by sharing documents, computerized information, oral reports, written reports, factual material, investigative materials, legal research or analysis, mental impressions, memoranda, interview reports, and other information, including their confidences, which otherwise would be protected from disclosure to third parties under the laws of any one of the jurisdictions in which the Bankruptcy Case, or any related cases concerning the Common Interest Matters, are pending. This listing is not intended to be all-inclusive and is merely representative

of materials or information that are privileged from disclosure to adverse or other parties because
it is subject to the attorney-client privilege, the attorney work-product doctrine, the accountant-
client privilege, and/or other applicable privileges or doctrines pursuant to the laws of any one of
the jurisdictions in which the Bankruptcy Cases, or any related cases concerning the Common
Interest Matters, are pending.  Such materials or information, which expressly includes the work
product of Akerman LLP and Rembrandt's counsel, shall hereinafter be collectively referred to as
the "**Shared Materials**." It is understood that the Shared Materials disclosed by and between the
Parties shall be protected by the common interest privilege, the attorney-client privilege, attorney
work-product doctrine, and any and all other applicable privileges or rules of confidentiality,
whether or not so identified or marked.

Accordingly, the Parties jointly and severally agree as follows:

1.      During the Bankruptcy Case and any related proceedings, Shared Materials may be
exchanged or disclosed between the Parties to further their common interests.  It is the Parties'
understanding that such exchanges or disclosures, no matter how disclosed, are not intended to,
and shall not, diminish or waive in any way the confidentiality of such materials or information.
It is the Parties' understanding that any exchanges or disclosures shall be conducted and protected
pursuant to the common interest privilege to the fullest extent allowed under relevant case law.

2.      All Shared Materials shared pursuant to this Agreement by a Party to another Party
shall be made by Counsel for the party disclosing such materials (the "**Originating Party**") to
Counsel for the receiving Party. All Shared Materials shared pursuant to this Agreement by the an
Originating Party to another Party is provided in the sole discretion of the Originating Party. No
Party to this Agreement is required to share information or to receive information pursuant to this
Agreement. No Party has any right to receive information from another Party by virtue of the

Party's common interest or joint defense or as a result of being a Party to this Agreement. It shall not be presumed that information in the possession of, or available to, any Party to this Agreement has been shared with any other Party to this Agreement. Upon written notice to the other Party before sharing Shared Materials, an Originating Party may limit the disclosure of specific Shared Materials to specific persons, and any client or counsel receiving Shared Materials subject to such a restriction shall not disclose the Shared Materials to unauthorized individuals.

3.      None of the Parties will disclose Shared Materials obtained from each other, or the content thereof, to anyone except to their respective legal counsel or other professionals, or employees or agents, without first obtaining the written consent of all parties who may be entitled to claim any privileges with respect to the Shared Materials, as well as the consent of their counsel with such consent not to be unreasonably withheld.

4.      Shared Materials obtained from another party to this Agreement are to be used solely by the Parties in the Bankruptcy Case or related proceedings.  Shared Materials obtained from another party to this Agreement may not be used for any other purpose.  No such Shared Materials obtained from another party to this Agreement may be taken out of the custody of the counsel and their respective clients without the written permission of the party with rights in said materials.

5.      If another person or entity requests or demands, by subpoena or otherwise, any Shared Materials obtained from another party to this Agreement, the Parties will immediately notify the party or parties with rights in the Shared Materials and their counsel as applicable.  In addition, the client and counsel from whom such Shared Materials are requested or demanded will, prior to production of the materials, assert all applicable rights, privileges, and doctrines on behalf of all parties to the Agreement.  Also, the parties from whom such Shared Materials are requested

or demanded will take all reasonable steps to assure that all parties with rights and privileges in the material have an opportunity to assert all applicable rights and privileges, prior to production.

6.      If, at any time, it becomes apparent that either of the Parties may no longer share a common interest with respect to the Bankruptcy Case and any related proceedings, such party shall promptly notify all others who are signatories to this Agreement, and immediately return, if requested, any and all materials shared pursuant to this Agreement and, in all other respects, continue to preserve the confidentiality of all Shared Materials obtained from another party to this Agreement, in the manner set forth herein. In particular, no party shall enter into any settlement, plea, or other agreement with a third party that would require or result directly or indirectly in disclosure of any Shared Materials obtained from another party to this Agreement. None of the Parties shall use any of the Shared Materials obtained from another party to this Agreement against any other party hereto absent consent to do so.

7.      Nothing in this Agreement shall establish or impute an attorney-client relationship between any lawyer or law firm hereto and any party, other than the party for whom that lawyer or law firm is listed as counsel in the first paragraph, above. In other words, counsel for one party shall not become, or be deemed to be, counsel for any party hereto, and moreover, one party shall not become, or be deemed to be, the client or former client of any other party's counsel, by virtue of the sharing or receipt of Shared Materials. Neither the substance of this Agreement nor the exchange of Shared Materials shall be asserted by any party as a basis for any claim that any counsel to any other party is or should be disqualified from representing such other party in this or any other matter whatsoever.

8.      It is understood that the Parties have a right to take action against the interest of parties who are not their respective clients. Such actions may include, but are not limited to,

generating and disclosing information that is not protected against disclosure pursuant to this Agreement to third parties and cross-examining the clients or other counsel at trial or other proceedings. It further is understood that a client's respective counsel will not be able to cross-examine at trial or other proceedings through the direct or indirect use of Shared Materials obtained from another party to this Agreement the clients of other counsel, even though cross-examination through the use of such materials may be in the client's interest, absent consent to do so.

9.      This Agreement supersedes any prior written or oral agreement or understanding that may have been in effect between and among any of the Parties and represents the full understanding of all the parties to this Agreement. This Agreement also confirms that, to the extent that any of the Parties already have been in communication concerning any Shared Materials, such communication and any corresponding exchanges or disclosures have been made pursuant to the joint defense or common interest privilege and are now subject to this written Agreement.

10.     This Agreement may be executed in counterpart, including both original and electronically transmitted signatures.

11.     This Agreement shall be governed by the laws of the State of Delaware.

[ The rest of this page left intentionally blank ]

## CONFIDENTIALITY AND COMMON INTEREST PRIVILEGE AGREEMENT

Dated: _____, 2024    By:_____

Trevor Coddington, Esq.
Akerman LLP
*Counsel for Visual Semiconductor, Inc.*
500 West 5th Street, Suite 1210
Austin, TX 78701
Phone:  (737) 999-7102
Fax:  (737) 999-7302
Trevor.Coddington@akerman.com

Dated: _____, 2024    By:_____

Christopher Michaels, Esq.
Brown & Michaels, PC
*Counsel for Rembrandt 3D Holding Ltd.*
400 M & T Bank Building
118 North Tioga Street
Ithaca, NY 14850
Phone: (607) 256-2000
Michaels@bmplegal.com

# EXHIBIT B

# LITIGATION FUNDING AND CONFIRMATION AMENDMENT

November 20, 2024

This LITIGATION FUNDING AND CONFIRMATION AMENDMENT is made between VISUAL SEMICONDUCTOR, INC., a Wyoming corporation ("**VSI**"), and REMBRANDT 3D HOLDING LTD., a Nevis corporation ("**Rembrandt**"). VSI and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party."

**WHEREAS**, Rembrandt and VSI entered into a Litigation Funding and Confirmation Agreement on November 5, 2024 (the "**LFCA**"), confirming adherence to various agreements executed between them previously and establishing a litigation funding arrangement; and

**WHEREAS**, the Parties wish to acknowledge certain amended terms to the LFCA, effective immediately;

**NOW THEREFORE**, the Parties agree that the LFCA shall be amended as follows:

All paragraphs in Sections A through C shall remain unchanged.

Paragraph D(4) shall be amended as follows:

4. For purposes of clarity, Akerman shall determine legal strategy and draft all filings, with Rembrandt entitled to review and provide input. Such filings shall be made in the Bankruptcy Court or other courts of relevant jurisdiction on behalf of Rembrandt by Rembrandt's Counsel. As long as VSI continues to fulfill its obligations hereunder, Rembrandt agrees that it shall pursue litigation as directed by VSI until VSI succeeds in securing the assets of Stream or abandons its pursuit thereof.

All other paragraphs of Section D shall remain unchanged.

Section E(1) shall be amended as follows:

1. VSI agrees to pay a fee of Twelve Thousand U.S. Dollars (USD $12,000) per week as total compensation for participation by Blumenthal and Rembrandt's in-house attorneys providing legal support, evidence, and historical information related to the matter hereof. Rembrandt shall not be responsible for tracking hourly billing, reporting, or invoicing VSI for such services. Rembrandt shall have sole discretion in how it distributes such weekly fees among Blumenthal and its in-house attorneys, Christopher Michaels and Neil Wallace. The weekly legal fee payments shall commence the week ending November 22, 2024 and continue until the earlier of (i) the Bankruptcy Court-approved VSI-sponsored Plan effective date, (ii) rejection of the VSI-sponsored Plan by either the Bankruptcy Court or the Debtors' creditors, (iii) Bankruptcy Court approval of a Sale of the Debtors' assets; or (iv) VSI abandons or otherwise terminates its pursuit of the Debtors or their assets.

All other paragraphs of Section E shall remain unchanged.

Initials Rembrandt _____ / VSI _____

## LITIGATION FUNDING AND CONFIRMATION AMENDMENT

The foregoing represents the agreement of the Parties as of the date hereof.

Acknowledged and agreed by
Visual Semiconductor, Inc.

Mathu Rajan
CEO
Date: _November 20, 2024_

Acknowledged and agreed by
Rembrandt 3D Holdings Ltd.

Stephen Blumenthal
CEO
Date: _November 20, 2024_

Initials Rembrandt _____ / VSI _____

# EXHIBIT C

# LITIGATION FUNDING AND CONFIRMATION AMENDMENT #2

### December 30, 2024

This LITIGATION FUNDING AND CONFIRMATION AMENDMENT #2 (this "**Amendment #2**") is made between VISUAL SEMICONDUCTOR, INC., a Wyoming corporation ("**VSI**"), and REMBRANDT 3D HOLDING LTD., a Nevis corporation ("**Rembrandt**"). VSI and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party."

**WHEREAS**, Rembrandt and VSI entered into a Litigation Funding and Confirmation Agreement on November 5, 2024 (the "**LFCA**"), confirming adherence to various agreements executed between them previously and establishing a litigation funding arrangement;

**WHEREAS**, Rembrandt and VSI entered into a Litigation Funding and Confirmation Amendment on November 20, 2024 (the "**Amendment**"), confirming certain changes to the LFCA; and

**WHEREAS**, the Parties wish to acknowledge certain additional amended terms to the LFCA, effective immediately;

**NOW THEREFORE**, the Parties agree that the LFCA shall be additionally amended as described below.

All paragraphs in Sections A through C of the LFCA shall remain unchanged.

Section D is amended and restated in full as follows:

## D. LITIGATION FUNDING AND JOINT REPRESENTATION

1. VSI shall engage counsel on behalf of Rembrandt ("**Rembrandt's Counsel**") for the purposes described herein. Such Counsel shall be acceptable to Rembrandt, which acceptance shall not be unreasonably withheld, to, working in consultation with Rembrandt's in-house attorneys and VSI counsel, represent Rembrandt in the Bankruptcy Cases, cases in other venues, and the pursuit of claims therein.

2. VSI shall fund the reasonable fees and expenses of Rembrandt's Counsel in the various cases and actions provided for herein (the "**Legal Actions**"). VSI's counsel, Akerman LLP ("**Akerman**"), will work closely with Rembrandt's Counsel as Rembrandt seeks to, among other things,

   a. enforce the TRO (ECF No. 119), entered by the United States Bankruptcy Court for the Eastern District of Pennsylvania (*In re: Stream TV Networks, Inc., et al.*, Adversary Case No. 23-00057 (MDC), against SeeCubic, Inc., Mr. Stastney, and other Defendants);

   b. restore, validate, or otherwise support the Rembrandt claims in the Bankruptcy Cases;

   c. object, as needed, to the scope of the Stream TV Networks, Inc. ("**Stream**") bankruptcy estate;

   d. seek damages and other compensation for patent infringement and trade secret misappropriation by William A. Homony as the chapter 11 trustee to Stream and SSG

Initials Rembrandt _____ / VSI _____

## LITIGATION FUNDING AND CONFIRMATION AMENDMENT #2

Advisors LLC as investment banker to Stream in the U.S. District Court for the Eastern District of Pennsylvania (*Rembrandt 3D Holding Ltd. v. William Homony, SSG Advisors, et al.*, Civil Case No. 2:24-cv-06706-JMY);

e. seek damages and other compensation for patent infringement and trade secret misappropriation by SeeCubic, Inc., Hawk, Investment Holdings Limited, and other parties as may be added in the U.S. District Court for the District of Delaware (*Rembrandt 3D Holding Ltd. v. Technovative Media, Inc., SeeCubic, Inc. and Hawk Investment Holdings Limited,* Civil Case No. 1:23-cv-00193-JLH);

f. seek damages and other compensation for patent infringement and trade secret misappropriation by SeeCubic, B.V. in the U.S. District Court for the District of Delaware or other prudent jurisdiction; and

g. take other actions in the Bankruptcy Cases or legal actions in other venues as may be prudent.

3. Akerman will also serve as a strategic sounding board for Rembrandt in the Legal Actions. Rembrandt shall maintain the sole and exclusive right to control its bankruptcy claims and intellectual property rights, but VSI shall maintain the sole right to direct Rembrandt's Counsel, in consultation with Akerman and Rembrandt, in the Legal Actions. Rembrandt reserves its right to

   a. cease sharing Shared Materials, as defined in the CONFIDENTIALITY AND COMMON INTEREST AGREEMENT attached as Exhibit A to the LFCA, if a conflict arises between the parties or joint representation no longer serves the Parties' collective best interests;

   b. review all Rembrandt's Counsel/Akerman legal filings, motions, and documents prepared on Rembrandt's behalf; and

   c. with respect to the matters hereof, have an in-house legal representative on all attorney's calls, to be copied on all emails, and for Stephen Blumenthal ("**Blumenthal**") to be included on all calls to which Mathu Rajan and/or Bud Robertson participate.

4. For purposes of clarity, VSI and Akerman shall determine legal strategy and draft all filings, with Rembrandt entitled to review and provide input. Such filings shall be made in the courts of relevant jurisdiction on behalf of Rembrandt by Rembrandt's Counsel, at the sole direction of VSI. As long as VSI continues to fulfill its obligations hereunder, Rembrandt agrees that it shall pursue litigation as directed by VSI.

5. The proceeds of litigation recovery, if any, shall be applied first to the legal costs of Rembrandt's Counsel paid by VSI hereunder, then to the License Covenant obligations of VSI, and finally to the Settlement Agreement obligations of Stream. Rembrandt shall retain the overage, if any, after payment of all Rembrandt's Counsel legal costs, payment of VSI's obligations under the License Covenant, and payment of Stream's obligations under the Settlement Agreement.

6. As additional compensation for the Litigation Funding provided by VSI hereunder, VSI shall be entitled to certain intellectual property benefits as described in Section E(4) below.

Initials Rembrandt  / VSI

# LITIGATION FUNDING AND CONFIRMATION AMENDMENT #2

<u>Section E is amended and restated in full as follows:</u>

## E. OTHER TERMS

1. VSI agrees to pay a fee of Eight Thousand U.S. Dollars (USD $8,000) per week as total compensation for participation by Rembrandt's in-house attorneys providing legal support, evidence, and historical information related to the matter hereof. Rembrandt shall not be responsible for tracking hourly billing, reporting, or invoicing VSI for such services. Rembrandt shall have sole discretion in how it distributes such weekly fees among its in-house attorneys, Christopher Michaels and Neil Wallace. The weekly legal fee payments shall commence the week ending January 3, 2025 and continue for 30 days. For the next 30 days ("**Second 30 Days**"), VSI agrees to pay a fee of Six Thousand U.S. Dollars (USD $6,000) per week. After the Second 30 Days, the fee shall become Three Thousand U.S. Dollars (USD$3,000) per week, as needed.

2. In consideration of Blumenthal's consulting services provided hereunder, VSI agrees to pay Blumenthal:

   a. Twenty-Five Thousand U.S. Dollars ($25,000) on November 8, 2024;

   b. Twenty Thousand U.S. Dollars ($20,000) on November 15, 2024; and

   c. Six Thousand Five Hundred U.S. Dollars ($6,500) per week, commencing on November 22, 2024, and continuing until the earlier of (i) VSI obtains legal title and possession of the Stream Ultra-D technology; (ii) Rembrandt receives a monetary settlement satisfactory to VSI; or (iii) VSI abandons or otherwise terminates its pursuit of the Stream Ultra-D technology or claims related thereto.

3. Fees paid pursuant to sections E(1) and E(2) shall be refunded to VSI from the proceeds of litigation recovery, if any.

4. In the event that Rembrandt succeeds in obtaining ownership of or access to the Stream Ultra-D technology, Rembrandt shall immediately transfer the entirety of such ownership or access to VSI as partial consideration for the litigation funding provided hereunder.

5. Notwithstanding anything to the contrary in the LFCA, the Amendment or this Amendment #2, Rembrandt shall not propose or agree to any settlement in the Legal Actions without VSI's prior written consent and approval.

6. Payments pursuant to sections E(1) and E(2) above shall be made by ACH or wire transfer to:

   | | |
   |---|---|
   | Account Name: | SVS 3D Consulting Services |
   | Bank: | Tompkins Community Bank |
   | Bank Address: | P.O. Box 460, Ithaca, NY 14851 |
   | Wire Routing (ABA): | 021302648 |
   | Account Number: | 0111142536 |

7. VSI and Rembrandt agree to abide by the terms of the Confidentiality and Common Interest Agreement attached hereto as Exhibit A.

8. This Agreement shall be interpreted under Delaware law and the parties agree to Delaware courts for jurisdiction and venue.

Initials Rembrandt _____ / VSI _____

## LITIGATION FUNDING AND CONFIRMATION AMENDMENT #2

All other terms and conditions of the LFCA not amended or restated above shall remain in full effect as of the date first agreed upon.

All terms and conditions of the Confidentiality and Common Interest Privilege Agreement attached as Exhibit A to the LFCA shall remain in full effect as of the date first agreed upon.

The foregoing represents the agreement of the Parties as of the date hereof.

Acknowledged and agreed by
Visual Semiconductor, Inc.

Mathu Rajan
CEO
Date: January 13, 2025

Acknowledged and agreed by
Rembrandt 3D Holdings Ltd.

Stephen Blumenthal
CEO
Date: Jan 13, 2025

Initials Rembrandt____ VSI ____

# EXHIBIT D

# **<u>EXHIBIT 5</u>**

Wire Transfer Payment Confirmations to

Chris Michaels, Rembrandt Counsel

Brown & Michaels, PC

**Print this Page**

**Transfer status: In Process**
**Order number:20241108B6B7HU4R009963**

**Transfer Accounts**

> From: Business Adv Fundamentals - 7952 : ▆▆▆▆▆▆▆▆

> To: Chris (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

> Send amount: $3,000.00

> Additional fee: $30.00

**Transfer description**

Legal Fees

**Transfer dates**

> Frequency: One time, immediately

> Delivery speed: Same Day

> Start on date: 11/08/2024

Estimated delivery date: 11/08/2024
> **Note:**The receiving bank may make funds available later
> than this.

Print this Page

**Transfer status: In Process**
**Order number:20241115B6B7HU3R021197**

**Transfer Accounts**

From:  Business Adv Fundamentals - 7952 :  ███████████████

To:  Chris (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount:  $3,000.00

Additional fee:  $30.00

**Transfer description**

Legal Fees

**Transfer dates**

Frequency:  One time, immediately

Delivery speed:  Same Day

Start on date:  11/15/2024

Estimated delivery date:  11/15/2024
**Note:**The receiving bank may make funds available later than this.

**Print this Page**

**Transfer status: In Process**
**Order number: 20241121B6B7HU3R015093**

**Transfer Accounts**

**From:** Business Adv Fundamentals - 7952 :

**To:** Chris (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount: $12,000.00

Additional fee: $30.00

**Transfer description**

Legal Fees

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 11/21/2024

Estimated delivery date: 11/21/2024
**Note:** The receiving bank may make funds available later
than this.

Print this Page

**Transfer status: In Process**
**Order number:523423958**

Transfer Accounts

From: Business Adv Fundamentals - 7952 :

To: Chris (Tompkins County Trust Co)

Transfer Details

**Send amount**

Send amount: $12,000.00

Additional fee: $30.00

**Transfer description**

Legal Fees 11-29-2024

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 11/29/2024

Estimated delivery date: 11/29/2024
**Note:**The receiving bank may make funds available later than this.

**Print this Page**

**Transfer status: In Process**
**Order number:20241206B6B7HU4R016104**

**Transfer Accounts**

      **From:** Business Adv Fundamentals - ▬▬▬▬▬▬▬▬

      **To:** Chris (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

      Send amount: $12,000.00

      Additional fee: $30.00

**Transfer description**

Legal Fees 12-6-2024

**Transfer dates**

      Frequency: One time, immediately

      Delivery speed: Same Day

      Start on date: 12/06/2024

Estimated delivery date: 12/06/2024
      **Note:**The receiving bank may make funds available later
      than this.

Print this Page

**Transfer status: In Process**
**Order number:20241213B6B7HU3R013317**

### Transfer Accounts

**From:**  Business Adv Fundamentals - 7952 ▬▬▬▬▬▬

**To:**  Chris (Tompkins County Trust Co)

### Transfer Details

**Send amount**

Send amount:  $12,000.00

Additional fee:  $30.00

**Transfer description**

Legal Fees 12-13-2024

**Transfer dates**

Frequency:  One time, immediately

Delivery speed:  Same Day

Start on date:  12/13/2024

Estimated delivery date:  12/13/2024
**Note:** The receiving bank may make funds available later than this.

<u>Print this Page</u>

**Transfer status: In Process**
Order number:527143188

### Transfer Accounts

**From:** Business Adv Fundamentals - 7952 : ████████████

**To:** Chris (Tompkins County Trust Co)

### Transfer Details

**Send amount**

Send amount: $12,000.00

Additional fee: $30.00

**Transfer description**

Legal Fees 12-20-2024

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 12/20/2024

Estimated delivery date: 12/20/2024
**Note:**The receiving bank may make funds available later than this.

Print this Page

Transfer status: In Process
Order number:20250411B6B7HU1R013351

Transfer Accounts

From:   Business Adv Fundamentals - 7952

To:   Chris (Tompkins County Trust Co)

Transfer Details

Send amount

Send amount:  $10,000.00

Additional fee:  $30.00

Transfer description

Participation in next week

Transfer dates

Frequency:  One time, immediately

Delivery speed:  Same Day

Start on date:  04/11/2025

Estimated delivery date:  04/11/2025
Note:The receiving bank may make funds available later than this.

# **EXHIBIT 6**

Wire Transfer Payment Confirmations to

Stephen K. Blumenthal, CEO of Rembrandt

d/b/a  SVS 3D Consulting Services

## Print this Page

**Transfer status: In Process**
**Order number:20241108B6B7HU4R010602**

### Transfer Accounts

**From:** Business Adv Fundamentals - 7952 ███████████

**To:** SVS (Tompkins County Trust Co)

### Transfer Details

**Send amount**

Send amount: $25,000.00

Additional fee: $30.00

**Transfer description**

Legal Fees

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 11/08/2024

Estimated delivery date: 11/08/2024
**Note:**The receiving bank may make funds available later
than this.

Print this Page

**Transfer status: In Process**
**Order number:20241115B6B7HU1R021851**

### Transfer Accounts

From:   Business Adv Fundamentals - 7952 : ▆▆▆▆▆▆▆▆▆▆

To:   SVS (Tompkins County Trust Co)

### Transfer Details

**Send amount**

Send amount:   $20,000.00

Additional fee:   $30.00

**Transfer description**

Legal Fees

**Transfer dates**

Frequency:   One time, immediately

Delivery speed:   Same Day

Start on date:   11/15/2024

Estimated delivery date:   11/15/2024
**Note:**The receiving bank may make funds available later
than this.

Print this Page

**Transfer status: In Process**
**Order number:522155254**

Transfer Accounts

From: Business Adv Fundamentals - 7952 : ▬▬▬▬▬▬▬

To: SVS (Tompkins County Trust Co)

Transfer Details

**Send amount**

Send amount: $6,500.00

Additional fee: $30.00

**Transfer description**

Blumenthal Legal Fees

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 11/21/2024

Estimated delivery date: 11/21/2024
Note:The receiving bank may make funds available later than this.

Print this Page

**Transfer status: In Process**
**Order number:523424864**

**Transfer Accounts**

**From:** Business Adv Fundamentals - 7952 : ▬▬▬▬▬▬▬

**To:** SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount: $6,500.00

Additional fee: $30.00

**Transfer description**

Blumenthal Legal Fees 11-29-2024

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 11/29/2024

Estimated delivery date: 11/29/2024
**Note:**The receiving bank may make funds available later
than this.

<u>Print this Page</u>

**Transfer status: In Process**
**Order number:20241206B6B7HU1R016626**

### Transfer Accounts

**From:** Business Adv Fundamentals

**To:** SVS (Tompkins County Trust Co)

### Transfer Details

**Send amount**

Send amount: $6,500.00

Additional fee: $30.00

**Transfer description**

Blumenthal Legal Fees 12-6-2024

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 12/06/2024

Estimated delivery date: 12/06/2024
**Note:**The receiving bank may make funds available later than this.

**Print this Page**

**Transfer status: In Process**
**Order number:20241213B6B7HU1R013524**

**Transfer Accounts**

      **From:**  Business Adv Fundamentals - 7952 : ▓▓▓▓▓▓▓▓▓▓▓

      **To:**  SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

    Send amount:  $6,500.00

    Additional fee:  $30.00

**Transfer description**

Blumenthal Legal Fees 12-13-2024

**Transfer dates**

    Frequency:  One time, immediately

    Delivery speed:  Same Day

    Start on date:  12/13/2024

    Estimated delivery date:  12/13/2024
      **Note:**The receiving bank may make funds available later
      than this.

Print this Page

**Transfer status: In Process**
Order number:20241220B6B7HU4R021673

**Transfer Accounts**

From:  Business Adv Fundamentals - 7952 : ▮▮▮▮▮▮▮▮▮▮

To:  SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount:  $6,500.00

Additional fee:  $30.00

**Transfer description**

Blumenthal Legal Fees 12-20-2024

**Transfer dates**

Frequency:  One time, immediately

Delivery speed:  Same Day

Start on date:  12/20/2024

Estimated delivery date:  12/20/2024
                         **Note:**The receiving bank may make funds available later
                         than this.

Print this Page

Transfer status: In Process
Order number:20241227B6B7HU4R010170

Transfer Accounts

> From: Business Adv Fundamentals - 7952 <span>▮▮▮▮▮▮▮▮</span>
>
> To: SVS (Tompkins County Trust Co)

Transfer Details

Send amount

> Send amount: $6,500.00

> Additional fee: $30.00

Transfer description

Blumenthal Legal fee 12-27-2024

Transfer dates

> Frequency: One time, immediately
>
> Delivery speed: Same Day
>
> Start on date: 12/27/2024

Estimated delivery date: 12/27/2024
**Note:**The receiving bank may make funds available later than this.

Print this Page

**Transfer status: In Process**
**Order number:529393298**

**Transfer Accounts**

> **From:** Business Adv Fundamentals - 7952 : ⬛⬛⬛⬛⬛⬛
>
> **To:** SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

> Send amount: $6,500.00
>
> Additional fee: $30.00

**Transfer description**

Blumenthal Legal fee 1-3-2025

**Transfer dates**

> Frequency: One time, immediately
>
> Delivery speed: Same Day
>
> Start on date: 01/03/2025

Estimated delivery date: 01/03/2025
**Note:**The receiving bank may make funds available later than this.

**Print this Page**

**Transfer status: In Process**
**Order number:20250110B6B7HU1R014462**

**Transfer Accounts**

From: Business Adv Fundamentals - 7952 :

To: SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount: $6,500.00

Additional fee: $30.00

**Transfer description**

Blumenthal Legal fee 1-10-2025

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 01/10/2025

Estimated delivery date: 01/10/2025
**Note**:The receiving bank may make funds available later
than this.

**Print this Page**

**Transfer status: In Process**
**Order number:20250117B6B7HU3R018228**

**Transfer Accounts**

**From:** Business Adv Fundamentals - 7952 : ~~█████████████~~

**To:** SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount: $14,500.00

Additional fee: $30.00

**Transfer description**

Blumenthal Legal fee 1-17-2025

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 01/17/2025

Estimated delivery date: 01/17/2025
**Note**:The receiving bank may make funds available later
than this.

**Bank of America** 🇺🇸                                          Online Banking

---

### Business Adv Fundamentals - 7952: Account Activity Transaction Details

---

| | |
|---:|:---|
| **Post date:** | 01/24/2025 |
| **Amount:** | -6,500.00 |
| **Type:** | Withdrawal |
| **Description:** | WIRE TYPE:WIRE OUT DATE:250124 TIME:1641 ET TRN:2025012400638565 SERVICE REF:018617 BNF:SVS 3D CONSULTING SERVICES ID:0111142536 BNF BK:TOMPKINS COMMUNITY BANK ID:021302648 PMT DET:532582242 BLUMENTHAL LEGAL FEE 1-24-2025 |
| **Merchant name:** ⍰ | SVS 3D CONSULTING SERVICES |
| **Merchant information:** | |
| **Transaction category:** | Cash, Checks & Misc: Other Expenses |

Print this Page

**Transfer status: Scheduled**
**Order number:532626386**

Transfer Accounts

From:  Business Adv Fundamentals - 7952 :

To:  SVS (Tompkins County Trust Co)

Transfer Details

**Send amount**

Send amount:  $8,000.00

Additional fee:  $30.00

**Transfer description**

Blumenthal Legal Fee 1-25-2025

**Transfer dates**

Frequency:  One time on...

Delivery speed:  Same Day

Start on date:  01/27/2025

Estimated delivery date:  01/27/2025
Note:The receiving bank may make funds available later
than this.

Print this Page

**Transfer status: Scheduled**
**Order number:533876758**

**Transfer Accounts**

**From:** Business Adv Fundamentals - 7952 : ▓▓▓▓▓▓▓▓▓▓

**To:** SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount: $14,500.00

Additional fee: $30.00

**Transfer description**

Blumenthal Legal Fee 2-2-2025

**Transfer dates**

Frequency: One time on...

Delivery speed: Same Day

Start on date: 02/03/2025

Estimated delivery date: 02/03/2025
**Note:** The receiving bank may make funds available later than this.

<u>Print this Page</u>

**Transfer status: In Process**
**Order number:20250207B6B7HU4R011226**

**Transfer Accounts**

**From:** Business Adv Fundamentals - 7952 : ▓▓▓▓▓▓▓▓

**To:** SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount: $14,500.00

Additional fee: $30.00

**Transfer description**

Blumenthal Legal Fee 2-7-2025

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 02/07/2025

Estimated delivery date: 02/07/2025
**Note**:The receiving bank may make funds available later than this.

<u>Print this Page</u>

**Transfer status: In Process**
**Order number:20250218B6B7HU4R020302**

**Transfer Accounts**

**From:** Business Adv Fundamentals - 7952 ;

**To:** SVS (Tompkins County Trust Co)

**Transfer Details**

**Send amount**

Send amount: **$14,500.00**

Additional fee: $30.00

**Transfer description**

Blumenthal Legal fee 2-18-2025

**Transfer dates**

Frequency: One time, immediately

Delivery speed: Same Day

Start on date: 02/18/2025

Estimated delivery date: 02/18/2025
**Note:**The receiving bank may make funds available later
than this.

Print this Page

**Transfer status: Scheduled**
**Order number:538596672**

**Transfer Accounts**

|  |  |
|---|---|
| **From:** | Business Adv Fundamentals - 7952 : ▬▬▬▬▬ |
| **To:** | SVS (Tompkins County Trust Co) |

**Transfer Details**

**Send amount**

|  |  |
|---|---|
| **Send amount:** | $12,500.00 |
| Additional fee: | $30.00 |

**Transfer description**

Blumenthal Legal Fee 3-1-2025

**Transfer dates**

|  |  |
|---|---|
| Frequency: | One time on... |
| Delivery speed: | Same Day |
| Start on date: | 03/03/2025 |
| Estimated delivery date: | 03/03/2025 |
|  | **Note:** The receiving bank may make funds available later than this. |

Print this Page

Transfer status: In Process
Order number:20250318B6B7HU3R012108

Transfer Accounts

From:  Business Adv Fundamentals - 7952

To:  SVS (Tompkins County Trust Co)

Transfer Details

Send amount

Send amount:  $12,500.00

Additional fee:  $30.00

Transfer description

Blumenthal Legal Fee 3-18-2025

Transfer dates

Frequency:  One time, immediately

Delivery speed:  Same Day

Start on date:  03/18/2025

Estimated delivery date:  03/18/2025
Note:The receiving bank may make funds available later than this.

# EXHIBIT E

**TERM SHEET**

**FOR**

**DEVELOPMENT, SUPPLY, AND LICENSE AGREEMENT**

**BETWEEN**

**STREAM TV NETWORKS, INC.**

**AND**

**REMBRANDT 3D HOLDINGS LTD**

**April 9, 2019**

*[handwritten annotation: Raja Rajan and Mathu Rajan are individuals who are defendants in the litigation]*

Stream TV Networks, Inc. ("Stream" or "Stream TV") is a Delaware corporation. Rembrandt 3D Holdings, Ltd ("Rembrandt") is a Nevis corporation. Rembrandt and Stream are referred to herein as the "Parties", and each one of them is a "Party".

*[handwritten annotation: Raja Rajan and Mathu Rajan]*

This non-binding term sheet ("Term Sheet") details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, ~~whether~~ existing as of the date hereof ~~or hereafter arising.~~ The final documentation regarding the Termsheet (the "Agreement") shall be executed by May 31, 2019. This Term Sheet is **non-binding** but subject to the Protective Order (Docket No. 60) signed by the Parties, in the litigation captioned *Rembrandt 3d Holding LTD v. Stream TV Networks, Inc., et al.*, No. 17 Civ. 00882 (S.D.N.Y.) (the "Litigation").

1. Confidentiality: The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Term Sheet and negotiation. The Parties agree further that the negotiation is subject to Rule 408 of the Federal Rules of Evidence and all discussions or negotiations are inadmissible in any proceeding.

2. Costs and Expenses: Each Party shall be responsible for its own costs and expenses in negotiating the terms of this transaction, and Rembrandt shall arrange for a first draft of the license, supply and development agreement(s). Stream will draft the Release Agreement.

3. Law: This Term Sheet and the terms for this transaction shall be governed by the laws of Delaware exclusively, and the Parties shall submit to that jurisdiction.

4. Commencement: Commencement of this intended settlement shall be only triggered only upon the signing of the long form agreements that include the release agreement and the license, supply and development agreement(s).

5. General Release: Contemporaneously with and subject to the payment of the

consideration of the settlement agreement, each Party shall enter into a general release of all claims, known and unknown (including any pending claims) against the other Party and its respective affiliates, subsidiaries, equity holders, directors, officers, employees, contractors, agents, advisors, counsel, successors and assigns.

6.  Products

(a) Provision of 4K Units –Stream TV will ship to Rembrandt ~~50~~ *100* 4K Ultra-D 65" units; it is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice.  Stream will pay transportation and all importation  costs of these units.

(b) High Resolution Units

(1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with ~~five~~ *eight* prototypes as follows:

i) the first unit by July 1, 2019;

ii) 2 units on or before September 1, 2019;

iii) 2 units on or before October 1, 2019; *iv) 3 units on or before December 1, 2019.*

Stream will warehouse such 4k and 8k units (for the 4k units and prototypes of the 8k) in facilities until shipping is requested by Rembrandt to a destination within the United States.   Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes. Stream will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution

based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost ~~the lesser of 1% of the units produced or~~ *and otherwise at standard commercial terms,* the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal on 1,000 units by December 31, 2019 and then increasing by 1,000 units/month every three months thereafter until the end of term. Such minimum right of first refusal is not cumulative and if Rembrandt does not use such right within a given month it does not carry over to future months. *Rembrandt may purchase additional units by paying Most FAvored Nation status at standard commercial terms*

7. **OEM**

Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications.

White Label - Rembrandt may brand product purchased from Stream with Rembrandt trademarks. Rembrandt will not remove any patent number marking applied by Stream.

8. **Term**

The Term of the agreement shall continue through December 31, 2030. ~~Upon termination Stream shall have a fully paid up license to all technology rights provided under this agreement.~~

9. **Rembrandt Grant of Rights**

Rembrandt shall grant a non-exclusive license to Stream to all Rembrandt Technologies listed in Schedule A to this Term Sheet for Rembrandt.

10. **Stream Grant of Rights**

Stream shall grant Rembrandt a non-exclusive license to any existing Stream technologies that Stream has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein. Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable.

| 11. Field | The licensed field of use from Rembrandt to Stream is all applications |
|---|---|
| | The licensed field of use from Stream to Rembrandt is all applications. |
| 12. Territory | All territories whether or not patents are issued or pending or licensed. Sale to any distributor in any territory is permitted for the Field ~~and such sales shall be subject to royalties.~~ |
| 13. Co-Marketing | Rembrandt and Stream shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party. |
| | Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses. |
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products ~~manufactured for sale~~ <sub>∧distributed</sub> by the Party. ~~Further sublicensing requires the consent of the Party granting the license, which shall not be unreasonably withheld if the granting party would receive the same royalties on sales as if the Party that received the license was making the sale.~~ |
| 15. Consideration | In addition to the product provided as consideration and described above, Stream shall provide the following as consideration: |

a) Upon execution of the Agreements contemplated by this Term Sheet, Stream TV will pay to Rembrandt the lump sum of one million ($1,000,000) USD. It is understood that total will be paid in four instalments paid quarterly with the final payment on or before June 30, 2020. ∧

b) Stream TV will pay Rembrandt a ∧fee ~~of twenty thousand~~ <sub>∧monthly</sub> ~~($20,000) USD per month~~ beginning with the execution of the Agreement for the full Term of this Agreement, According to the following schedule:

*Handwritten annotations:*

Stream shall also provide ∧ two million warrants, with provision of a cashless exercise price at a $1.50 value per Warrant. ~~The warrants~~ ~~$20,000~~

- 12 months @ $20,000/per month
- 12 months @ $24,000/per month
- 12 months @ $28,000/per month
- 12 months @ $32,000/per month
- 12 months @ $36,000/per month
- 79 months @ $40,000/per month.

The monthly payments shall be Accelerated upon a merger, acquisition, or change of control. No Accelleration by IPO.

JLS            SB

**Signed for and on behalf of Stream:**          **Signed for and on behalf of Rembrandt:**

............................................................          ...............................................................
Signature                                       Signature

............................................................          ...............................................................
Print Name                                      Print Name

............................................................          ...............................................................
Witness Signature                               Witness Signature

............................................................          ...............................................................
Print name                                      Print name

............................................................          ...............................................................
Date                                            Date

*Raja Rajan*

*Mathu Rajan*



**SCHEDULE A**

1. **Knowhow and trade secrets related to methodology for:**
a. **efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology**
b. **utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.**
c. **utilizing the On Screen Display functions of Borders and "Liveliness."**
2. **Trademarks**
3. **the patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)**

## Representations and Warranties

The Parties represent and warrant ~~that~~ to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed or learned ~~during othe~~ during the pendency of the Litigation

## Next Steps

- Stream to provide Warrant Agreement, Supply Agreement, and any patents filed within last 18 months.

- Stream will investigate and provide Rembrandt an answer as to whether it can represent and warrant that it will not revive any abandoned patents



# EXHIBIT F

**THIS SETTLEMENT AGREEMENT AND MUTUAL RELEASE** (this "Agreement") is entered into as of May 23, 2021 (the "Effective Date"), by and among, **Stream TV Networks, Inc.**, a Delaware corporation (the "Company" or "Stream TV"), **Mathu Rajan** ("M. Rajan"), and **Raja Rajan** ("R. Rajan," and, together with the Company and M. Rajan, collectively, the "Company Parties"), on the one side, and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt") on the other side. Each of the Company Parties and Rembrandt are referred to herein collectively as the "Parties" and each as a "Party".

## BACKGROUND

Stream TV is a Philadelphia-based new media company created to serve a consumer market seeking enhanced entertainment and communications experiences through devices with unlimited accessibility and superior quality;

Rembrandt is the successor to 3DFusion Corp. ("3D Fusion");

On January 6, 2017, Rembrandt filed suit against the Company in the Supreme Court of New York, New York County, which the Company removed to the U.S. District Court for the Southern District of New York captioned Rembrandt 3D Holding LTD v. Stream TV Network, Inc., et al., No. 17 Civ. 00882 (RA) (KHP) (S.D.N.Y.) (the "Litigation");

This Agreement details a global settlement arrangement between Stream and Rembrandt, intended to settle all disputes between them, existing as of the effective date of May 23, 2021 ("Effective Date"). This Agreement is subject to the Protective Order (Docket No. 60) signed by the Parties in the Litigation.

Without admitting liability for any claim or damages, the Parties to this Agreement desire to settle the Litigation and agree to enter this Settlement Agreement and Mutual Release.

NOW THEREFORE, in consideration of the mutual promises, covenants, undertakings and agreements set forth herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. Confidentiality:      The Parties have executed a Protective Order in the Litigation (Docket No. 60) and the terms of the Protective Order shall cover this Agreement.

2. Costs and Expenses      Each Party shall be responsible for its own costs and expenses in negotiating the terms of this Agreement.

3. Law:      This Agreement shall be governed by the laws of Delaware, without regard to its conflict of law principles.

4. Commencement      Commencement of this intended settlement shall be triggered upon the execution of this Agreement and the Warrant

Agreement (Exhibit A) (which is incorporated herein by reference) and the attached Stipulation Of Voluntary Dismissal Pursuant To F.R.C.P. 41(a)(1)(A)(ii) (Exhibit B) which will be executed immediately after execution of this Agreement.

5. General Release

a. Each of the Company Parties and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys do hereby fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises, obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have, or have had, past, present, or future, against Rembrandt and its predecessors, successors, affiliates, subsidiaries, agents, officers, directors, members, managers, employees, owners and shareholders, relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

b. Upon payment of all payments under Section 15. Consideration, each of Rembrandt and their agents, respective insurance companies, third-party administrators, parents, subsidiaries, affiliates, owners, officers, directors, members, managers, general partners, limited partners, agents, employees, servants, assigns, predecessors, successors, shareholders, representatives, special servicers, related entities, and attorneys agree to fully, knowingly, voluntarily, intentionally, unconditionally, and irrevocably waive, release, and forever discharge any and all claims, debts, demands, losses, actions, causes of actions, suits, costs, damages, expenses, accounts, covenants, contracts, controversies, agreements, promises obligations, and liabilities whatsoever, both in law and in equity, in contract, tort or otherwise, all whether known or unknown, which they may have now, or ever may have,

or have had, past, present, or future, against any of the Company Parties and their respective predecessors, successors, affiliates, subsidiaries, agents, officers, directors, employees, and shareholders (and, in the case of M. Rajan and R. Rajan, their respective heirs, personal representatives, executors, and administrators) relating to the conduct, facts or circumstances giving rise to the Litigation prior to the Effective Date.

6. Products

(a) Provision of 4K Units – Stream TV will ship to Rembrandt 100 of the following units: Display/Monitor Model: SC65D21Q-4K 65" Ultra-D Display (the "4K Units"). It is understood by the Parties that the 4K units will be provided "as is" and have no warranty or returnability available. Rembrandt will provide Stream TV with written notice ("Delivery Notice") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice. Stream will pay transportation and all importation costs of these units. Upon execution of this Agreement Stream TV will notify Rembrandt if it will not be able to deliver any of the 4K Units and $5,250.00 will be added to the consideration under Section 15. A. for each 4K Unit that Stream TV can not provide upon execution or Stream TV will agree to provide additional 8K prototype units as a replacement for the 4K units to be delivered at up to 10 units/month starting seven months after Prototype Commencement.

(b) High Resolution Units
   (1) As Stream TV builds 8K resolution units, after the Agreements are mutually executed, Stream will provide Rembrandt with eight prototypes as follows:
      i) the first unit within one month of the first prototype created by Stream TV of an 8K resolution unit after execution of this Agreement ("Prototype Commencement");
      ii) 2 units on or before three months from Prototype Commencement;
      iii) 2 units on or before four months from Prototype Commencement; and
      iv) 3 units on or before six months from

Prototype Commencement.
Stream TV will warehouse such 4K and 8K units (for the 4K units and prototypes of the 8K) in facilities until shipping is requested by Rembrandt to a destination within the United States. Rembrandt will provide Stream TV with written notice ("Delivery Notice of Prototypes") of where the units are to be shipped as part of the Agreements. Any storage, tax, if any, or other incidental fees for those units will be the responsibility of Rembrandt once units are in the U.S. to the location specified on the Delivery Notice of Prototypes. Stream TV will pay transportation and all importation costs of these units. The default is that the Delivery Notice of Prototypes is to the location of 128 Bull Hill Road, Newfield New York, 14867.

It is understood notwithstanding anything to the contrary Stream TV is not obligated to hold those samples for Rembrandt if the is a change to the default location Rembrandt is unwilling to ship the units within seven days of them being completed and in such case Stream TV may use those prototypes for any purpose thereafter without any obligation to Rembrandt.

(2) Standard Products - As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost, and otherwise at standard commercial terms, the minimums provided below. It is understood by both Parties that Stream TV is not required to change its business model which may or may not include completing finished units. If Rembrandt accepts the order and meet the financial and volume requirements required by Stream TV, then Rembrandt will retain this option. If Rembrandt does not exercise this option with a specific plan within seven (7) business days, then Stream TV can offer this inventory to other customers as needed. Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus and 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of term.

Such minimum right of first refusal is cumulative and if Stream TV is not in production or Rembrandt does not use such right within a given month it carries over to future months. Rembrandt may purchase additional units by paying standard commercial terms with most favored nation status on a per unit price basis and similar shipping terms.   At present the following products defined in the attached specification sheets provided by Stream TV on June 13, 2019 are Standard Products attached hereto as Exhibit B, which is incorporated herein by reference.)

(3) Title for each of the Units shall transfer to Rembrandt, and risk of loss will be assumed by Rembrandt, upon delivery of each such Unit.

(4) Tax Matters.  Rembrandt shall be solely responsible for any taxes chargeable to the purchaser of goods in connection with or arising out of the transfer of the Units. Stream TV shall be solely responsible for any taxes chargeable to the seller of goods in connection with or arising out of the transfer of the Units.

7.  OEM

Stream TV in good faith is not finishing products but will recommend to Rembrandt certain Original Equipment Manufacturers ("OEM") that Rembrandt may wish to utilize after it fully investigates the finished products capabilities under its specifications; however, the selection of OEM(s) is at Rembrandts discretion. In such case Stream TV will provide the 3D components directly to the OEM with Rembrandt's specifications.

White Label - Rembrandt may brand product purchased from Stream TV with Rembrandt trademarks.  Rembrandt will not remove any patent number marking applied by Stream.

8.  Term

The Term of the Agreement shall continue through December 31, 2030.

9.  Rembrandt Grant of Rights

Rembrandt hereby grants a non-exclusive license to Stream TV to all Rembrandt Technologies listed in Schedule A to this

Agreement for Rembrandt.

| | |
|---|---|
| 10. Stream Grant of Rights | Stream TV hereby grants Rembrandt a non-exclusive license to any existing Stream technologies that Stream TV has the right to license/sub-license solely to enable Rembrandt to distribute Products described herein.    Rembrandt shall obtain or reimburse Stream for Stream's Philips license as part of the At Cost price, as applicable. |
| 11. Field | The licensed field of use from Rembrandt to Stream TV is all applications |
| | The licensed field of use from Stream TV to Rembrandt is all applications. |
| 12. Territory | All territories whether or not patents are issued or pending or licensed.  Sale to any distributor in any territory is permitted for the Field. |
| 13. Co-Marketing | Rembrandt and Stream TV shall work cooperatively to educate and co-market the benefit of the no glasses 3D technology and agree to not disparage the other Party. |
| | Stream will be responsible for its own sales and marketing expenses and Rembrandt will be responsible for their own sales and marketing expenses. |
| 14. Sub-license | Either Party may sublicense their rights to other parties for the purpose of having products distributed by the Party. |
| 15. Consideration | In addition to the product provided as consideration and described above, Stream TV shall provide the following as consideration:<br>a) Upon execution of this Agreement, Stream TV agrees to pay to Rembrandt the lump sum of one million five hundred twenty eight thousand ($1,528,000) USD and is due immediately.<br>b) Stream TV is providing  warrants equal to X% of the outstanding stock in Stream TV after Stream TV has raised at least sixty million dollars in capital in excess of all outstanding debt and currently liabilities, with provision of a cashless exercise price at a $$Y value per warrant, pursuant to the attached Warrant Agreement (Exhibit A), which is incorporated herein by reference. |

"X%" shall be equal to the 2,000,000/(the number of shares in Stream TV outstanding on April 9, 2019). "$Y value" shall be equal to (the book equity value of Stream TV at issuance)/(the number of shares in Stream TV outstanding at issuance)

c) Stream TV will pay Rembrandt a monthly fee ("Monthly Payment") beginning with the execution of the Agreement for the full Term of this Agreement, according to the following schedule:

    a. 12 months @ $28,000/per month
    b. 12 months @ $32,000/per month
    c. 12 months @ $36,000/per month
    d. 79 months @ $40,000/per month

    The monthly payments shall be accelerated upon a merger, acquisition, or change of control. No acceleration by IPO.

**16. Payments**

Stream TV shall pay each Installment and Monthly Payment by wire transfer of immediately available funds to an account designated by Rembrandt in writing below, or otherwise designated by Rembrandt in writing and delivered to mathu@streamacquistiongroup.com:

Eng Law Firm, Attorney Trust Account [TD Bank A/C# 4327484509 ABA# 031201360].

**17. Representations and Warranties**

The Parties represent and warrant to one another that they will not bring a trade secret claim based upon any information that is the basis for the Litigation or was otherwise disclosed of learned during the pendency of the Litigation.

Stream TV represents and warrants that it has not revived and will not revive any abandoned patents or patent applications that were abandoned prior to the Effective Date.

Each of the Parties hereby represents and warrants to the others that, as of the Effective Date, (i) it has full power and authority to execute and deliver this Agreement and to perform its obligations hereunder, (ii) the execution, delivery, and performance of this Agreement have been duly authorized by all necessary corporate or company action on its behalf, (iii) this Agreement has been duly and validly executed and delivered by it and constitutes a legal, valid and binding obligation enforceable against it in accordance with the terms

of this Agreement, (iv) each individual signing this Agreement
in a representative capacity acknowledges and represents that
he/she is duly authorized to execute this Agreement in such
capacity in the name of, and on behalf of, the designated
Party; and (v) the agreements and understandings identified
herein constitute all of the agreements and understandings
between and among the Parties with respect to the subject
matter hereof.

18. Notices                Notices required by this Agreement shall be submitted either
by any form of overnight courier or by hand delivery, and
simultaneously by e-mail, as follows:

To Stream TV, ~~Raja Rajan~~ Mathu Rajan:
Stream TV Networks, Inc
2009 Chestnut Street
3rd Floor
Philadelphia, PA 19103
~~Attention:~~ General Counsel, Mathu and/or Raja Rajan
individually

and

XXX

To Rembrandt:
128 Bull Hill Road
Newfield, New York  14867
Attention: Stephen Blumenthal
Email:  Stephen3d@mac.com

and

Eng Law Firm
369 Lexington Ave., 2nd Floor
New York, New York  10017
Attention: Chi Eng
Email:  chi@englawfirm.com

Brown & Michaels, PC
118 N. Tioga St, 4th Floor
Ithaca, NY 14850
Attention: Christopher Michaels
Email: michaels@bpmlegal.com

| 19. Advice of Counsel | Each Party has been represented by counsel of its own selection, has reviewed this Agreement, has had the terms of this Agreement explained by counsel, and understands the contents and effect of this Agreement. Each Party enters into this Agreement wholly upon each Party's own respective judgments, beliefs and knowledge of the matters set forth herein and on the advice of each Party's own respective attorneys. |
|---|---|
| 20. Entire Agreement | It is expressly understood and agreed that this Agreement along with all of the following documents: 1) the Warrant Agreement; and 2) the Protective Order in the Litigation (Docket No. 60) constitutes the entire and complete understanding and agreement among the Parties hereto in regard to the subject matter of the dispute described above and the terms hereof, and supersedes and replaces all prior negotiations, agreements or understandings among the Parties, whether written or oral, concerning the subject matter of this Agreement. Each of the Parties acknowledges and represents that no other Party or agent or attorney of any other Party has made a promise, representation, or warranty whatsoever, express or implied, not contained herein concerning the subject matter of this Agreement. Each Party acknowledges and represents that it has not executed this Agreement in reliance upon any promise, representation, or warranty whatsoever that is not expressly set forth in this Agreement. |
| 21. Severability | If any provision of this Agreement shall be invalid, illegal or otherwise unenforceable, such provision shall be severable from all other provisions of this Agreement, and the validity, legality, and enforceability of the remaining provisions of this Agreement shall not be adversely affected or impaired, and shall remain in full force and effect. |
| 22. Binding Effect | This Agreement shall be binding on, and shall be enforceable against, and shall inure to the benefit of the Parties to this Agreement and their respective past and present officers, directors, affiliates, member firms, subsidiaries, parents, successors, shareholders, members, partners, general partners, limited partners, principals, participating principals, managing members or other agents, management personnel, attorneys, servants, employees, representatives of any other kind (and any officers, directors, members or shareholders of |

any of the foregoing which are not natural persons), spouses, estates, executors, estate administrators, heirs, and assigns.

| | |
|---|---|
| 23. Waiver and Amendment | No provision of or rights under this Agreement may be waived or modified unless in writing and signed by the Party whose rights are thereby waived or modified. Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein (whether similar or not), nor shall such waiver constitute a continuing waiver unless otherwise expressly so provided. This Agreement may not be amended except through an instrument in writing signed by the Parties hereto. |
| 24. Further Assurances | Each Party shall cooperate fully in the execution and delivery of this Agreement and shall take, or cause to be taken, such further action as may be reasonably necessary or appropriate to effectuate or facilitate the terms of this Agreement, including the execution and delivery of any further documents that may be necessary or appropriate for that purpose. Each Party further agrees to take no action, directly or indirectly, to avoid or circumvent, in whole or in part, the terms of this Agreement. |
| 25. Costs | The Parties acknowledge that each Party is to bear its own costs, fees, and expenses, including attorneys' fees, incurred in connection with the dispute giving rise to this Agreement. |
| 26. Dispute Resolution | In the event of a dispute arising from this Settlement Agreement, the parties agree to resolve such dispute in good faith within fifteen (15) business days of receipt of notice of such dispute. If the parties fail to resolve such dispute, the parties consent to initially seek mediation by the Court in the Litigation, which Court the parties also agree shall maintain jurisdiction over any dispute arising from this Agreement. |
| 27. Right to Attorney's Fees in Case of Breach | In the event of any dispute or litigation arising out of or concerning this Agreement, the prevailing Party shall be entitled to an award against the non-prevailing Party of its reasonable attorney's fees and costs. |
| 28. Headings | The various headings of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement. |

{00843971.DOCX 1}

| 29. Counterparts and Transmission of Signatures | This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Original signatures transmitted by electronic mail or facsimile shall be deemed to be original signatures. No Party shall be bound hereby unless and until all other Parties have executed this Agreement. |
| :--- | :--- |
| 30. Authorized Signature | Each individual signing this Agreement in a representative capacity acknowledges and represents that he is duly authorized to execute this Agreement in such capacity in the name of, and on behalf of, the designated corporation, partnership, limited liability company, trust or other entity. |
| 31. Joint Preparation | This Agreement shall be deemed to have been prepared jointly by the Parties, and any uncertainty or ambiguity existing herein shall not be interpreted against any Party by reason of its drafting of this Agreement, but shall be interpreted according to the application of the general rules of interpretation for arm's length agreements. |

IN WITNESS WHEREOF, the Parties do hereby execute this Agreement by duly authorized representatives as of the Effective Date:

**Signed for and on behalf of Defendants:**      **Signed for and on behalf of Plaintiff:**


Signature                                        Signature
STREAM TV NETWORK, INC.,                         REMBRANDT 3D HOLDING LTD

By: Mathu Rajan, Chief Executive Officer         By: Stephen Blumenthal, President/CEO

Date: May 23, 2021                               Date: May 23, 2021


Signature
Mathu Rajan, Individually

Date: May 23, 2021


Signature
Raja Rajan, Individually

Date: May 23, 2021


{00843971.DOCX 1}

## SCHEDULE A

1. Know how and trade secrets related to methodology for:
   a. efficiently converting, correcting and optimizing a 2D+Depth video for playback on a 3D autostereoscopic associated with the Philips technology
   b. utilizing the Philips 2d Switchable Lens technology for refractive and defractive lens switching for the creation of the 'lightfield' and 3d content artefact correction.
   c. utilizing the On Screen Display functions of Borders and "Liveliness."
2. Trademarks
3. The patents asserted in Rembrandt's First Amended Complaint, and dismissed by the Court on March 28, 2018 (ECF No. 47)

**Exhibit A**

**(Warrant Agreement)**

**Exhibit B**

**(Standard Products)**

{00843971.DOCX 1}

# EXHIBIT G

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **Stream TV Networks, Inc.,** *et al*. | : | **Bankruptcy No. 23-10763 (DJB)** |
| | : | |
| Debtors. | : | **(Jointly Administered)[1]** |
| | : | |

| | | |
|---|---|---|
| **William A. Homony, in his Capacity as Chapter 11 Trustee of the Bankruptcy Estates of Stream TV Networks, Inc. and Technovative Media, Inc.** | : : : : | |
| | : | **Adv. No. _____ (DJB)** |
| **Plaintiff** | : : | |
| **v.** | : : | |
| **Rembrandt 3D Holding Ltd., Visual Semiconductor, Inc., Mathu Rajan, Raja Rajan, and Brown and Michaels, P.C.,** | : : : : : | |
| **Defendants.** | : | |

## COMPLAINT/CLAIMS OBJECTION

## I.    INTRODUCTION

1.     Plaintiff William A. Homony, in his capacity as Chapter 11 Trustee (the "Trustee")

of the bankruptcy estates of Stream TV Networks, Inc. ("Stream") and Technovative Media, Inc.

("Technovative," and collectively with Stream, the "Debtors"), by and through his counsel, Steven

M. Coren, Esquire and Coren & Ress, P.C., files this Complaint and Claims Objection to, *inter*

---

[1] On April 10, 2023, the Court entered an order directing joint administration of the Stream and Technovative (docketed at 23-10764-DJB) caes. (D.I. 95).

1

*alia*, (a) avoid and invalidate any/all obligations and associated transfers in connection with a pre-petition and two post-petition agreements among Stream and Defendants, (b) to avoid and recover an unauthorized post-petition transfer from Stream to Defendant Brown & Michaels, P.C. ("B&M"), for the benefit of B&M and/or Defendant Rembrandt 3D Holding LTD ("Rembrandt"), in the amount of $50,000.00, (c) to challenge, object to and invalidate the Proofs of Claim filed against the Debtors by Defendant Rembrandt (the "Rembrandt Claims"), and (d) in the alternative, to subordinate the Rembrandt Claims below those of all other creditors of the Debtors' bankruptcy estates pursuant to Bankruptcy Code 11 U.S.C. §§ 510 (b) and (c).

## II.   <u>JURISDICTION & VENUE</u>

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1334, since the litigation arises under Title 11 of the United States Code (the "Bankruptcy Code"), or in or related to cases under the Bankruptcy Code.

3.      The Trustee consents to the Bankruptcy Court's entry of final judgment in connection with all claims asserted herein and waives a jury trial before an Article III judge in connection with all claims to which he is entitled to a jury trial under the Constitution and applicable law.

4.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1409(a).

## III.   <u>PARTIES</u>

### A.   **The Plaintiff**

5.      Plaintiff William A. Homony is the duly appointed Chapter 11 Trustee of Debtors' bankruptcy estates.

6.      On March 15, 2023 (the "Petition Date"), the Debtors filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code.

2

7. After almost a year of "acrimony" and "relative lack of progress," on January 5, 2024, this Court entered a Memorandum (the "Trustee Opinion") (D.I. #548) and Order which, among other things, appointed a Chapter 11 trustee and granted Debtors' secured creditors—represented by Hawk Investment Holdings Limited ("Hawk")—relief from the automatic stay to permit Hawk to resume litigation against the Debtors in the Delaware Court of Chancery under § 225 (the "§ 225 Action") of Title 8 of the Delaware Code (the "Trustee Order") (D.I. #549).

8. The Trustee Opinion held, in relevant part, that, due to the gross mismanagement and lack of transparency under Defendant Mathu Rajan's leadership, (i) a Chapter 11 trustee must be appointed to administer the Debtors' cases, and (ii) Rajan was no longer authorized to act on behalf of the Debtors' estates. (D.I. #548).

9. On January 9, 2024, the Office of the United States Trustee filed a Notice of Appointment of William A. Homony to serve as the Chapter 11 trustee and on January 12, 2024, the Bankruptcy Court entered an Order appointing William A. Homony as the Trustee (D.I. #558).

**B.    The Defendants**

10. Defendant Rembrandt 3D Holding LTD ("Rembrandt") is a Nevis Corporation who may be served through its agent Andrew DeMarco, Esquire, c/o Devlin Law Firm, LLC, 1526 Gilpin Avenue, Wilmington, DE 19806.

11. Defendant Visual Semiconductor, Inc. ("VSI") is a Wyoming Corporation with a place of business at 1105 William Penn Drive, Bensalem, PA 19020.

12. Defendant Mathu Rajan ("Rajan") is an individual who resides at 1105 William Penn Drive, Bensalem, PA 19020. At times material hereto, Rajan was the Debtors' CEO, President and Director, while at the same time serving as the founder and CEO of VSI.

13. Defendant Raja Rajan is an individual and the brother of Mathu Rajan, and Raja

3

resides at 5215 Bishop View Circle Cherry Hill, NJ 08002. At times material hereto, Raja Rajan was Debtors' Chief Operating Officer and General Counsel, and upon information and belief held similar positions at VSI.

14. Defendant Brown & Michaels, P.C. ("B&M") is a law firm with offices at 118 North Tioga Street, 4th Floor, Ithaca, NY 14850.

## IV. **FACTS**

15. Commencing in or around May 2021, and continuing through the Trustee's appointment and thereafter, Defendants colluded in an unlawful scheme to take ownership, possession and control of the Debtors' property—a scheme which included an effort to hinder, delay and defraud Hawk (who's secured claims exceeded $150 million), and Debtors' other non-insider creditors.

16. To place the unlawful scheme in context, it is significant to highlight that VSI founder and CEO, Mathu Rajan, is the Debtors' CEO, President and Director—who was removed from operational control by this Court because of gross mismanagement and disqualifying conflicts. This Court held, *inter alia*, that:

(i) Debtors, under Rajan's leadership, breached their fiduciary duties to creditors and disclosure obligations to the Court in failing to disclose that VSI had made millions of dollars of payments on behalf of the Debtors in return for Debtor stock;

(ii) Debtors' management, specifically Rajan, contemporaneously and improperly acted as a fiduciary of the Debtors and VSI;

(iii) "Alarmingly, the interrelationship between VSI, Stream, and Mr. Rajan's overlapping interests and roles in each is so entrenched that Mr. Rajan's testimony . . . was at times rendered unintelligible, or alternatively, intentionally deceptive, by his inability or unwillingness

to draw distinctions between the entities and his roles with each"; and,

(iv)    "Mr. Rajan's conflicted interests, gamesmanship, and lack of candor to the Court

and creditors rises to the level of gross mismanagement of the estates, even when viewed against

the high standard of glaring and inexcusable badness."

Trustee Opinion at 60-61.

17.    Rajan is no stranger to bad faith bankruptcy filings, as he orchestrated two prior

bad faith filings involving Stream, both of which were dismissed by the Delaware bankruptcy

court.

18.    The first was a Chapter 11 case initiated by Stream TV Debtor on February 24,

2021, and docketed *In re: Stream TV Networks, Inc.*, Bankr. D. Del. No. 21-10433-KBO (the

"Delaware Voluntary Bankruptcy Case"), and the second was an involuntary Chapter 7 case

initiated on May 23, 2021, by, *inter alia*, purported creditor Rembrandt, docketed *In re Stream TV

Networks, Inc.*, Bankr. D. Del. 21-10848-KBO (the "Delaware Involuntary Bankruptcy Case").  In

each case, Rajan controlled Stream.

19.    The Delaware Bankruptcy Court dismissed the Delaware Voluntary Bankruptcy

Case on May 17, 2021, as having been filed in a bad faith effort to block the Delaware Chancery

Court Action from proceeding regarding litigation concerning the "Omnibus Agreement" – a May

2020 agreement among Stream, Hawk, Hawk representative Shad Stastney, and 52 of Stream's

stockholders, whereby Stream would transfer its assets to SeeCubic Inc. in exchange for, *inter alia*,

extinguishment of Hawk's debt, see Trustee Opinion at p. 4 – and divert Debtors' property to Rajan

and his alter ego, an entity named Visual Technology Innovations, Inc. ("VTI"),[2] the predecessor

---

[2] VTI—the predecessor to VSI—filed a Chapter 11 bankruptcy proceeding on January 6, 2025 in
the United States Bankruptcy Court for the District of Nevada, docked as 25-10024-abl, to stay a

to VSI.  Trustee Opinion at 6.  A true and correct copy of the Delaware Bankruptcy Court's bench

opinion is attached hereto as Exhibit A.

**The Collusive, Sham Settlement Agreement.**

20.    Less than one week later, Stream, Rajan, Rajan's brother Raja Rajan, an attorney

for Stream and VSI, and Rembrandt executed a collusive/sham Settlement Agreement and Mutual

Release dated May 23, 2021 (the "Settlement Agreement") which, among other things, (a) required

Stream to manufacture and provide to Rembrandt knowingly unattainable quantities of products

deploying so-called "Ultra-D" technology in 4K and 8K along with illusory rights of first refusal

to purchase more than 3 million of such products "At Cost," (b) obligated Stream to make

knowingly unattainable monetary payments, including a downpayment of $1,528,000 along with

knowingly unattainable monthly payments through the term of the agreement which expired on

December 31, 2030, ranging from $28,000 a month to $40,000 a month, (c) granted Stream a non-

exclusive license to purported Rembrandt technologies listed in Schedule A of the Settlement

Agreement, (d) granted 2,000,000 warrants to Rembrandt for Stream stock pursuant to a Warrant

Agreement—which, upon information and belief, was never executed, and (e) provided in

paragraph 4 that commencement of the Settlement Agreement was "triggered upon the execution

of this Agreement and the Warrant Agreement (Exhibit A) ("which is incorporated herein by

reference…").  A true and correct copy of the Settlement Agreement is attached hereto as Exhibit

B.

21.    The same day that Rajan executed the Settlement Agreement—purportedly

granting Rembrandt a sizable, liquidated claim against Stream—Rembrandt, as one of three (3)

---

civil fraud and breach of contract action against VTI and Rajan filed by a VTI investor in the
Eastern District of Pennsylvania, docketed as 2:23-cv-1740-kns.

petitioning creditors, filed the Delaware Involuntary Bankruptcy Case. Not fooled, the Delaware

Bankruptcy Court again dismissed Stream's involuntary bankruptcy proceeding as a bad faith

filing and imposed a twelve (12) month bar on Stream re-filing for bankruptcy. Trustee Opinion

at 6. A true and correct copy of the June 10, 2021 dismissal order is attached hereto as Exhibit C.

22.     The timing of the filing of the Delaware Involuntary Bankruptcy Case substantiates

that the Settlement Agreement was a collusive sham, intended to manufacture a fixed "allowed"

claim for Rembrandt to end run the Delaware Bankruptcy Court's dismissal of the Delaware

Voluntary Bankruptcy Case a week earlier by allowing Rembrandt standing (which it didn't

previously have) to act as a petitioning creditor.

23.     The collusive, sham nature of the Settlement Agreement is further confirmed by a

series of emails from Stream representatives on April 20-21, 2021, copies of which are attached

hereto as Exhibit D, which confirm Stream's view during the pendency of the Delaware Voluntary

Bankruptcy Case that Rembrandt's claims in pending but stayed New York federal court litigation

were meritless.

24.     In the New York case, Rembrandt sought unsuccessfully to enforce a settlement

term sheet negotiated by Hawk representative Shad Stastney—when he was the Vice Chairman

and CFO of Stream TV—which in Stream's view "would essentially wreck the company finances"

and "bankrupt Stream." Stream, led by Mathu and Raja Rajan, vigorously opposed and fought for

a determination that the settlement term sheet was not enforceable. The New York Court

ultimately held that the settlement term sheet was unenforceable and the parties remained in active

litigation over Rembrandt's claims as of the date of the collusive Settlement Agreement.[3]  As Raja

---

[3] Order dated 4/15/2021[D.I. 98] in the United States District Court for the Southern District of
New York, docketed as 17-00882.

Rajan expressed in his email of April 20, 2021 regarding the "Stream TV – Rembrandt litigation" – "Some people think that Shadron signed that settlement term sheet intentionally to bankrupt Stream. Don't know but that makes a lot more sense in hindsight."

25.     As Rembrandt represented in its objection filed on November 6, 2024 (D.I. 789) to the Trustee's sale motion, at paragraph 44: "On May 23, 2021, Stream and Rembrandt memorialized the Settlement Term Sheet in a more formal Settlement Agreement and Mutual Release (the "Settlement Agreement"), with terms nearly identical to those negotiated in mediation [in the New York case]. The Settlement Agreement granted a non-transferable license for Stream to use the Rembrandt IP in exchange for cash and products valued at approximately $1.2 billion."

26.     Evidencing the collusive, sham nature of the Settlement Agreement, in the week following dismissal of the Delaware Voluntary Bankruptcy Case, business terms which "would essentially wreck the company finances" and "bankrupt Stream" morphed into agreeable terms when needed to support a friendly petitioning creditor who was willing to collude with Rajan and file the Delaware Involuntary Bankruptcy Case to block the Delaware Chancery Court proceeding regarding the Omnibus Agreement, i.e., to hinder, delay and defraud Debtors' creditors.

27.     The Settlement Agreement was a collusive sham, entered into to hinder, delay and defraud Hawk and the Debtors' other non-insider creditors, as further evidenced by, among other things, (a) Stream never complied with any of its monetary or production "obligations" under the Settlement Agreement as it defaulted at moment one by failing to pay the $1,528,000 due upon signing and by the contemporaneous commencement of the Delaware Involuntary Bankruptcy Case, (b) as Defendants knew, the obligations imposed upon Stream were illusory and a sham, as Stream had virtually no money, no operations, no funding, no warehouses, no raw materials, no production capacity and no ability to perform under the Settlement Agreement, and (c) years

8

passed without Rembrandt declaring a default or seeking to enforce the Settlement Agreement, or to cancel the license and claw back whatever technology, if any, was transferred under the Settlement Agreement.

**Unauthorized Post Petition Agreements/Transactions.**

28.     After the Petition Date and while Debtors remained under Mathu Rajan's control, Stream entered into agreements, effectuated transactions and made a $50,000 transfer outside the ordinary course of business with insiders without seeking or obtaining Bankruptcy Court approval.

29.     The first was an amendment to the Settlement Agreement (the "Settlement Amendment") on August 12, 2023. A true and correct copy of the Settlement Amendment is attached hereto as Exhibit E.

30.     The Settlement Amendment purported to, *inter alia*, (a) obligate Stream to pay $250,000 on account of Rembrandt's attorneys' fees under section 27 of the Settlement Agreement, (b) obligate Stream to pay Rembrandt $2,360,000 on account of past due amounts owed as of August 2023, (c) altered the production and delivery schedules for TVs and displays— an illusory production schedule because Stream was in bankruptcy with no ability to manufacture, produce or deliver the required products, and (d) added provisions that would benefit VSI and deprive Stream of rights in the event Rajan was removed as the principal in control of Stream.

31.     Just two days later, and again without Bankruptcy Court approval, Rembrandt, Stream, and VSI entered into a post-petition licensing covenant (the "Licensing Covenant").  A true and correct copy of the Licensing Covenant is attached hereto as Exhibit F.

32.     The Licensing Covenant clearly prioritized VSI's and Mathu Rajan's interests over the interests of the Debtors and their subsidiaries by expressly barring Rembrandt from issuing licenses to any of Stream's subsidiaries.  Trustee Opinion at 49-50.

9

33.     The Licensing Covenant was "intended, at least in large part, to protect VSI's interest in Stream's technology and products, while at the same time expressly barring Rembrandt from issuing a license to any of Stream's subsidiaries.  The Licensing Agreement completely aligns Stream and VSI with respect to licensing the technology of Rembrandt, to the exclusion of, *inter alia*, Stream's subsidiaries."  Trustee Opinion at 50.

34.     In a stunning admission of fraudulent intent, internal emails dated August 14, 2023 and September 6, 2023 among VSI, Rembrandt and Stream CEO, President and Director Mathu Rajan admit:

> the Licensing Covenant "is intended to 'block' the bad guys [i.e., secured creditor Hawk] w/r/t the Rembrandt technology."  (Email dated August 14, 2023);

> and

> Per the attached <u>Licensing Covenant of August 14, 2023</u> in which Rembrandt agreed to block licenses to Stastney et al [i.e., secured creditor Hawk], VSI owes a series of monthly cash payments to Rembrandt.

> Attached is the wire confirmation of a $50,000 partial payment #1. Email dated September 6, 2023).

35.     VSI transferred $50,000 to the Debtor in Possession account of Stream at Bank of America (the "DIP Account") on September 5, 2023, in return for shares of Stream.

36.     On September 11, 2023, Stream transferred $50,000 from its DIP account to B&M, Rembrandt's counsel, allegedly on account of VSI/Stream's obligations to Rembrandt under the Licensing Covenant.

37.     The $50,000 post-petition transfer from Stream to Rembrandt's counsel was not approved by the Bankruptcy Court and is subject to avoidance and recovery by the Trustee.

**<u>Rembrandt's Proofs of Claim.</u>**

38.     Not listed by Stream in its schedules as having a claim in the Stream bankruptcy case, on April 14, 2023, Rembrandt filed a Proof in Claim in the amount of $1.2 Billion (the "Stream Claim"). *See*, Claim No. 2-1. A true and correct copy of the Stream Claim is attached hereto as Exhibit G.

39.     As the Declaration of Stephen Blumenthal in support of Rembrandt's claim makes clear at paragraph 12, the Settlement Agreement upon which the claim is based involves a securities transaction:

> 12.     Stream agreed to pay Rembrandt-Holding $5,840,000 in cash, 2,000,000 warrants to purchase Stream stock, 100 4K TVs for no charge, 8 8K prototypes at no charge, and the right to purchase 3,015,000 8K 3DASD LCD units at cost.

40.     On the Petition Date, Technovative filed its List of Creditors Who have the 20 Largest Unsecured Claims and are not Insiders (the "Top 20 List") and scheduled Rembrandt as its only creditor having a "breach of contract" claim in the amount of $10 million (+) and listed the claim as contingent, unliquidated, and disputed and thus, not an allowed claim (Technovative Bankruptcy Docket, D.I. #1 and #3).

41.     Without explanation, a mere two (2) weeks later, when Technovative filed its Schedules of Assets and Liabilities ("Technovative Schedules"), it listed Rembrandt's claim as having ballooned to $100 million dollars, ten (10) times the original amount, and it was listed by Rajan as underlined: undisputed, noncontingent, and liquidated and therefore, an "allowed" claim for "goods and services." (Technovative Bankruptcy Docket, D.I. #50).

42.     As reflected on its Schedule G, Technovative, a holding company that never had any operations, has no contracts with Rembrandt.  There is no record evidence or other documents supporting Rembrandt's claims against Technovative, and the claim is a sham.

43.     On October 10, 2024, the Trustee filed an amendment to the Technovative

11

Schedules and listed the Rembrandt claim as contingent, disputed, and unliquidated in the amount of zero dollars.

44.     In response to the Trustee's amendments to the Technovative Schedules, on October 24, 2024, Rembrandt filed a nearly identical proof of claim to the Stream Claim against Technovative for the same $1.2 Billion based on the Settlement Agreement, to which Technovative is not a party (the "Technovative Claim" and collectively with the Stream Claim, the "Rembrandt Claims"). *See*, Claim No. 26-1. A true and correct copy of the Technovative Claim is attached hereto as Exhibit H.

45.     The claim against Technovative is similarly based on the Settlement Agreement and is therefore reliant on a securities transaction.

46.     That the Debtors did not receive reasonably equivalent value in exchange for incurring the obligations contained in the Settlement Agreement, Settlement Amendment and Licensing Covenant is convincingly established by the Rembrandt Claims themselves.

47.     Rembrandt values the benefits to it under the Settlement Agreement at $1.2 billion, the amount which it seeks.

48.     When the Settlement Agreement was executed, the corresponding value to the Debtors was zero—as Debtors were insolvent, had virtually no money, no operations, no funding sources outside of Rajan's efforts to fleece unsuspecting investors in a scheme which smacks of securities fraud, no warehouses, no raw materials, no production capacity and were in the midst of a "friendly foreclosure" under the Omnibus Agreement whereby Stream's property was being transferred to Hawk in return for the extinguishment of Hawk's secured debt.

49.     At all times material hereto, the Debtors were insolvent and attempting to engage in a business for which they were grossly undercapitalized.

12

## V.   CLAIMS

### FIRST CLAIM – AVOIDANCE OF OBLIGATIONS/TRANSFERS
### (Pursuant to 6 Del. C. §§ 1304(a)(1), 1304(a)(2), and 1305 and 11 U.S.C. § 544)

50.     Paragraphs 1 through 49 above are incorporated herein by reference, as if restated in their entirety.

51.     As of the Petition Date, Stream had numerous general unsecured creditors holding allowable claims who, but for the Debtors' bankruptcy filing, would have standing to bring claims to avoid the obligations or accompanying transfers under the Settlement Agreement, Settlement Amendment and/or Licensing Covenant under 6 Del. Code § 1304(a)(1), 6 Del. Code § 1304(a)(2), and/or 6 Del. Code § 1305.

52.     Debtors incurred the obligations and made transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant with the actual intent to hinder, delay and defraud creditors (including Hawk).

53.     The secured and general unsecured creditors of Debtors were thus foreseeable creditors at the time the obligations under the Settlement Agreement, Settlement Amendment and Licensing Covenant were incurred and the accompanying transfers were made.

54.     Debtors did not receive reasonably equivalent value in exchange for incurring the obligations or making the transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant.

55.     The obligations incurred and the transfers made when Debtors were insolvent constitute avoidable obligations and fraudulent transfers for which the transferee Defendants are liable.

56.     The Debtors were engaged in a business for which the remaining assets of the Debtors were unreasonably small in relation to the business of the Debtors following incurring the

obligations or making the transfers, as set forth above.

57.     Accordingly, the obligations incurred, and accompanying transfers made under the Settlement Agreement, Settlement Amendment and Licensing Covenant are avoidable pursuant to 6 Del. C. §§ 1304 and 1305, and Section 544 of the Bankruptcy Code.

## SECOND CLAIM – AVOIDANCE OF OBLIGATIONS/TRANSFERS
### (Pursuant to 12 Pa. C.S.A. § 5104(a) and 11 U.S.C. § 544)

58.     Paragraphs 1 through 57 above are incorporated herein by reference, as if restated in their entirety.

59.     Debtors incurred the obligations and made the transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant with the actual intent to hinder, delay and defraud creditors (including Hawk).

60.     Debtors did not receive reasonably equivalent value in exchange for incurring the obligations or making the transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant.

61.     The obligations incurred and the transfers made when Debtors were insolvent constitute avoidable obligations and fraudulent transfers for which the transferee Defendants are liable.

62.     The Debtors were engaged in a business for which the remaining assets of the Debtors were unreasonably small in relation to the business of the Debtors following incurring the obligations or making the transfers, as set forth above.

63.     Accordingly, the obligations and accompanying transfers under the Settlement Agreement, Settlement Amendment and Licensing Covenant are avoidable pursuant to 12 Pa. C.S.A. § 5104(a) and Section 544 of the Bankruptcy Code.

14

## THIRD CLAIM – AVOIDANCE OF OBLIGATIONS/TRANSFERS
### (Pursuant to 11 U.S.C. § 549)

64.     Paragraphs 1 through 63 above are incorporated herein by reference, as if restated in their entirety.

65.     The Settlement Amendment and Licensing Covenant were entered into and the $50,000 transfer to B&M, for the benefit of Rembrandt, was made post-petition, outside the ordinary course of business and without Bankruptcy Court approval.

66.     Accordingly, the Trustee may avoid the obligations and the accompanying transfers, including the $50,000 transfer to B&M, pursuant to Section 549 of the Bankruptcy Code.

## FOURTH CLAIM – REQUEST FOR DECLARATORY JUDGMENT
### (To Void the Settlement Agreement, Settlement Amendment and Licensing Covenant as Collusive, Fraudulent, the Product of Breaches of Fiduciary Duty and Ultra vires)

67.     Paragraphs 1 through 66 above are incorporated herein by reference, as if restated in their entirety.

68.     VSI, Rembrandt and the Debtors' CEO, President and Director, Defendant Mathu Rajan, conspired and colluded with each other to defraud the Debtors and their creditors by entering into agreements and engaging in transactions in furtherance of Defendants' self-interests and contrary to the interests of the Debtors and their non-insider creditors.

69.     The Settlement Agreement, Settlement Amendment and Licensing Covenant were the product of collusive and fraudulent conduct on Defendants' behalf, along with a breach of fiduciary duty on the part of Defendants Mathu Rajan, Raja Rajan, and VSI and aiding and abetting breach of fiduciary duty on the part of Rembrandt.

70.     Given the wrongdoing of the Defendants as aforesaid, the Court should rescind or void the tainted agreements, i.e., the Settlement Agreement, Settlement Amendment and Licensing

15

Covenant.

## FIFTH CLAIM – REQUEST FOR DECLARATORY JUDGMENT
### (To Void the Settlement Agreement for Failure of Condition
### Precedent and Lack/Failure of Consideration)

71.     Paragraphs 1 through 70 above are incorporated herein by reference, as if restated in their entirety.

72.     The execution and delivery of the Warrant Agreement is a condition precedent to the validity of the Settlement Agreement.

73.     Upon information and belief, the Warrant Agreement was not executed or delivered.

74.     Additionally, the alleged consideration to the Debtors under the Settlement Agreement, Settlement Amendment and Licensing Covenant was illusory and a sham, especially given Debtors' precarious financial condition and its known inability to manufacture or deliver the products for which it was obligated to pay almost $6 million in license fees.

75.     The Settlement Agreement was a collusive sham orchestrated by the parties thereto as a poison pill to sabotage Hawk's ability to realize on its collateral, and to facilitate the confiscation of Debtor property for their own behalf.

76.     Accordingly, the Court should rescind or void the tainted agreements, i.e., the Settlement Agreement, Settlement Amendment and Licensing Covenant.

## SIXTH CLAIM – OBJECTION TO REMBRANDT PROOFS OF CLAIM

77.     Paragraphs 1 through 76 above are incorporated herein by reference, as if restated in their entirety.

78.     For the reasons previously advanced, the Settlement Agreement upon which the Rembrandt Claims are based is a collusive sham which should be avoided or voided and afforded

16

no validity whatsoever.

79.     Rembrandts damage calculations are based on worthless, "pie in the sky" speculation as to products and profitability.  As Rembrandt and the colluding Defendants knew all along, Debtors had no ability to manufacture or produce any products, let alone the more than 3 million products necessary to support Rembrandt's $1.2 billion "lost profits" damage calculation, and the $400 profit margin is based on nothing but rank speculation.

80.     As to Rembrandt's claim against Technovative, that Debtor was merely a holding company with whom Rembrandt had no contractual or other relationship, and which did not manufacture or sell products.  As such, the claim against Technovative is frivolous.

81.     Rembrandt's Claims are otherwise specious because:

(a) The Settlement Agreement does not obligate Stream to produce and/or sell to Rembrandt a minimum quantity of "Standard Products" and accordingly Rembrandt's "lost profits" claim of $1,206,000,000—which is premised on a non-existent obligation to deliver 3,015,000 3D products—is frivolous.  To the contrary, the Settlement Agreement provides only a right of first refusal to purchase such products if available, "At Cost":

> "Standard Products – As Stream TV builds high-resolution based 3D technology products, it shall offer Rembrandt a right of first refusal to purchase At Cost … the minimums provided below….
>
> Rembrandt will have a minimum right of first refusal to purchase Standard Products At Cost on 63,000 units plus 7,000 units/month on execution of this Agreement and then increasing by 1,000 units/month every three months thereafter until the end of the term.

Settlement Agreement, para. 6(b)(2).

(b) As Defendants knew when the Settlement Agreement was executed, there were no "Standard Products" available for sale, as the technology was in the proof-of-concept phase,

Stream was a pre-revenue start up without a developed market for the commercialization of the 3D products, and Stream's secured creditors were in litigation seeking to foreclose on all of Debtors' property.

(c) Stream never produced or had available for sale any of the "Standard Products" upon which Rembrandt basis its $1.2 billion claim—let alone the 3,015,000 units upon which the specious claim depends.

82.     The Court should disallow the Rembrandt Claims under Section 502 (d) of the Bankruptcy Code, and as grossly inflated, specious and unsupportable.

## SEVENTH CLAIM – MANDATORY SUBORDINATION
### (Under Section 510 (b) of the Bankruptcy Code)

83.     Paragraphs 1 through 82 above are incorporated herein by reference, as if restated in their entirety.

84.     The Settlement Agreement involves a securities transaction, as do Rembrandt's Claims.

85.     Under Section 510(b) of the Bankruptcy Code, claims arising in connection with securities transactions, like the Rembrandt Claims challenged here, are subject to mandatory subordination below the claims of Debtors' creditors.

86.     In the event that it is determined that the Settlement Agreement is valid and the resulting warrants granted to Rembrandt under the terms of the Settlement Agreement were in fact issued, the Court should subordinate the Rembrandt Claims below those of the Debtors' creditors.

## EIGHTH CLAIM – EQUITABLE SUBORDINATION
### (Under Section 510 (c) of the Bankruptcy Code)

87.     Paragraphs 1 through 86 above are incorporated herein by reference, as if restated in their entirety.

18

88.     As set forth in detail above, Rembrandt engaged and/or knowingly participated in inequitable conduct with respect to the Debtors, including: (i) colluding with Debtors' fiduciaries to hinder, delay and defraud creditors, (ii) entering into a sham Settlement Agreement to manufacture a friendly creditor, i.e, Rembrandt, as a petitioning creditor in a bad faith involuntary bankruptcy proceeding, (iii) aiding and abetting the breach of fiduciary duty by Debtors' fiduciaries, and (iv) conspiring with Debtor fiduciaries to wrest control of Debtor property for the benefit of the Defendants.

89.     After it became clear that the Trustee would settle with Debtors' secured creditors and offer Debtor property for sale, Rembrandt colluded with VSI and Mathu Rajan to sabotage the Trustee's efforts by, among other things:

(i) Promoting false and misleading statements regarding the Trustee's efforts to sell the Debtors' assets, which specifically excluded Rembrandt's alleged intellectual property;

(ii) Threatening the Trustee and his professionals as well as any potential buyer with criminal and civil liability related to Rembrandt's alleged intellectual property despite knowing that it was specifically excluded from the APA.  Rembrandt's arguments and actions chilled any potential parties' interest in the Debtors' assets;

(iii) Promoting false and misleading statements regarding the status of the Philips license and impact on the sale.  (Leia, the current owner of the Philips license, filed a reservation of rights specifically refuting Rembrandt's claims).  The Philips license was never property of the Debtors' estates that the Trustee was seeking to sell;

(iv) Making false and misleading statements to the Court that the Trustee had viable alternative reorganization options; and,

(v) Routinely filing meritless objections to sabotage the Trustee's efforts to maximize value

19

for the benefit of creditors.

90. As a result of this inequitable conduct, non-insider creditors have been injured, and Rembrandt has obtained an unfair advantage over those creditors.

91. Given the willful, unfair, bad faith, and/or inequitable conduct described herein, the Rembrandt Claims should be equitably subordinated below the rights of all other innocent creditors of the Debtors, pursuant to Section 510(c) of the Bankruptcy Code.

## NINTH CLAIM – RECOVERY OF TRANSFERS UNDER 11 U.S.C. § 550
### (Against B&M and Rembrandt)

92. Paragraphs 1 through 91 above are incorporated herein by reference, as if restated in their entirety.

93. The Trustee is entitled to avoid the $50,000 transfer to B&M pursuant to 11 U.S.C. §§ 549, and 544.

94. Defendant B&M was the initial transferee of a transfer made for Rembrandt's benefit, and if paid over to Rembrandt, Rembrandt is also liable as a subsequent transferee.

95. Accordingly, the Trustee is entitled to recover the aforesaid transfer, plus interest, pursuant to Section 550 of the Bankruptcy Code.

## VI. RELIEF REQUESTED

WHEREFORE, William A. Homony, in his capacity as Chapter 11 Trustee of the bankruptcy estates of Stream TV Networks, Inc. and Technovative Media, Inc. demands judgment in his favor and against the Defendants for:

(a) Avoidance of the obligations under the Settlement Agreement, Settlement Amendment and Licensing Covenant, along with avoidance and recovery of all transfers in connection therewith;

20

(b)  Judgment against Brown & Michaels, P.C. and Rembrandt, jointly and severally, for

the amount of $50,000, plus interest;

(c)  Disallowance of the Rembrandt Claims;

(d)  The entry of a judgment granting mandatory and/or equitable subordination;

(e)  Declaratory relief as requested;

(f)  Pre-judgment interest, reasonable attorneys' fees and costs; and,

(g)  Such additional relief as this Court deems just.


                                                          Respectfully submitted,


Dated: April 30, 2025        By:    /s/ Steven M. Coren
                                      Steven M. Coren, Esquire
                                      COREN & RESS, P.C.
                                      Two Commerce Square, Suite 3900
                                      2001 Market Street
                                      Philadelphia, PA 19103
                                      Telephone: (215) 735-8700
                                      scoren@kcr-law.com

                                      Special Counsel to the Trustee

# EXHIBIT H

## SETTLEMENT AMENDMENT
August 12, 2023

The following represents the agreed terms of an Amendment (the "Settlement Amendment") to the Settlement Agreement and Mutual Release (the "Settlement") by and between **Stream TV Networks, Inc.**, a Delaware corporation ("Stream"), **Mathu Rajan** ("M Rajan"), and **Raja Rajan** ("R Rajan" and, together with Stream and M Rajan, the "Stream Parties") and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt"). Each of the Stream Parties and Rembrandt are referred to herein collective as the "Parties" and each as a "Party."

**WHEREAS**, the Parties entered into the Settlement on May 23, 2021, resolving litigation between them and conferring certain intellectual property license rights to the Stream Parties in consideration of cash payments and certain product purchase rights granted to Rembrandt;

**WHEREAS**, the Parties negotiated and agreed to certain proposed amended Settlement terms described in the Disclosure Statement (Docket Entry 293) filed by Stream on July 13, 2023 (the "Amendments") in the pending bankruptcy case in the Eastern District of Pennsylvania (Case No. 23-10763);

**WHEREAS**, all terms and conditions of the Settlement shall remain in full force and effect unless specifically amended herein; and

**WHEREAS**, the Parties wish to formally adopt the Amendments by executing this Settlement Amendment;

**NOW THEREFORE**, the Parties agree as follows:

## I.  AMENDMENTS

### A. PAYMENTS
1. The Stream Parties shall pay Rembrandt Two Hundred Fifty Thousand Dollars (USD $250,000.00) as payment for attorney fees Rembrandt is owed under section 27 of the settlement agreement.
2. The Stream Parties shall pay Rembrandt Two Million Three Hundred Sixty Thousand Dollars (USD $2,360,000.00) – as the past due amount owed as of August 2023 – as follows:
   a. One Million Dollars (USD $1,000,000.00) paid to Rembrandt within seven (7) days of the Effective Date of Stream's Plan of Reorganization as approved by the Bankruptcy Court in the Eastern District of Pennsylvania.
   b. One Hundred Thousand Dollars (USD $100,000.00) per month paid to Rembrandt, beginning thirty (30) days after the Plan Effective Date, until all past due amounts have been satisfied.
   c. All subsequent monthly payments shall be made timely thereafter until the Settlement terms have been satisfied.

Stream Parties _Mattu_ / Rembrandt

d. Past due amounts shall be paid with interest accruing at the Delaware statutory rate of Six Percent (6.0%) per annum compounded annually from the date each payment was due under the Settlement.

## B. PRODUCTS

1. Delivery of prototype TVs owed to Rembrandt to be delayed until Stream's production line is operating.
2. Rembrandt may order Three Million Fifteen Thousand (3,015,000) 8K 3DASD units at cost limited monthly purchases up to the higher of
   a. Five Thousand (5,000) units per month starting the second month Stream is in production and adding an additional One Thousand (1,000) units per month each quarter thereafter
   b. Fifteen Percent (15%) of Stream's production capacity, or
   c. Any excess capacity in Stream's production in a particular month
3. Rembrandt may order additional units beyond the "at cost" units at most favored nation pricing.
4. Rembrandt will receive production financing at cost (i.e. at costs provided by third party lenders with no mark-up by Stream).

## C. RIGHTS

1. Stream's subsidiary and affiliate companies shall have the right to use the Rembrandt Intellectual Property (the "Rembrandt IP") solely for the benefit of Stream.
2. If Stream becomes aware that any of its subsidiaries are violating the terms of the Settlement by providing products or services to non-Stream customers, Stream will report such violation to Rembrandt and Rembrandt may seek an injunction to prevent further violations.

## D. CHANGE OF CONTROL

1. In the event of a change in control of Stream, Rembrandt agrees to a one-time transfer of the Rembrandt license from Stream to Visual Semiconductor, Inc. ("VSI") subject to:
   a. VSI making full payment of all amounts due to Rembrandt per the acceleration clause of Section 15 of the settlement; and
   b. VSI assuming all remaining obligations of the Settlement.

## E. FAILURE TO GAIN PLAN ACCEPTANCE

2. In the event, Stream's Plan of Reorganization is not approved, then Section I(A)(1), Section I(A)(2)(d), and Section I(D) shall continue in full force and effect but the remaining terms shall revert to the original Settlement terms unless the Settlement and the Settlement Agreement are transferred to VSI pursuant to Section I(D).

[ THE REST OF THIS PAGE LEFT INTENTIONALLY BLANK ]

SA20230811 - Page - 2                                    Stream Parties _____ / Rembrandt _____

The parties acknowledge their assent to the terms of this Amendment by affixing their signatures below.

Accepted and agreed by Stream:

Mathu Rajan
CEO
Stream TV Networks, Inc.

August 12, 2023

Accepted and agreed by Rembrandt:

Stephen Blumenthal
President/CEO
Rembrandt 3D Holding LTD

August 12, 2023

Accepted and agreed by Mathu Rajan:

Mathu Rajan

August 12, 2023

Accepted and agreed by Raja Rajan:

Raja Rajan

August 12, 2023

Accepted and agreed by VSI:

Visual Semiconductor, Inc.

Name: Joseph Corso
Title: Under Limited Power of Attorney Nov 30, 2022

August 12, 2023

Stream Parties _____ / Rembrandt _____

# EXHIBIT I

# LICENSING COVENANT

August 14, 2023

The following represents the agreed terms of a Licensing Covenant (the "Covenant") by and between **Stream TV Networks, Inc.,** ("Stream"), a Delaware corporation, Visual Semiconductor, Inc. ("VSI") a Wyoming corporation, jointly and severally the "VSI Parties") and **Rembrandt 3D Holding LTD**, a Nevis corporation ("Rembrandt"). Each of the VSI Parties and Rembrandt are referred to herein collective as the "Parties" and each as a "Party."

**WHEREAS**, Rembrandt and Stream entered into a Settlement Agreement and Mutual Release (the "Settlement") on May 23, 2021, resolving litigation between them and conferring certain intellectual property license rights to the Stream in consideration of cash payments and certain product purchase rights granted to Rembrandt;

**WHEREAS**, Rembrandt and Stream, have agreed on a Settlement Amendment dated August 12, 2023;

**WHEREAS**, As a shareholder of Stream, VSI has been making certain payments on behalf of Stream for more than a year;

**WHEREAS**, Stream has filed for bankruptcy in the Eastern District of Pennsylvania (Case No. 23-10763); and has filed a Disclosure Statement (Docket Entry 293) on July 13, 2023 that describes plan for VSI to provide funding to Stream;

**WHEREAS**, the VSI Parties understand that the current Settlement Agreement includes a non-exclusive license from Rembrandt to Stream, the VSI Parties want the plan for reorganization to have an optimal chance of success and to ensure that it is clear that the VSI Parties will have the sole right to commercialize the technology and products developed by Stream among the lenders, creditors, and shareholders of Stream;

**WHEREAS**, the VSI Parties would like to enter into a Licensing Covenant with Rembrandt to prevent certain lenders, creditors, and shareholders of Stream attempting to commercialize the technology and products developed by Stream;

**WHEREAS**, Rembrandt is willing to agree to a Licensing Restriction in exchange for Additional Payments and right to order Additional Products; and

**WHEREAS**, the VSI Parties represent and warrant that the Philips License to Stream's subsidiary is in good standing.

**NOW THEREFORE**, the Parties agree as follows:

Stream _mith_ VSI _JC_ Rembrandt

## A. CONDITIONS PRECEDENT

1. This Licensing Covenant shall take effect immediately upon execution through September 1, 2023, but shall only become fully effective beyond September 1, 2023 when the VSI Parties provide the following:

   a. Proof of financing, including but not limited to corporate resolutions, proof of the escrow funds, or reasonable proof of funding described in the Disclosure Statement (Docket Entry 293) filed by Stream on July 13, 2023 subject to an agreement of non-disclosure and non-circumvention by Rembrandt (sensitive documents to be shared with Rembrandt on an attorneys eyes only basis);

   b. Payment of the first Additional Payment within the first to occur of: 1) 5 business days of funding of VSI, or 2) September 1, 2023;

## B. LICENSE RESTRICTIONS

1. Although the Parties acknowledge and agree that the license conferred to Stream by Rembrandt pursuant to the Settlement is non-exclusive, the Parties hereby confirm that Rembrandt shall NOT provide a license for its Rembrandt IP to certain competitors of Stream in exchange for the payments and terms and conditions herein.

2. Accordingly, Rembrandt hereby confirms that it shall not issue a license of any kind for its Rembrandt IP as defined in the Settlement to ANY of the following:

   a. SeeCubic, Inc. (a Delaware corporation) and any subsidiary or affiliate thereof, including but not limited to SeeCubic Limited (a private limited company formed in the United Kingdom) and SeeCubic India Pvt Ltd.

   b. Hawk Investment Holdings Limited and any subsidiary or affiliate thereof

   c. Shadron L. Stastney

   d. SLS Holdings VI, LLC or any other SLS Holdings company

   e. Arthur Leonard Robert Morton

   f. Alastair Crawford

   g. Any entity to which Shadron L. Stastney, Arthur Leonard Robert Morton, or Alastair Crawford are associated. Such association shall include any and all roles, including but not limited to corporate officer, board director, employee, consultant, advisor, investor, or customer.

   h. Any current or former subsidiary of Stream.

## C. ADDITIONAL PAYMENTS

1. The VSI Parties agree to pay Rembrandt a total payment of Three Million Six Hundred Thousand Dollars (USD $3,600,000.00) (the "Additional Payments") payable in one installment of One Million Five Hundred Thousand Dollars (USD $1,500,000) within seven (7) days of plan approval in the pending Stream bankruptcy and another twelve installments of One Hundred Seventy-Five Thousand Dollars (USD $175,000) each with the first payment to be made on September 1, 2023, the second payment to be made on September 15, 2023, and the remaining ten payments to be paid on the 15th of each month starting October 15, 2023.

2. Warrants equal to One and One-Half Percent (1.5%) of the outstanding equity in the entity taking control of the technology and business currently held by Stream after plan execution

Stream _Mstn_ VSI _JC_ Rembrandt

post approval in the pending Stream bankruptcy wherein the exercise price and terms of the warrants are equal to the price paid for the shares in the entity immediately prior to or upon the execution of the plan.

3. The Payments are in addition to payments described in the Settlement and Settlement Amendment).

4. Once the Conditions Precedent are met, this Licensing Covenant shall take full effect and the VSI Parties shall receive the full value of the Licensing Covenant subject to all Payments under Section C(1), issuance of Warrants under C(2), and Additional Products under D(1) owed to Rembrandt upon the schedule provided herein. The VSI Parties are free to make any payment early and once all payments have been made, this Licensing Covenant becomes irrevocable.

5. If the VSI Parties fail to make any payment when due, Rembrandt shall be entitled to seek collection of any amounts owed, and the VSI Parties agree to a summary proceeding to obtain judgment in favor of Rembrandt and waive any right to contest the underlying value of this Licensing Covenant. Alternatively, Rembrandt can choose to be released from this Licensing Covenant with no obligation to return any prior payments, subject to a 30-day cure period effective upon notice to the VSI Parties (the "Cure Period"). If the covenant becomes forfeit after the Cure Period, the VSI Parties shall be liable for the missed payment owed during the Cure Period. If the VSI Parties make all 12 monthly payments but no bankruptcy plan has been approved, the covenant shall remain in full force and the VSI Parties shall have 30 days to exercise an option to make full payment of all amounts due and preserve the irrevocable covenant (the "Option Period"). The VSI Parties shall make a payment for the 30-day Option Period whether or not the option is exercised to preserve the restrictive covenant. If the option is exercised, the VSI Parties shall resume the payment schedule. If 1) the bankruptcy case is dismissed and all rights of appeal are exhausted; 2) the assets of Stream are sold; or 3) Stream exits bankruptcy voluntarily, the Option Period shall apply.

6. If VSI receives the Rembrandt license from Stream pursuant to the Settlement Amendment 1(D), VSI shall have the one-time right to assign, retaining no license for Stream/VSI, such acquired rights to a third-party at its sole discretion. Such assignment will accelerate all monetary and equity payments under the Settlement, Settlement Amendment, and this Licensing Covenant, but the production and equity obligations will remain the same as provided in Settlement, Settlement Amendment, and this Licensing Covenant.

## D. ADDITIONAL PRODUCTS

1. The VSI Parties agree that Rembrandt may order an additional Nine Hundred Eighty-Five Thousand (985,000) 65" 8K 3DASD units at cost, subject to the same monthly limitations described in Section I(B) of the Settlement Amendment.

2. The Products are in addition to the products described in the Settlement and Settlement Amendment) and this increases the total number of "at-cost" units provided by Stream to Rembrandt to Four Million (4,000,000) total.

3. The Parties agree that if Stream is making standard products other than 65" 8K 3DASD, Rembrandt may substitute units for those other units proportionally to the costs of the respective units. For example, if a 65" 8K 3DASD unit has an at cost price of $1,000 and Stream is making a tablet with an at cost price of $200, Rembrandt may exchange 1 unit

SA20230814 - Page - 3

Stream _Matth_ VSI _JC_ Rembrandt

of a 65" 8K 3DASD for 5 units of tablets. However, such exchanges shall require at least three (3) months prior notice and may not exceed more than Fifteen Percent (15%) of the production capacity for the unit being exchanged.

The parties acknowledge their agreement to the terms of this Settlement Amendment by affixing their signatures below.

Accepted and agreed by Stream:

Mathu Rajan
CEO
Stream TV Networks, Inc.

August 14, 2023

Accepted and agreed by Rembrandt:

Stephen Blumenthal
President/CEO
Rembrandt 3D Holding LTD

August 14, 2023

Accepted and agreed by VSI:

Visual Semiconductor, Inc.

Name: _Joseph Corso_
Title: _Under Limited Power of Attorney   Nov 30, 2022_

August 14, 2023

# EXHIBIT J

**bud@streamacquisitiongroup.com**

| | |
|---|---|
| **From:** | William Homony <bhomony@mctllp.com> |
| **Sent:** | Tuesday, September 10, 2024 4:01 PM |
| **To:** | bud@streamacquisitiongroup.com |
| **Cc:** | 'Nicole Maneen'; 'Suby Joseph' |
| **Subject:** | RE: Philips - breach of contract |
| **Attachments:** | RRF_71646_Jan2024_Mar2024_20240331_214522.xlsx; RRF_71646_Apr2024_Jun2024_ 20240630_214516 (version 1)_.xlsx |

Bud, the TRO is no longer in effect.  I settled that issue.

During Q1 no displays were delivered. As a result, the reporting is empty.
During Q2 two (2) 12.3-inch display demonstrators were delivered to a customer.

Please have Suby submit the appropriate reports through the Philips portal.  Once the reporting is remitted, I will be adding myself as the primary licensee contact in the database.

Regards,

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

---

**From:** bud@streamacquisitiongroup.com [mailto:bud@streamacquisitiongroup.com]
**Sent:** Tuesday, September 10, 2024 6:04 PM
**To:** William Homony <bhomony@mctllp.com>
**Cc:** 'Nicole Maneen' <nicole@streamacquisitiongroup.com>; 'Suby Joseph' <suby@streamacquisitiongroup.com>
**Subject:** RE: Philips - breach of contract

Dear Bill,

As you know, the Ultra-D technology of Stream TV Networks is founded on technology licensed from Royal Philips in the Netherlands. The Philips licensee is not Stream, but one of its non-debtor subsidiaries: Ultra-D Ventures C.V. in Curacao. Suby Joseph has historically submitted all required royalty reports to Philips via the Philips online licensee portal, except during the period when SeeCubic, Inc. exercised control of Ultra-D Ventures following the issuance of the improvident Chancery Court injunction on December 8, 2020 until the Delaware Supreme Court reversal on June 15, 2022. As a Stream contract employee, Suby is the primary licensee contact in the Philips database, which is why they routinely contact him regarding licensee obligations.

Out of respect for your position as chapter 11 trustee of Stream as the parent company of Ultra-D Ventures, Mathu Rajan (director and CEO of Ultra-D Ventures), Suby, and other Stream contract employees have refrained from any outreach to Philips. We have done so with the expectation that you would collect accurate sales information from Stream's subsidiary SeeCubic B.V. – the only entity having sold units since 2022 – and submit timely royalty reports to Philips via the online portal (or work with Suby to have them filed at your direction). In fact, Suby sent multiple reminders to you so he could fulfill this critical obligation. Despite these reminders, no royalty reports

1

have been filed for Q1 2024 (due April 30, 2024) and Q2 2024 (due July 30, 2024). As a result, Philips has now issued the attached breach of contract notice.

Accurate sales information required for the Philips royalty reporting can only be provided by SeeCubic B.V., which is currently under the direction of Shad Stastney. You are aware of this, as you obtained such information for Q4 2023 on January 29, 2024 – just in time to provide it to Suby for posting in the Philips licensee portal as required per contract. Either Mr. Stastney has refused to provide such information for the first two quarters of 2024, or you have not yet requested it. Regardless, Ultra-D Ventures is in breach, and Stream faces irreparable harm if the license is terminated.

It is of particular significance that SeeCubic B.V. has been enjoined by TRO since January 4, 2024 and SHOULD, therefore, have no sales to report. However, the royalty report MUST be accurate. If SeeCubic B.V. has, in fact, sold any units (even demonstrator samples), those sales must be reported to Philips. The license fees for such sales are minimal, as you saw from the Philips Q4 2023 invoice. Termination of the license becomes much more likely if a fraudulent royalty report is filed. It is up to you to obtain true and accurate sales data and authorize the royalty reporting immediately.

If the lack of reporting is not corrected immediately, Philips will be within its right to terminate the license for breach of contract. If that happens, the foundation of the glasses-free technology you have been tasked with protecting will be pulled out from under Stream and every potential buyer, leaving only technology enhancements that nobody will be legally allowed to use without obtaining a new license from Philips. And, since Philips has now sold its 3D patent portfolio to a third party – a fact disclosed in bankruptcy court testimony last year – Philips no longer has the power to grant a new license if the old one is terminated.

I can't stress enough the importance of getting the Q1 and Q2 royalty reports filed asap, with ACCURATE sales information that will not be disproven if Philips requests an audit. The Q3 report will be due by the end of October, so you should be prepared to gather sales data from SeeCubic B.V. in about 3 weeks to file that report as well. Suby can submit royalty reports on your behalf or enable you to file them directly; that is not the issue. The issue is preventing cancelation of the license, a disastrous consequence you certainly want to avoid under your watch.

Best regards,

Bud Robertson
Stream TV Networks, Inc.

---

**From:** Suby Joseph <suby@streamacquisitiongroup.com>
**Sent:** Monday, September 9, 2024 12:04 PM
**To:** William Homony <bhomony@mctllp.com>
**Cc:** Bud <bud@streamacquisitiongroup.com>; 'Nicole Maneen' <nicole@streamacquisitiongroup.com>
**Subject:** Re: Philips - breach of contract

Hi Bill

I do not have a direct communication with Philips. And to my knowledge, nobody else within Stream is has been communicating with Philips for quite some time.

Way back, Philips provided the login access linked to my email ID at their license portal to submit the information sought per the license agreement. We collate this information and submit it on the portal and Philips generates the invoice and emails it to us. **The earlier emails I sent you last week has the email ID of the maildrop from where the invoices were sent.** It also includes the link to the license portal. You can communicate with them directly, but the information still must be input into the license portal. The Philips' alerts are generated automatically including the notice of breach.

We had requested the same information in January this year, which you did provide on 1/29/24. We submitted this information on the license portal for which Philips raised an invoice which was sent to you by Nicole on 1/30/24, and you processed the payment on 3/4/24.

Thanks
S

**From:** William Homony <bhomony@mctllp.com>
**Date:** Monday, September 9, 2024 at 1:10 PM
**To:** Suby Joseph <suby@streamacquisitiongroup.com>
**Cc:** Bud <bud@streamacquisitiongroup.com>, 'Nicole Maneen' <nicole@streamacquisitiongroup.com>
**Subject:** RE: Philips - breach of contract

Suby, you and any other party not specifically authorized by myself are prohibited from communicating directly with Philips.  Please provide me with Philipps primary contact with respect to the license.

Thank you,
Bill

**William A. Homony, CIRA**
**Miller Coffey Tate LLP**
**1628 John F. Kennedy Boulevard**
**Suite 950**
**Philadelphia, PA 19103**
**p (215) 561-0950 ext. 26**
**f (215) 561-0330**

**From:** Suby Joseph [mailto:suby@streamacquisitiongroup.com]
**Sent:** Monday, September 09, 2024 12:50 PM
**To:** William Homony <bhomony@mctllp.com>
**Cc:** Bud <bud@streamacquisitiongroup.com>; 'Nicole Maneen' <nicole@streamacquisitiongroup.com>
**Subject:** Philips - breach of contract

You don't often get email from suby@streamacquisitiongroup.com. Learn why this is important
Hi Bill

I sent you 2 emails trying to get the information regarding the number of products, prototypes and /or samples that were produced in Q1 and Q2 of 2024. I have not heard back from you. Philips has informed us about the breach of contract and want this cured immediately. Please provide the accurate information by 5ppm ET Tuesday 9/10/24. In addition to providing the information, please make sure it is accurate. If Philips understand that there are inaccuracies later, it could be grounds for termination of the Philips license. As you know, Seecubic, Inc and Seecubic BV are under a TRO, I am sure it is discomforting to admit samples were made, but we must provide this information under contract as required. If the Philips license is cancelled, the asset value is going to zero.

Thanks
Suby Joseph